## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.Ş., and KAPTAN DEMIR CELIK ENDÜSTRISI VE TICARET A.Ş., | **NON-CONFIDENTIAL VERSION** |
| *Plaintiffs*, | Court No. 21-00306 |
| v. | Business Proprietary (Confidential) Information Deleted from Pages 17, 18, 20, 21. |
| THE UNITED STATES, | |
| *Defendant*. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

Matthew M Nolan
Leah N. Scarpelli

Arent Fox, LLP
1717 K Street, NW
Washington, DC 20006

October 15, 2021

# TABLE OF CONTENTS

**Page**

I.   STATEMENT PURSUANT TO RULE 56.2(C)(1) ......................................................... 1

    A.   Administrative Record To Be Reviewed ................................................. 1

    B.   Issues Presented And Summary Of Argument ....................................... 2

II.   STATEMENT OF FACTS ............................................................................. 4

III.   STANDARD OF REVIEW .......................................................................... 7

IV.   ARGUMENT ............................................................................................. 8

    A.   Icdas Is Entitled To A Full Duty Drawback Adjustment To U.S. Price ............... 8

        1.   The Turkish Drawback Program Satisfies Commerce's Criteria For Adjustment ............................................................................... 8

        2.   An IPC Is "Closed" When Imports And Exports Under That IPC Are Completed ........................................................................... 11

        3.   Icdas Completed All Imports And Exports Under The Inward Processing Certificates .............................................................. 15

        4.   Commerce Should Have Accepted Documentation Submitted By Icdas ........................................................................................ 20

    B.   Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price .............................................................................. 23

        1.   The Statute Does Not Contemplate Adjustments For "Special" Tariffs ...................................................................................... 24

        2.   The Section 232 Tariffs On Steel Imports Are "Special" Tariffs ........... 27

            a.   Section 232 Tariffs Are Remedial .............................................. 28

            b.   Section 232 Tariffs Are Temporary ............................................. 32

            c.   Section 232 Tariffs Were Implemented Under Congress's Specific Delegation of Authority to the Executive ..................... 35

        3.   There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy ........................................................ 37

    C.   Any Deduction Should Be Limited to the 25 Percent Tariffs Assessed Pursuant to Presidential *Proclamation 9705* .......................................... 40

    D.   There Was High Inflation In Turkey During The POR Necessitating Use Of Commerce's Special Methodology .................................................. 41

V.   PRAYER FOR RELIEF ............................................................................. 43

AFDOCS/24821064.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States,*
988 F.Supp.584 (Ct. of Int'l Trade 1997) ...............................................37

*Am. Inst. for Int'l Steel, Inc. v. United States,*
376 F.Supp.3d 1335 (Ct. Int'l Trade 2019) ............................................31

*ArcelorMittal USA Inc. v. United States,*
32 CIT 440 (2008) ......................................................................................9

*Asociacion Colombiana de Exportadores de Flores v. United States,*
6 F.Supp.2d 865 (1998) ..............................................................................8

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States,*
494 F.Supp.3d 1365 (Ct. Int'l Trade 2021) ................................... *passim*

*Chang Tieh Indus. v. United States,*
840 F.Supp.141 (Ct. Int'l Trade 1993) ..........................................11, 21

*Chevron. Union Steel v. United States,*
713 F.3d 1101 (Fed. Cir. 2013).................................................................7

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984)....................................................................................7

*Consol. Edison Co. v. NLRB,*
305 U.S. 197 (1938).....................................................................................7

*DuPont Teijin Films USA, LP v. United States,*
407 F.3d 1211 (Fed. Cir. 2005)..................................................................7

*Eregli Demir ve Celik Fabrikalari T.A.S v. United States,*
357 F.Supp.3d 1325 (Ct. Int'l Trade 2018) .............................................9

*Forest Lab'ys, Inc. v. United States,*
403 F.Supp.2d 1348 (Ct. Int'l Trade 2005), *aff'd,* 476 F.3d 877 (Fed. Cir.
2007) ...........................................................................................................35

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States,*
361 F.Supp.3d 1314 (Ct. Int'l Trade 2019) .............................................9

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States,*
429 F.Supp.3d 1353 (Ct. Int'l Trade 2020) .................................9, 10, 15

AFDOCS/24821064.1

*Jinko Solar Co. v. United States*,
  229 F.Supp.3d 1333 (Ct. Int'l Trade 2017), *aff'd*, 961 F.3d 1177 (Fed. Cir.
  2020) ............................................................................................................19, 20

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006).....................................................................7

*NMB Sing. Ltd. v. United States*,
  557 F.3d 1316 (Fed. Cir. 2009).................................................................14, 27

*Rhone Poulenc, Inc. v. United States*,
  899 F.2d 1185 (Fed. Cir. 1990) ...................................................................39

*Rhone-Poulenc, Inc. v. United States*,
  20 CIT 573, 927 F.Supp. 451 (1996) ...........................................................7

*Saha Thai Steel Pipe (Pub.) Co. v. United States*,
  635 F.3d 1335 (Fed. Cir. 2011).............................................................8, 9, 15

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*,
  384 F.Supp.3d 1321, 1325-26 (Ct. Int'l Trade 2018) .................................14

*Transpacific Steel LLC v. United States*,
  4 F.4th 1306 (Fed. Cir. 2021) .............................................................33, 40, 41

*Transpacific Steel LLC v. United States*,
  466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020), *rev'd and remanded*, 4 F.4th
  1306 (Fed. Cir. 2021)..................................................................................40

*Viraj Grp., Ltd. v. United States*,
  162 F.Supp.2d 656 (Ct. Int'l Trade 2001) ...................................................43

*Wheatland Tube Co. v. United States*,
  495 F.3d 1355 (Fed. Cir. 2007).......................................................... *passim*

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................7

19 U.S.C. § 1673 ...............................................................................................24

19 U.S.C. § 1675 ...............................................................................................4

19 U.S.C. § 1675(a)(1).......................................................................................4

19 U.S.C. § 1677(7)(C)......................................................................................29

19 U.S.C. § 1677a(c)(1)(B)......................................................................8, 11, 44

19 U.S.C. § 1677a(c)(2)(A) ............................................................................ *passim*

19 U.S.C. § 1677b(f)(1)(A) .............................................................. 4, 41, 43

19 U.S.C. § 1862 .......................................................................................... 35

19 U.S.C. § 1862(b)(1)(A) ............................................................................ 28

19 U.S.C. § 1862(c) ...................................................................................... 36

19 U.S.C. § 1862(c)(1)(A)(ii) ...................................................................... 32

19 U.S.C. § 1862(c)(1)(A)(ii), (b)(3)(A) .................................................... 36

19 U.S.C. § 1862(d) ................................................................................ 29, 36

19 U.S.C. §§ 1862(d), 1677(7)(C), 2251(a) ................................................ 29

19 U.S.C. §§ 2251, 1671, 1673, 1862 ........................................................ 29

19 U.S.C. §§ 2251-2252, 1673, 1671 ........................................................ 30

19 U.S.C. § 2251(a) ...................................................................................... 29

**Regulations**

19 C.F.R. § 351.213 ........................................................................................ 4

**Administrative Determinations**

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716
(Dep't Commerce Oct. 19, 2006) ............................................................ 9

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 31295
(Dep't Commerce July. 1, 2019) .............................................................. 4

*Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea: Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 18404
(Dep't Commerce Apr. 15, 1997) ............................................................ 24

*Certain Corrosion Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Preliminary Results of the Antidumping Duty Administrative Review*, 74 Fed. Reg. 46110
(Dep't Commerce Sept. 8, 2009) ............................................................ 43

-iv-

*Certain Oil Country Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part,* 79 Fed. Reg. 41971 (Dep't Commerce July 18, 2014)...............................................................10, 13, 18

*Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System,* Inv. No. 332-131, USITC Pub. 1400 (June 1983) ....................................................34

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016).......................................................................12

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47242, 47250-51 (Dep't Commerce Sept. 9, 2019) .........................................................................4

*Light-Walled Rectangular Pipe and Tube From Turkey: Notice of Final Determination of Sales at Less Than Fair Value*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004) ......................................................................9

*Light-Walled Rectangular Pipe and Tube from Turkey: Preliminary Results; 2018-2019,* 85 Fed. Reg. 44861 (Dep't Commerce Jul. 24, 2020).......................................................................41, 43

*Procedures To Consider Additional Requests for Exclusion of Particular Products From the Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (USTR Feb. 14, 2018)...........................................................................34

*Proclamation 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) .........................................3, 31, 33, 40

*Proclamation 9711 of March 22, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13361 (Mar. 28, 2018) .................................................33

*Proclamation 9740 of April 30, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20683 (May 7, 2018)..................................................33, 34, 36

*Proclamation 9759 of May 31, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857 (June 5, 2018)...........................................................33

*Proclamation 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018).........................................3, 40, 41, 44

*Proclamation 9886 of May 16, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23421 (May 21, 2019)..............................................................40

*Proclamation 9894 of May 19, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23, 2019)..............................................................33

*Proclamation 9980 of January 24, 2020: Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020) ...................................................................................33

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020)..............23, 30, 31, 38

*Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106 (Dep't Commerce Mar. 19, 2018)..........................................................................32

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19153 (Dep't Commerce Apr. 12, 2004) ........................................................24, 25, 28, 37

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021)................................................................... *passim*

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No-Shipments; 2018-2019*, 85 Fed. Reg. 74983 (Dep't Commerce Nov. 24, 2020) ...............................................................5, 6, 22

*Steel Concrete Reinforcing Bar From Turkey: Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 79 Fed. Reg. 54965 (Dep't Commerce Sept. 15, 2014) ................................................................. *passim*

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum*, 83 Fed. Reg. 46026 (Dep't Commerce Sept. 11, 2018) ...............................................................32, 34

*Welded Line Pipe From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 61362 (Dep't Commerce October 13, 2015) ........................................................10, 13, 18

AFDOCS/24821064.1

**Other Authorities**

Memorandum from A. Maldonado to The File, re: Verification of the Sales
    Response of Toscelik Profil ve Sac Endustrisi A.S. (Toscelik Profil) and
    Tosyali Dis Ticaret A.S. (Tosyali) (collectively, Toscelik) in the
    Antidumping Duty Investigation of Welded Line Pipe from Turkey (Jul. 16,
    2015) ................................................................................................................12, 15, 18, 19

Memorandum from B. Hansen to The File, re: Verification of the Sales Response
    of Çayirova Boru Sanayi
    ve Ticaret A.Ş. and Yücel Boru Ithalat-Ihracat ve Pazarlama A.Ş., Ltd., in the
    Less-Than-Fair-Value Investigation of Certain Oil Country Tubular Goods
    from the Republic of Turkey (Mar. 31, 2014) ............................................................19

Memorandum from C. Showers to P. Lee Smith, re: Issues and Decision
    Memorandum for the Final Normal Value Calculations to be Effective from
    Release of the Final Normal Values through June 30, 2019, under the
    Agreement Suspending the Antidumping Duty Investigation on Certain Oil
    Country Tubular Goods from Ukraine (Feb. 15, 2019) .............................................27

Memorandum from J. Lawska and G. McMahon to The File, re: Verification of
    the Sales Response of Icdas in the 2012-13 Investigation of Steel Concrete
    Reinforcing Bar from Turkey (Jun. 27, 2014) ..........................................................19

AFDOCS/24821064.1

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.Ş., and KAPTAN DEMIR CELIK ENDÜSTRISI VE TICARET A.Ş., | **NON-CONFIDENTIAL VERSION** |
| Plaintiffs, | Court No. 21-00306 |
| v. | Business Proprietary (Confidential) Information Deleted from Pages 17, 18, 20, and 21. |
| THE UNITED STATES, | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Pursuant to the Court's Order dated August 16, 2021, ECF No. 24, Plaintiffs Icdas Celik Enerji Tersane ve Ulasim Sanayi A.Ş. ("Icdas") and Kaptan Demir Celik Endüstrisi ve Ticaret A.Ş. ("Kaptan") (collectively, "Plaintiffs"), foreign manufacturers and exporters of steel concrete reinforcing bar ("rebar") from Turkey, hereby submits this memorandum of points and authorities in support of its motion for judgment on the agency record challenging the final affirmative determination as set forth below.

## I.    STATEMENT PURSUANT TO RULE 56.2(C)(1)

### A.    Administrative Record To Be Reviewed

This is an appeal from the final results of the antidumping duty administrative review of Steel Concrete Reinforcing Bar From the Republic of Turkey ("*Rebar from Turkey*"). The period of review ("POR") is July 1, 2018 through June 30, 2019. Commerce's final antidumping duty determination was published in the *Federal Register* on May 27, 2021. *Steel Concrete*

1

*Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019,* 86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021) ("*Final AD Results*"), P.R. 169.[1] Commerce's factual and legal conclusions underlying the *Final AD Results* are set forth in its Issues and Decision Memorandum. Memorandum from J. Maeder to C. March, re: Issues and Decision Memorandum for the Final Results of the 2018-2019 Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Turkey (May 21, 2021) ("*Final I&D Memo*"), P.R. 159.

### B.   Issues Presented And Summary Of Argument

Plaintiffs raise the following three issues in this brief:

1.      Whether Commerce's decision to deny Plaintiffs' claimed duty drawback adjustment on the basis that its inward processing certificates ("IPCs") were not "closed" is contrary to law and unsupported by substantial evidence on the record. Plaintiffs have demonstrated that they qualify for a full duty drawback adjustment because all imports and exports under the IPCs had been completed and Plaintiffs were no longer permitted by the Government of Turkey ("GOT") to add import or export information. Accordingly, Commerce should have accepted information related to Plaintiffs' closed IPCs and increased Plaintiffs' U.S. prices by a duty drawback ratio.

2.      Whether Commerce's determination to deduct Section 232[2] tariffs paid from the price of Plaintiffs' U.S. sales is contrary to law and unsupported by substantial evidence on the record. Section 232 tariffs are remedial and temporary "special" tariffs imposed pursuant to a

---

[1] The Public and BPI Administrative Record Index was filed August 9, 2021, ECF No. 22. All public record citations to the record are designated as "P.R." and confidential record citations are designated as "C.R.".

[2] Trade Expansion Act of 1962 § 232 ("Section 232").

specific congressional delegation of tariff making authority to the executive branch, rather than "ordinary" United States import duties within the meaning of the antidumping statute. As such, Commerce's deduction of these special Section 232 tariffs from Plaintiffs' U.S. price results in a double remedy and artificially inflates the dumping margin calculated for Plaintiff.

3.      Whether Commerce's deduction of 50 percent tariffs assessed under Presidential *Proclamation 9772*, rather than the 25 percent tariffs assessed pursuant to Presidential *Proclamation 9705*, is contrary to law and unsupported by substantial evidence on the record. *See Proclamation 9772 of August 10, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40429 (Aug. 15, 2018) ("*Proclamation 9772*"); *Proclamation 9705 of March 8, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) ("*Proclamation 9705*"). The additional tariffs applicable to Turkey alone are uniquely temporary and remedial such that they should be treated as "special" tariffs, rather than ordinary U.S. import duties. The legality of these tariffs is also still be considered by the reviewing courts. As such, these remedial and temporary "special" tariffs imposed on Turkish imports should not be deducted from Plaintiffs' U.S. price in Commerce's dumping calculation.

4.      Whether Turkey experienced inflation exceeding 25 percent during the POR necessitating a statutorily mandated adjustment to Commerce's standard cost calculation methodology to compare U.S. sales prices to normal values based on either home market sale prices or the inflation adjusted cost of production for the same month. Commerce's determination that Turkey did not experience high inflation during the POR was improperly based on an 11-month period rather than the 12-month annualized rate. Official Turkish government statistics demonstrate that annualized inflation for the 12-month period covering the POR exceeded 25 percent, which is the threshold for making a hyperinflation adjustment to costs

3

to ensure that Commerce's calculations "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A).

## II.   <u>STATEMENT OF FACTS</u>

On July 1, 2019, Commerce published a notice of opportunity to request an administrative review of the antidumping order on rebar from Turkey covering the period of July 1, 2018 through June 30, 2019. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review*, 84 Fed. Reg. 31295 (Dep't Commerce July. 1, 2019). Commerce subsequently published a notice of initiation of an administrative review of the antidumping order on Rebar from Turkey on September 9, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47242, 47250-51, (Dep't Commerce Sept. 9, 2019). Commerce initiated the review pursuant to Section 751(a)(1) of the Act, as amended, 19 U.S.C. § 1675(a)(1), and 19 C.F.R. § 351.213. Commerce initiated the review pursuant to Section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675.

Plaintiffs were selected as mandatory respondents in Commerce's review and participated throughout the proceeding through the filing of questionnaire responses and supplemental questionnaire responses, and the submission of legal arguments. *See* Icdas's Section A Questionnaire Response (Mar. 23, 2020)P.R. 42; Kaptan's Section A Questionnaire Response (Mar. 23, 2020) P.R. 45; Icdas's Section B Questionnaire Response (Apr. 15, 2020), P.R. 55; Icdas's Section C Questionnaire Response (Apr. 15, 2020) ("Icdas Sec. C Resp."), P.R. 56; Kaptan's Section B Questionnaire Response (Apr. 15, 2020), P.R. 57; Kaptan's Section C Questionnaire Response (Apr. 15, 2020) ("Kaptan Sec. C Resp."), P.R. 58; Icdas's Section D Questionnaire Response (Apr. 20, 2020) ("Icdas Sec. D Resp."), P.R. 59; Kaptan's Section D

4

Questionnaire Response (Apr. 20, 2020) ("Kaptan Sec. D Resp."), P.R. 60-61; Icdas's

Supplemental Sections A-D Questionnaire Response (Aug. 17, 2020) ("Icdas 1st Supp. Resp."),

P.R. 83-86; Icdas's Second Supplemental Questionnaire Response (Oct. 8, 2020) ("Icdas 2nd

Supp. Resp."), P.R. 98; Kaptan's Supplemental Sections A-D Questionnaire Response (Aug. 10.

2020), P.R. 82; Kaptan's 2nd Supplemental Sections A-D Questionnaire Response (Oct. 20,

2020), P.R. 105; Kaptan's 3rd Supplemental Sections A-D Questionnaire Response (Oct. 28,

2020), P.R. 110. On March 6, 2020, both Plaintiffs notified Commerce that the annual inflation

rate was in excess of 25 percent during the POR. *See* Icdas and Kaptan Notice of Inflation Rate

Above 25 Percent (March 6, 2020), P.R. 37. On September 17, 2020, Icdas submitted factual

information to update its Section C questionnaire response of April 15, 2020 by providing

additional information related to duty drawback, which was rejected by Commerce. *See* Icdas's

Submission of Factual Information (Sept. 17, 2020), P.R. 88.

On November 24, 2020, the Department issued its preliminary results in which it

assigned Icdas a weighted average dumping margin of 19.10 percent and Kaptan a weighted

average dumping margin of 11.8 percent. *Steel Concrete Reinforcing Bar From the Republic of*

*Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary*

*Determination of No-Shipments; 2018-2019*, 85 Fed. Reg. 74983, 74984 (Dep't Commerce Nov.

24, 2020) ("Preliminary Results"), P.R. 127. Commerce's factual and legal conclusions

underlying its *Preliminary Results* are set forth in the Preliminary Results Decision

Memorandum. Memorandum from J. Maeder to J. Kessler, re: Decision Memorandum for

Preliminary Results of the Antidumping Administrative Review: Steel Concrete Reinforcing Bar

From the Republic of Turkey; 2018-2019 (Nov. 17, 2020) ("*Prelim. Decision Memo*"), P.R. 114.

In the *Preliminary Results*, Commerce denied the duty drawback adjustment claimed by Icdas because there was not sufficient evidence that the Inward Processing Certificates ("IPCs") had been formally closed by the Government of Turkey ("GOT"). *Id.* at 15, P.R. 127. Commerce also determined that the additional Section 232 tariffs paid by Plaintiffs on U.S. imports should be deducted from the U.S. price as an ordinary "U.S. Customs duty," rather than special tariffs. *Id.* at 13, P.R. 127. Finally, Commerce determined that Turkey did not experience high inflation during the POR and therefore declined to make any adjustments to its standard average annual cost methodology. *Id*. at 9, P.R. 127.

On May 27, 2021, the Department published its *Final AD Results*, assigning Icdas a weighted-average dumping margin of 5.30 percent and assigning Kaptan a weighted-average dumping margin of 12.41 percent. *See Final AD Results* at 28574, P.R. 169. The challenged determinations, findings, and conclusions are set out in the accompanying *Final I&D Memo*. In the *Final AD Results*, Commerce continued to deny Icdas's claimed duty drawback adjustment on the basis that an application for closure to the GOT was not sufficient for an IPC to be considered closed, despite prior findings to the contrary. *See Final I&D Memo* at 12, 16-19, P.R. 159. Commerce also continued to find that the 25 percent and 50 percent additional Section 232 tariffs were normal U.S. import duties, rather than special tariffs, deducting them from Plaintiffs' U.S. price pursuant to section 772(c)(2)(A) of the Act." *See id.* at 26, P.R. 159. Finally, Commerce continued to find that that the inflation rate in Turkey did not reach the 25 percent threshold to warrant a change in methodology from calculating a POR annual average cost of production to a monthly indexed POR average cost of production. *Id.* at 21-23, P.R. 159.

### III.    **STANDARD OF REVIEW**

This Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotations omitted)).

When reviewing Commerce's statutory interpretations, the Court applies the two-part framework set forth in the Supreme Court's opinion in *Chevron*. *Union Steel v. United States*, 713 F.3d 1101, 1106–07 (Fed. Cir. 2013) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, (1984)). Under *Chevron*, to determine whether an agency's interpretation of the statute is entitled to deference, the court conducts a two-part test. Under the first prong of this test, the court determines whether Congress has spoken directly to the question at issue, and if it has, the court and the agency must give effect to the unambiguously expressed intent of Congress. *See id.* Where the statute is vague or silent on an issue, the court upholds Commerce's interpretation only if the interpretation is reasonable. *See id*. at 843.

This Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 20 CIT 573, 575, 927

7

F.Supp. 451, 454 (1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F.Supp.2d 865, 880 (1998).

IV.    **ARGUMENT**

    A.    **Icdas Is Entitled To A Full Duty Drawback Adjustment To U.S. Price**

In the *Final AD Results*, Commerce did not grant Icdas a duty drawback adjustment to U.S. price. Commerce's failure to grant Icdas the full duty drawback adjustment to which it was entitled is unsupported by record evidence, which demonstrates that Icdas's IPCs were closed because it was no longer permitted to add import or export information after its submission to the GOT. Moreover, Icdas submitted the formal closure documentation now required by Commerce as soon as it became available. The Court should therefore grant Icdas a full duty drawback adjustment to U.S. price.

        1.    **The Turkish Drawback Program Satisfies Commerce's Criteria For Adjustment**

The duty drawback adjustment to U.S. price is guaranteed by the statute. 19 U.S.C. § 1677a(c)(1)(B). In determining whether to grant a duty drawback adjustment to U.S. price under 19 U.S.C. § 1677a(c)(1)(B), Commerce applies a two-prong test in which the party requesting the adjustment must demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

*Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1340 (Fed. Cir. 2011) (citation omitted); *see also, Final I&D Memo* at 11-12, P.R. 159. While Commerce does "not require that the imported material be traced directly from importation through exportation," it does require that companies "meet {its} 'two-pronged' test in order for {the drawback} adjustment to be

made to U.S. price." *Id* at 11, P.R. 159. Where, as here, an importer satisfies both criteria, it has

been Commerce's longstanding policy to grant a drawback adjustment to EP and CEP for the

amount of the duty foregone, allocating the "total amount of duty drawback received across all

exports that may have incorporated the duty-paid input in question, regardless of destination."

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages,*

*Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61716, 61723 (Dep't Commerce Oct.

19, 2006).

      This methodology has been applied by Commerce in determinations addressing the

Turkish drawback system for more than 15 years and Turkey's IPR system has not changed. *See,*

*e.g., Light-Walled Rectangular Pipe and Tube From Turkey: Notice of Final Determination of*

*Sales at Less Than Fair Value*, 69 Fed. Reg. 53675 (Dep't Commerce Sept. 2, 2004), and

accompanying Issues & Decision Memorandum at 9 (Comment 1) ("The only limitation placed

on the duty drawback adjustment is that the adjustment to the U.S. price may not exceed the

amount of import duty actually paid."). Use of Commerce's two-prong test has been repeatedly

acknowledged and upheld by the reviewing courts. *See, e.g., Saha Thai*, 635 F.3d at 1340; *Icdas*

*Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F.Supp.3d 1353, 1362 (Ct. Int'l

Trade 2020); *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States*, 361

F.Supp.3d 1314, 1319 (Ct. Int'l Trade 2019) (appeal to the Federal Circuit Court of Appeals, No.

21-1066, dismissed voluntarily by Appellants on June 4, 2021); *Eregli Demir ve Celik*

*Fabrikalari T.A.S v. United States*, 357 F.Supp.3d 1325, 1329 (Ct. Int'l Trade 2018). Moreover,

any deviations from Commerce's standard methodology, including application of the two-prong

test, have been categorically rejected by the reviewing courts. *See ArcelorMittal USA Inc. v.*

*United States*, 32 CIT 440, 463 n.23 (2008) (rejecting allocation over total shipments); *see, e.g.,
Icdas*, 429 F.Supp.3d at 1364 (rejecting allocation over total production).

During the POR, Icdas utilized the same drawback program considered by Commerce in
previous administrative reviews involving Turkey – the Inward Processing Regime ("IPR"). *See*
Icdas Sec. C Resp. at C-38 and Exh. C-18, P.R. 56. Commerce has analyzed the Turkish IPR in
numerous cases and consistently found it to satisfy Commerce's two-prong test. *See, e.g.*, *Welded
Line Pipe From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*,
80 Fed. Reg. 61362 (Dep't Commerce October 13, 2015) ("*Welded Line Pipe from Turkey*"), and
accompanying Issues & Decision Memorandum at 7; *Steel Concrete Reinforcing Bar From
Turkey: Final Negative Determination of Sales at Less Than Fair Value and Final Determination
of Critical Circumstances*, 79 Fed. Reg. 54965 (Dep't Commerce Sept. 15, 2014) ("*Rebar from
Turkey*"), and accompanying Issues & Decision Memorandum at 15; *Certain Oil Country
Tubular Goods From the Republic of Turkey: Final Determination of Sales at Less Than Fair
Value and Affirmative Final Determination of Critical Circumstances, in Part*, 79 Fed. Reg.
41971 (Dep't Commerce July 18, 2014) ("*OCTG from Turkey*"), and accompanying Issues &
Decision Memorandum at 15.

Consistent with these previous findings, the IPR program utilized by Icdas during the
POR satisfies the first prong of Commerce's two-prong test because it specifies and restricts that
only exports that contain qualifying incorporated imported inputs may be used to claim
drawback and strictly requires that the exported product contain the imported raw material inputs
to qualify for drawback, based on a "report demonstrating the link between the exported finished
goods and imported inputs." *See* Icdas Sec. C Resp. at C-39 and Exh. C-18 at Arts. 2, 8, P.R. 56.
As detailed below, record evidence demonstrates that Icdas received drawback on its U.S.

10

exports and that there were sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise, satisfying the statutory requirements of 19 U.S.C §1677a(c)(1)(B) and the second prong of Commerce's test. *See* Icdas Sec. C Resp. at Exhs. C-19–C-21, P.R. 56.

Commerce's new requirement in this review – that an IPC not be considered closed until a respondent can provide documentation establishing its official closure by the GOT – adds a third prong to Commerce's established test and is therefore an unlawful "new hurdle to the drawback test that is not required by the statute." *Chang Tieh Indus. v. United States*, 840 F.Supp.141, 147 (Ct. Int'l Trade 1993); *Final I&D Memo* at 19, P.R. 159. Because Icdas satisfies Commerce's longstanding test for drawback eligibility, the denial of the claimed adjustment in this review is contrary to law and unsupported by the record evidence.

## 2.     An IPC Is "Closed" When Imports And Exports Under That IPC Are Completed

In the *Final AD Results*, Commerce declined to grant Icdas the duty drawback adjustment to which it was statutorily entitled under the Turkish IPR on the basis that "documentation that Icdas placed on the record does not indicate that the GOT formally closed any of the IPCs for which Icdas is claiming a duty drawback adjustment." *Final I&D Memo* at 16, P.R. 159. Specifically, Commerce found that the "copies of letters from Icdas to the GOT requesting formal closure by the GOT" did not "demonstrate that Icdas' duty liability was extinguished." *Id.* at 19, P.R. 159. Commerce's determination implies that absent "certifications from the GOT indicating that the IPCs for which Icdas claimed a duty drawback adjustment have been formally closed," a party will not qualify for a duty drawback adjustment. *Id.,* P.R. 159.

Commerce's finding is inconsistent with findings in previous cases, Court precedent, and its own definition of "closed" in this review. First, in prior instances in which Commerce has

11

considered the closure of IPCs, which are also known as DIIBs, it has defined an IPC to be closed "{f}or practical purposes . . . when the exporting company has applied to the Turkish government for closure." *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) ("*HWRP from Turkey*"), and accompanying Issues & Decision Memorandum at 28 (footnote omitted). Though Commerce attempts to distinguish its finding in *HWRP from Turkey* on the basis that an IPC may be suspended after the respondent had applied for closure, a suspension is not equivalent to a modification and there is no evidence that a company's IPC may be modified, nor that imports/ exports under the IPC may continue after it has been fulfilled, expired, or submitted for closure. *Final I&D Memo* at 16, P.R. 159.

To the contrary, when the export commitment under an IPC is filled, the participant will "close" the IPC, declaring it completed, and apply to the GOT for an official liquidation of the closure by the Turkish Government. *See* Icdas Sec. C Resp. at C-39, P.R. 56, ("Upon completion of production and exportation, ICDAS must submit a report demonstrating the link between the exported finished goods and the imported inputs."). Commerce has consistently accepted that the "'closed' date is the date the DIIB certificate expires." Memorandum from A. Maldonado to The File, re: Verification of the Sales Response of Toscelik Profil ve Sac Endustrisi A.S. (Toscelik Profil) and Tosyali Dis Ticaret A.S. (Tosyali) (collectively, Toscelik) in the Antidumping Duty Investigation of Welded Line Pipe from Turkey (A-489-822), at 17 n.13 (Jul. 16, 2015) ("*Welded Line Pipe Verification Report*"), ACCESS Barcode: 3291956-01. Though petitioners in past cases have argued that the drawback claims should be denied where "the Turkish government has not given final approval to any of the import certificates used in the calculations," Commerce has historically considered IPCs to be "closed" based on the "documents {respondents} submitted to

12

the GOT when they *closed out* the inward processing certificate." *Welded Line Pipe from Turkey*
at 5, 7 and 11 (emphasis added); *Rebar from Turkey* at 15.

For example, in *Welded Line Pipe from Turkey*, Commerce determined that IPCs were
closed when "import certificates to which the company was no longer permitted by the Turkish
government to add import or export information" were submitted, an interpretation Commerce
noted was consistent with its determination in *Steel Concrete Reinforcing Bar From Turkey*. *See
Welded Line Pipe from Turkey* at 7 (citing *Rebar from Turkey*). Indeed, Commerce extensively
examined the closure of IPCs in *Rebar from Turkey* and granted a drawback adjustment to
respondents on the basis that "{r}espondents submitted IPR certificates that were properly
matched to specific exports and closed." *Rebar from Turkey* at 17. Commerce considered an IPC
to be "closed" when respondents submitted documents to the GOT containing "a tally of the
items imported and exported" to "close out" the IPC. *Id.* at 15. Similarly, in *OCTG from Turkey*,
Commerce again examined closure of IPCs, and concluded that:

> {A}lthough neither company demonstrated final, approved duty and KKDF
> exemption amounts, because not all of the DIIBs with final import and export
> amounts had been closed and approved as of the latest DIIB information on the
> record, each respondent demonstrated that it met the requirements of the IPR via
> the DIIB documentation process, and there is nothing to indicate that they were
> not entitled to exemptions under the IPR.

*OCTG from Turkey* at 16.

Commerce has thus considered the closure of IPCs in several cases involving Turkey and
concluded each time that that final government approval of the closure of IPCs was not required
and that "there is nothing to indicate that {respondents'} were not entitled to exemptions under
the IPR" in such a circumstance. *See id.* Contrary to Commerce's claims in the *Final Results*, its
ruling is thus *not* "consistent with {its} past treatment of not-yet-closed IPCs." *Final I&D Memo*
at 19. Where, as here, Commerce has "establishe{d} a course of action . . . {it} is obliged to

13

follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009). Commerce has provided no such "reasoned analysis" in this case.

Second, this Court has also considered and found Commerce's attempts to change its policy with regard to closed IPCs to be unreasonable. Specifically, in *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, the Court considered when an IPC closes and the reasonableness of Commerce's determination to exclude IPCs that "closed" outside the POI. 348 F. Supp. 3d 1321, 1325-26 (Ct. Int'l Trade 2018). The Court noted that Commerce "has struggled to identify a reasoned basis for its POI limitation," first claiming that that the policy "might thwart potential manipulation of 'information reflected on the DIIBs prior to their closure'" then claiming that "it reasonably allows Commerce to evaluate respondents' 'actual duty liability extinguished . . . during the POI'" and "helps to make computing respondents' duty drawback 'more administrable for Commerce.'" *Id.* at 1325 (citations omitted). Because Commerce was able to verify "the usage and closure of the DIIBs on the record, including those that closed after the POI," and because the accuracy of those DIIBs "is not in question," the Court found that "Commerce's imposition of the POI limitation in this matter unreasonably undercuts its stated goals of accuracy, transparency, and predictability by ignoring verified record information." *Id.* at 1327, 1328 (citations omitted). The Court instead concluded that "{t}he one reasonable thing to do here is calculate . . . duty drawback adjustments consistent with that verified information" – including IPCs that closed after the POI. *Id.* at 1328.

Finally, in this review, Commerce defines closed IPC's as "import certificates to which the company was no longer permitted by the GOT to add import or export information." *Final I&D Memo* at 16. Commerce has recognized that, after the IPC expires or is fulfilled, Turkish

14

companies "can no longer apply additional imports or exports to the DIIB." *Welded Line Pipe Verification Report* at 17 n.13. Though Turkish Customs has three additional months from the expiration to "finalize the export quantities for each customs export declaration . . . used to close the DIIB before {a company} submits the formal application for closure to {the GOT}," the GOT may ultimately "take up to four years to formally approve the closed DIIBs." *Id.*

Having failed to eviscerate the drawback statute by modifying its calculations to allocate the adjustment over total production, rather than total exports, Commerce now attempts a new, similarly unlawful methodology to deny respondents the adjustment to which they are statutorily entitled. *See, e.g.*, *Icdas*, 429 F. Supp. 3d at 1364. The Turkish drawback system does not require the GOT to reach a decision as to closure of a given IPC within a fixed time. The four-year time lag between application for closure and a final decision from the GOT makes it an unreasonable prerequisite for granting an drawback adjustment to Icdas in this case.

### 3. Icdas Completed All Imports And Exports Under The Inward Processing Certificates

In denying Icdas's claimed duty drawback adjustment, Commerce noted that "{t}he documentation that Icdas placed on the record does not indicate that the GOT formally closed any of the IPCs for which Icdas is claiming a duty drawback adjustment." *Final I&D Memo* at 16. Commerce's finding ignores record evidence demonstrating that Icdas had "sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise" during the POR – satisfying the second prong of Commerce's two-prong test. *See Saha Thai*, 635 F.3d at 1340 (citation omitted).

The exemption from paying customs duties, VAT, and charges pursuant to the IPR drawback program in Turkey is conditional on the exportation of the products. *See* Icdas Sec. C Resp. at C-39 ("Under the IPR, failure to demonstrate that the finished goods have been exported

will result in retroactive collection of all the import customs duties and VAT, as well as fines and possible criminal penalties."), P.R. 56. To ensure that there are sufficient imports and exports, participation in the IPR involves four key steps:

(1) *Issuance of the IPC* – The participant applies online via the GOT's e-portal system to open an IPC, which automatically records the IPC with Turkish Customs. Icdas Sec. C Resp. at C-39, P.R. 56;

(2) *Use of the IPC* – Participants make imports and exports under the issued IPC, which are recorded by Turkish Customs. Icdas Sec. C Resp. at C-39 ("Customs duties are provided in the online IPR system managed by the Ministry of Trade."), P.R. 56;

(1) *Closing of the IPR* – When the import/ export allocation pursuant to an IPC is filled, the participant stops entering imports under that certificate and submits a completion report to the GOT, "closing out" the IPC. Icdas Sec. C Resp. at C-38-39, P.R. 56.

(2) *Official Liquidation of the IPC* – The IPC is formally liquidated by the GOT, sometimes after a lag of up to 4 years. *See, e.g.*, *Welded Line Pipe Verification Report* at 17, n.13.

Here, Icdas, "at the time of importation submit{ed} a letter of guarantee or pledge of money covering the total of all duties and VAT that would otherwise be paid to the Turkish Customs authorities." Icdas Sec. C Resp. at C-38, P.R. 56. Upon exportation, Icdas subsequently submitted "a report demonstrating the link between the exported finished goods and the imported inputs." *Id.* at C-39 and Exh. C-19, P.R. 56. Once the imports and exports under its IPCs were completed, Icdas applied for the closing of the IPCs to the GOT and certified that imports and exports within the scope of the IPCs had been completed. *Id.*, P.R. 56. In its responses to Commerce, Icdas provided copies of the IPCs for shipments made to the U.S. during the POR, as well as a list of the imports and exports made under each IPC, as extracted directly from the

16

GOT's online e-portal system. *Id.* at Exhs. C-19 and C-20, P.R. 56. Icdas also provided copies of its final report to the GOT certifying that imports and exports had been completed. *Id.* at Exh. C-19 (Clearance Visa of IPC Certificate), P.R. 56.

As Icdas explained, for [                    ] certificates used during the POR,[3] IPC nos. [                    ], imports and exports were completed during the POR and Icdas had applied to the GOT for their closure. *Id.*, C.R. 45-46, P.R. 56. Indeed, the translated IPCs provided to Commerce lists the expiry dates for exports and imports [

], *i.e.* before the POR ended on June 30, 2019. *Id.* at Exh. C-19 (fields 7 and 8), C.R. 56, P.R. 56. The fact that the [    ] IPCs expired before the conclusion of the POR highlights that imports and exports were not able to continue and the IPCs have been closed. *Id.,* C.R. 45-46, P.R. 56.

Moreover, the weighted average closing ratio for IPC nos. [                    ] is [        ], further confirming that Icdas has fulfilled its liabilities under the IPR by conservatively exporting more than was required. *See id.* at Exh. C-21, C.R. 58, P.R. 56. Even if the GOT excludes a portion of Icdas's exports pursuant to the liquidation process, which it has never done and is thus extremely unlikely, Icdas would still meet the criteria for closure under [        ] IPCs due to the [                    ]. *Id.,* C.R. 45-46 and 58, P.R. 56. So even assuming, as Commerce does, that Icdas's import-export ratio is subject to change, which it is not, the realized export margin comfortably exceeds the reported yield ratios, ensuring that Icdas still satisfies Commerce's criteria for a drawback adjustment.

---

[3] Imports and exports under the [                    ], were not completed during the POR. For this IPC, Icdas calculated the estimated quantity of exports that will have been made under IPC [        ] when it is fulfilled. Icdas Sec. C Resp. at C-40 and Exh. C-21, Icdas Sec. C Resp. at C-38, C.R. 45-46 and 58, P.R. 56.

AFDOCS/24821064.1

Though the imports and exports under IPC nos. [                              ] have been completed and Icdas has closed the expired IPCs by submitting the completion report to the GOT, it is still awaiting final liquidation from the GOT. *Id.* at C-39, C.R. 45-46, P.R. 56. In other words, Icdas has completed steps 1-3 above, but is still waiting official liquidation of the IPC from the GOT, a process that Commerce has acknowledged may take several years. *See Welded Line Pipe Verification Report* at 17, n. 13. Icdas has thus demonstrated that the [    ] IPCs are closed for practical purposes in that the permissible volume of imports and exports under the IPCs have been completed and the IPCs are now expired. *See* Icdas Sec. C Resp. at Exh. C-19-C-20, C.R. 56-57, P.R. 56. There is no evidence that Icdas has ever been denied final IPC closure where, as here, imports/exports under an IPC were fully satisfied, nor reason to question the reliability of import and export data under the control of Turkish Customs.

The combined import and export data provided for each IPC is extracted directly from the GOT e-portal system, which is "a complete, detailed, and fully integrated electronic filing and approval system" specifically designed to "ensure transparent, neutral, and objective criteria to measure all IPC transactions." *Id.* at C-41 and Exh. C-20, C.R. 45-46 and 57, P.R. 56. Commerce has consistently found that the structure of an IPC is sufficient to ensure that participants satisfy Commerce's two-prong test – all IPC usage data is entered automatically from entry and exit documentation finalized by Turkish Customs and outside the control of participants, who can only download the data, not change it. *See Welded Line Pipe from Turkey* at 7, 11; *Rebar from Turkey* at 13-17; *OCTG from Turkey* at 16. The imports and exports in the IPCs reflect the *actual* imports and exports by Icdas, as formalized by Turkish Customs. The transactions are updated "in detail on an ongoing basis," and the download of IPCs is fully verifiable; Commerce has, in

18

fact, verified it many times. *Id.* at C-41, C.R. 45-46, P.R. 56; *see, e.g.*, *Welded Line Pipe Verification Report* at 17.

In prior cases, Commerce has accepted evidence of "closure" similar to that submitted by Icdas for purposes of granting respondents' claimed drawback adjustment. For example, in *Rebar from Turkey*, Commerce obtained screen shots of from the "Turkish Customs on-line database" to confirm that the "inward processing certificates used during the POI by {respondent} {we}re closed." Memorandum from J. Lawska and G. McMahon to The File, re: Verification of the Sales Response of Icdas in the 2012-13 Investigation of Steel Concrete Reinforcing Bar from Turkey (Jun. 27, 2014) at 22, ACCESS Barcode 3212338-01. At verification in *OCTG*, Commerce similarly noted that Turkish "customs updates the actual quantities and percentages of each tariff number category, tracks the 'fulfillment' of the original projected quantity for each tariff number category" which enables respondents and Commerce "to view 'snap shots' of the DIIBs fulfillment status to ensure it is on track for the import-to-export requirements to claim exemption on claimed imported goods." Memorandum from B. Hansen to The File, re: Verification of the Sales Response of Çayirova Boru Sanayi ve Ticaret A.Ş. and Yücel Boru Ithalat-Ihracat ve Pazarlama A.Ş., Ltd., in the Less-Than-Fair-Value Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey (A-489-816) (Mar. 31, 2014) at 13, ACCESS Barcode 3193110-01.

Though Icdas was not afforded the same opportunity for on-site verification due to travel restrictions resulting from the COVID-19 pandemic,[4] it provided similar fulfilment

---

[4] As the CIT has affirmed, physical meetings between company and Commerce officials enable Commerce to make "credibility determinations in person during the verification procedure," which frequently support "Commerce's determination to accept the new information provided," such as the IPCs at issue here. *See, e.g.*, *Jinko Solar Co. v. United States*, 229 F.Supp.3d 1333,

documentation from Turkish customs demonstrating that imports and exports under IPC nos.

[                                    ] have been completed (and in fact exceeded). *See* Icdas Sec. C Resp.

at Exhs. C-19 (IPCs and translations, C-20 (extract of combined import and export data for each

IPC), and C-22 (screenshots of IPR yield rates), C.R. 56-58, P.R. 56. The record evidence

provided demonstrates that IPC nos. [                                    ] expired and were closed during

the POR, prohibiting Idcas from adding additional import or export information. *Id*. Commerce

accepted Icdas's reporting, as evidenced by the fact that they did not conduct an on-site or virtual

verification, nor ask a single question regarding the duty drawback adjustment and the status of

these IPCs in either of its two supplemental questionnaires. Commerce's failure to grant Icdas

the duty drawback adjustment to which it was entitled under IPC nos. [

] is therefore not supported by record evidence. *Id*.

### 4.    Commerce Should Have Accepted Documentation Submitted By Icdas

It is Icdas's position that, consistent with Commerce's definition, an IPC is closed when

"the company {is} no longer permitted by the GOT to add import or export information," *Final

I&D Memo* at 16, *i.e.* when the company applies for final liquidation to the GOT. But, even if the

Court accepts Commerce's arguments that an IPC is not closed absent final certification from the

GOT, the record demonstrates that Icdas attempted to provide additional, probative evidence

regarding its duty drawback claims as soon as it became available. *Final I&D Memo* at 17, P.R.

159. However, Commerce rejected that submission in its entirety on that basis that "the new

---

1358 (Ct. Int'l Trade 2017), *aff'd*, 961 F.3d 1177 (Fed. Cir. 2020). These same credibility
determinations cannot be made "based on a cold paper record," as Idcas, by no fault of its own,
has in this review. *Id*. (quoting *De Samo {sic} v. Dep't of Com.*, 761 F.2d 657, 661 (Fed. Cir.
1985)).

AFDOCS/24821064.1

information "concerning duty drawback was submitted {after} the due date for Section C of the questionnaire" and was therefore "untimely filed." *Id.*

It follows from Commerce's position that, if a respondent has not received the formal closure documents *by the deadline for the Initial Section C response*, which occurs at the outset of an investigation or review, Commerce will not accept the claimed duty drawback adjustment. In other words, not only will Commerce consider an IPC to be open until a respondent can provide documentation establishing its official closure by the GOT, but it also requires that documentation to be readily available by the date of submission of the response to the Initial Section C questionnaire. Again, this new requirement improperly adds an additional prong to Commerce's two-prong test for granting a drawback adjustment and is not workable for respondents like Icdas given that the official closure of an IPC may take several years. *See Chang Tieh Indus., 840 F. Supp. at 147*; *Welded Line Pipe Verification Report* at 17, n.13.

Though Commerce claims that it is "simply not feasible for Commerce to speculate on what information a respondent does or does not wish to provide to support a request for an adjustment such as duty drawback," *Final I&D Memo* at 18, P.R. 159,  Icdas clearly stated in its Section C Response that it had completed imports and exports under IPCs [

] and was waiting for the "Ministry of Trade of the Turkish Government {to} clos{e} out the certificates." Icdas Sec. C Resp. at C-39, C.R. 45-46, P.R. 56. Commerce's rigid position that "{t}he deadline for submission of IPC information was when the Section C questionnaire response was due," *Final I&D Memo* at 18, P.R. 159, ignores that Commerce regularly issues supplemental questionnaires to respondents, and in fact issued two such supplemental questionnaires to Icdas in this review. *See* Icdas 1st Supp. Resp., P.R. 83-86; Icdas 2nd Supp. Resp., P.R. 98. If the granting of Icdas's claimed drawback adjustment was wholly dependent on

official closure from the GOT, rather than establishing that Icdas "was no longer permitted by the GOT to add import or export information," consistent with Commerce's position in past cases, Commerce should have given Icdas the opportunity to submit such closure documents in a supplemental questionnaire. *Final I&D Memo* at 16, P.R. 159.

Moreover, it is disingenuous for Commerce to have rejected this information as "untimely filed" when it subsequently acknowledges that the information would have been accepted "if it met the requirements under 19 C.F.R. 351.301(c)(5)." That provision permits certain factual information may be filed "30 days before the scheduled date of the preliminary results in an administrative review." 19 C.F.R. 351.301(c)(5). Icdas's submission of new factual information was filed on September 17, 2020, more than 68 days before the publication of the *Preliminary Results*. *Final I&D Memo* at 17, P.R. 159. Though Commerce now alleges that "Icdas was free to refile it's submission of new factual information" under 19 C.F.R. 351.301(c)(5), Commerce's removal of the rejected submission from the record notes that the "unsolicited September 17, 2020, submission containing new factual information {was rejected} because it was untimely filed *under 19 CFR 351.301(c)(5).*" Memorandum from R. Copyak to the File re: Steel Concrete Reinforcing Bar from the Republic of Turkey – Removal of Rejected Submission from the Record (Sept. 28, 2020) (emphasis added), P.R. 92. It is unreasonable for Commerce to expect Icdas to know that a refiling of this information under 19 C.F.R. 351.301(c)(5) would have been accepted when Commerce rejected the submission under that same regulation as untimely. *Id.*

As detailed above, because Icdas satisfies Commerce's well-established two-prong test, it should have been granted the full duty drawback to U.S. price without further inquiry from Commerce.

**B.      Section 232 Tariffs Are "Special" Tariffs That Should Not Be Deducted From Export Price**

Certain rebar imported by Turkish Respondents during the POR were subject to additional tariffs imposed pursuant Section 232 of the Trade Expansion Act of 1962. *Final I&D Memo* at 28-29, P.R. 159. Section 232 tariffs are special tariffs imposed to remedy threats to national security – in this case a threat to the viability of the U.S. steel industry. *See Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't Commerce Jul. 6, 2020) ("*Section 232 Report*").

In its *Final AD Results*, Commerce concluded that "section 232 duties should be treated as U.S. import duties . . . – and thereby as U.S. Customs duties, which are deducted from U.S. price." *Final I&D Memo* at 26, P.R. 159. However, Commerce's treatment of the Section 232 tariffs as regular U.S. import duties, rather than special tariffs is unsupported by substantial evidence. Commerce's deduction of the Section 232 tariffs from U.S. price, which effectively increases antidumping margins solely on the basis of the special tariffs imposed, is contrary to Commerce's longstanding policy of excluding adjustments for special tariffs, such as safeguards, antidumping, and countervailing ("CVD") duties, which has been consistently upheld by the reviewing courts, and unlawfully results in a double remedy. *See, e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1363 (Fed. Cir. 2007).

The Court previously considered treatment of Section 232 tariffs in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, and found that, "{w}hile Section 232 duties are 'special' in some sense . . . they are still import duties" and the "the reasoning provided by Commerce differentiating its treatment of Section 232 and Section 201 duties is {not} so lacking in merit that the court must say it is arbitrary." 494 F.Supp.3d 1365, 1375-76 (Ct. Int'l

23

Trade 2021), *appeal docketed*, Fed. Cir. No. 2021-2240. For the reasons that follow, the Court should reconsider its ruling and find that the special Section 232 tariffs are distinguishable from ordinary U.S. import duties and may not be deducted from EP and CEP.

### 1.   The Statute Does Not Contemplate Adjustments For "Special" Tariffs

Commerce calculates a margin of dumping based on a comparison between the price of the merchandise sold in the home market, *i.e.* the "normal value," and the price of merchandise sold in the United States. 19 U.S.C. § 1673. The export ("EP") or constructed export ("CEP") price in this comparison refers to ex-factory prices, which are adjusted based on specific factors outlined in the statute. 19 U.S.C. §§ 1677a(a)-(b). Specifically, Commerce is statutorily mandated to, amongst other things, reduce the price used to establish both EP and CEP by:

> {T}he amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and *United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

*Id.* § 1677a(c)(2)(A) (emphasis added). The statute does not define "United States import duties" and the reviewing courts have found that it is an "ambiguous phrase in the statute." *Borusan*, 494 F.Supp.3d at 1372 (citing *Wheatland Tube*, 495 F.3d at 1359–60). Relying on the legislative history, Commerce has determined that the phrase "United States import duties" does not cover all U.S. customs duties imposed on imported merchandise, but rather excludes special or remedial remedies, including safeguards (Section 201) and trade remedies (AD/CVD), which should not be treated as "United States import duties" for purposes of calculating gross U.S. price. *Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19153, 19159 (Dep't Commerce Apr. 12, 2004) ("*SSWR Korea*"); *see also Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea: Final Results of Antidumping Duty Administrative Reviews*, 62 Fed. Reg. 18404,

AFDOCS/24821064.1

18421 (Dep't Commerce Apr. 15, 1997) (distinguishing between "special" dumping duties and "ordinary" customs duties, and determining that "United States import duties" are limited to ordinary duties); *Borusan*, 494 F.Supp.3d at 1372 ("Commerce relied on the legislative history of the Antidumping Act of 1921 to conclude there is a distinction between '*special* dumping duties' and '*normal* customs duties' (also referred to as 'United States import duties').").

For example, in *SSWR Korea*, Commerce specifically issued an interpretation of the statutory term "United States import duties" following formal notice and comment procedures. *SSWR Korea*, 69 Fed. Reg. at 19157-61. Upon examination of the legislative history of the Antidumping Act of 1921, from which section 1677a(c)(2)(A) derives, Commerce concluded that the term United Sates import duties was intended to apply only to regular customs duties and did not cover special tariffs such as antidumping duties. *SSWR Korea*, 69 Fed. Reg. at 19159; *see also Borusan*, 494 F. Supp. 3d at 1372 ("Congress intended that some duties implementing trade remedies, such as AD duties, are special duties to be distinguished from the normal duties that should be deducted from EP and CEP.").[5] Reasoning that Section 201 safeguards are remedial tariffs that are temporary in nature, the deduction of which would result in a double remedy by imposing the Section 201 tariffs a second time in the form of a dollar-for-dollar increase in antidumping duties, Commerce explicitly found that safeguards were special tariffs not to be deducted from U.S. price under section 1677a(c)(2)(A). *SSWR Korea*, 69 Fed. Reg. at 19159-61.

This Court has recognized Commerce's distinction between special dumping tariffs and ordinary customs duties, and the U.S. Court of Appeals for the Federal Circuit ("CAFC") has

---

[5] Further support for the distinction is found in the Senate report regarding the Antidumping Act of 1921, which consistently refers to antidumping duties as "special dumping duties," while referring to ordinary customs duties as "United States import duties." *See* S. Rep. No. 16, 67th Cong., 1st Sess., at 4 (1921).

affirmed that this interpretation of "United States import duties" as not including special tariffs is reasonable. *Wheatland Tube*, 495 F.3d at 1365-66; *see, e.g., Borusan*, 494 F.Supp.3d at 1372. In *Wheatland Tube*, the CAFC concluded that Congress did not intend all duties to be considered "United States import duties" and that Section 201 safeguards were properly considered special tariffs that should not be deducted from EP and CEP. *Wheatland Tube*, 495 F.3d at 1361.

Specifically, the CAFC found that:

> Like antidumping duties, Commerce found that § 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports. Antidumping duties aim to remedy sales by a foreign exporter in the U.S. market at less than fair value. Similarly, § 201 safeguard duties aim to remedy the injurious effects on the U.S. industry of a significant surge in imports. Normal customs duties, in contrast, have no remedial purpose. They are imposed regardless of whether the U.S. industry is suffering adverse effects as a result of imports.

*Id.* at 1362 (citations omitted). The court noted with approval Commerce's observation that "antidumping duties and § 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that a domestic industry is being injured or threatened with injury due to the imported merchandise." *Id.* "Given the similarities between antidumping duties and § 201 safeguard duties," the CAFC held:

> {I}t was reasonable for Commerce to conclude that § 201 safeguard duties are more like antidumping duties "in purpose and function than they are like ordinary customs duties." Because of Commerce's finding that § 201 safeguard duties are like antidumping duties for purposes of § 1677a(c)(2)(A), it was reasonable for Commerce to treat § 201 safeguard duties as antidumping duties and not deduct them from the EP when calculating dumping margin.

*Id.* (citations omitted). Finally, the court affirmed as reasonable Commerce's finding that "if § 201 safeguard duties were included as 'United States import duties' for purposes of determining the EP pursuant to § 1677a(c)(2)(A), then in certain situations Commerce would improperly collect § 201 safeguard duties twice." *Id.*

26

Consistent with CAFC precedent, Commerce has interpreted 19 U.S.C. § 1677a(c)(2)(A) to provide for the deduction only of regular customs duties and not special remedial tariffs. Because special tariffs are distinct from ordinary customs duties, their deduction from U.S. price in calculating antidumping margins is not contemplated by the statute. 19 U.S.C. § 1677a(c)(2)(A). Where, as here, Commerce has "establishe{d} a course of action . . . {it} is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary." *NMB Sing. Ltd.*, 557 F.3d at 1328. In finding the Section 232 tariffs to be ordinary customs duties, Commerce has departed from its consistent interpretation of the statute without adequately explaining its reasons for diverging from it. As Commerce has repeatedly found, and the CAFC has affirmed, 19 U.S.C. § 1677a(c)(2)(A) provides for the deduction only of regular customs duties and not special tariffs. Section 232 tariffs are remedial, temporary, and indistinguishable from the antidumping and Section 201 safeguards that Commerce and the reviewing courts have consistently found to be non-deductible United States import duties.

### 2.     The Section 232 Tariffs On Steel Imports Are "Special" Tariffs

In the *Final AD Results*, Commerce found "that section 232 duties are not akin to antidumping or section 201 duties" and should be "treated as any other duties." *Final I&D Memo* at 28, P.R. 159. However, Commerce has itself "acknowledge{d} the extraordinary nature of 232 duties," in the absence of which the U.S. "industry will continue to decline{.}" *See* Memorandum from C. Showers to P. Lee Smith, re: Issues and Decision Memorandum for the Final Normal Value Calculations to be Effective from Release of the Final Normal Values through June 30, 2019, under the Agreement Suspending the Antidumping Duty Investigation on Certain Oil Country Tubular Goods from Ukraine (A-823-815), at 7 (Feb. 15, 2019), ACCESS Barcode 3793809-01. It is clear that Commerce and the Administration contemplated the Section

232 tariffs on steel as an alternate means to remedy injury and/or threat of injury to a domestic industry, consistent with the underlying purpose of other special tariffs. Moreover, similar to Section 201 safeguards and antidumping duties, the Section 232 tariffs are remedial, temporary, and were implemented under Congress's delegation of authority, providing additional support for their treatment as special tariffs in dumping calculations.

### a.   Section 232 Tariffs Are Remedial

In finding that Section 201 safeguards are properly characterized as special tariffs, Commerce and the CAFC found it significant that Section 201 safeguards, like antidumping duties, are remedial in nature. *SSWR Korea*, 69 Fed. Reg. at 19159; *Wheatland Tube*, 495 F.3d at 1362. By contrast, ordinary customs duties, which are imposed "regardless of whether the U.S. industry is suffering adverse effects as a result of imports," have "no remedial purpose." *Wheatland Tube*, 495 F.3d at 1362.

In the *Final AD Results*, Commerce found that the Section 232 tariffs are not remedial because they "are not focused on remedying injury to a domestic injury," but rather "the effects on the national security of imports." *Final I&D Memo* at 27, P.R 159 (quoting 19 U.S.C. § 1862(b)(1)(A)). This is a distinction without a difference. Contrary to Commerce's claims, Section 232 tariffs, as well as Section 201 and antidumping duties, "are all directed at the same overarching purposes – protecting the bottom line of domestic producers." *Id.* (quoting *Wheatland Tube*, 495 F.3d at 1364). Though Commerce reasons that the 232 tariffs are specifically tailored towards national security, *id.*, its conclusion ignores the text and operation of the Section 232 statute, as well as the articulated rationale of Commerce and the President in implementing the tariffs.

28

Like other special tariffs, the Section 232 tariffs are imposed "in response to trade practices in specific instances in which the welfare of key domestic industries is impacted by foreign trade." *Borusan*, 494 F.Supp.3d at 1374. Unlike import duties imposed in the normal course of trade, Section 201, antidumping and countervailing, and Section 232 tariffs may only be imposed following investigations establishing the existence of particular conditions. *See* 19 U.S.C. §§ 2251, 1671, 1673, 1862. Factors considered by the International Trade Commission ("ITC") in antidumping and Section 201 cases are similar to those considered pursuant to the Section 232 statute, which directs Commerce and the President to consider, amongst other things, "the impact of foreign competition on the economic welfare of individual domestic industries;" "any substantial unemployment . . . loss of skills or investment;" and "other serious effects resulting from the displacement of any domestic products by excessive imports." 19 U.S.C. § 1862(d). In assessing material injury in antidumping investigations, the ITC likewise looks to conditions of competition in the U.S. market, U.S. producers' financial experience and employment levels, and other effects related to displacement from imports, including U.S. production, shipments, apparent consumption, market shares, and pricing data. *Id.* § 1677(7)(C). In Section 201 proceedings, the Commission considers whether "an article is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry." 19 U.S.C. § 2251(a). Under each provision, the amount of tariffs imposed is related directly to the extent of the particular conditions determined to exist with regards to the domestic industry. *See* 19 U.S.C. §§ 1862(d), 1677(7)(C), 2251(a). In other words, the remedy provided by these measures "is the same—the imposition of duties on foreign exports, which is intended to raise the United States market price for the subject merchandise and thereby increase sales and profits of domestic producers." *Wheatland Tube*, 495 F.3d at 1364.

While, as Commerce notes, the Section 232 tariffs address threats to national security, *Final I&D Memo* at 27, P.R. 159, the remedial purpose of adjusting imports to safeguard national security does not make the Section 232 tariffs more like ordinary customs duties than other special tariffs. To the contrary, comparing the Section 232 tariffs with special tariffs like Section 201 and AD/CVD duties reveals a nearly identical underlying purpose—protection of the domestic industry via adjustment of imports. Indeed, like Section 232, each of the special tariff provisions require an additional finding beyond injury to domestic producers, *i.e.* a surge in imports (Section 201), that imports are sold at below fair value (AD), or that imports causing injury benefit from government subsidies (CVD). These additional factors do not obscure the same primary focus of each special measure to protect the economic welfare of U.S. domestic industries. *See* 19 U.S.C. §§ 2251-2252, 1673, 1671; *see also Wheatland Tube*, 495 F.3d at 1363-64 ("While all of these three types of duties remedy 'distinct harms' they are all directed at the same overarching purpose—protecting the bottom line of domestic producers.").

The Section 232 statue is likewise broadly focused on the economic impact of imports on domestic producers and industries, as evidenced by Commerce's investigation, which considered, amongst other things, the "loss of domestic opportunities" and the "financial distress" of the domestic industry in the face of "{r}ising levels of imports." *Section 232 Report* at 40216-18. Commerce's analysis included many of the same factors weighed by the ITC in determining injury in Section 201 and antidumping cases, including the profit margins, net income, revenue, capacity utilization rates, and capital expenditures of the domestic industry. *Id.* As in those cases, Commerce's recommendation "that the President take immediate action by adjusting the level of imports" was based on its conclusion that "the present quantities and

circumstance of steel imports are 'weakening our internal economy,'" most notably the "financial viability" of U.S. steel producers. *Id.* at 40204, 40225-26.

Commerce's *Section 232 Report* to the President highlights not only the special nature of the tariffs, but also their connection to antidumping orders, which are repeatedly referenced throughout the report. *See Section 232 Report* at 40204, 40210-11, and 40216. In implementing the 25 percent tariffs, the President emphasized that, as with other special tariffs, the Section 232 tariffs were being imposed "in response to specific requests from affected domestic parties" for the explicit purpose of protecting "domestic steel producers" and preventing "further closures of domestic steel production facilities. *Proclamation 9705*, 83 Fed. Reg. 11625. *Proclamation 9705*, which implemented the tariffs, explained that the "tariff is necessary and appropriate to address the threat that imports of steel articles" due to Commerce's findings that those imports are "weakening our internal economy, resulting in the persistent threat of further closures of domestic steel production facilities." *Id.* at 11625. In other words, the Section 232 tariffs were recommended and implemented to serve the remedial purpose of providing relief to the domestic steel industry from the adverse effects of imports.

As the Court recently noted, "the purpose of Section 232 duties is . . . remedial in a broad sense." *Borusan*, 494 F.Supp.3d at 1374. That is especially true, where, as here, Commerce and the President viewed the Section 232 tariffs as an alternate means to remedy injury to a domestic industry, equivalent to special tariffs like antidumping and Section 201 tariffs. Indeed, both the Court and Commerce have recognized the Section 232 tariffs as "remedial" outside the context of antidumping calculations. *Am. Inst. for Int'l Steel, Inc. v. United States,* 376 F.Supp.3d 1335, 1343 (Ct. Int'l Trade 2019), *aff'd*, 806 F. App'x 982 (Fed. Cir. 2020), *cert denied,* 139 S. Ct. 2748 (2020); *Submissions of Exclusion Requests and Objections to Submitted Requests for Steel*

31

*and Aluminum*, 83 Fed. Reg. 46026, 46054-55 (Dep't Commerce Sept. 11, 2018) (interim final rule) ("*Submission of Exclusion Requests and Objections*") (noting that "the President is implementing these remedial actions" and that "any delay in implementing these remedial actions (as described Proclamations 9704 and 9705 of March 8, 2018) would further undermine U.S. national security interests"); *Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12106, 12109 (Dep't Commerce Mar. 19, 2018) (interim final rule). Given this reality, Commerce's claim that that the Section 232 tariffs are now "separate and distinct" from other special, remedial safeguard provisions is disingenuous.

Because remedying the impact of the imports on the economic welfare of U.S. domestic industries is the primary focus of the Section 232 statute, as with both antidumping and Section 201 safeguards, the Court should find that the Section 232 tariffs have a remedial purpose.

### b.      Section 232 Tariffs Are Temporary

In *Wheatland Tube*, the CAFC agreed with Commerce that Section 201 tariffs, which are temporary in nature, are distinguishable from ordinary custom duties, which have no termination provision and are permanent unless modified by Congress. *Wheatland Tube*, 495 F.3d at 1362. Like other special tariffs, the Section 232 tariffs are temporary in nature and do not require congressional action to be modified.

The Section 232 statute provides authority for the President to determine the "nature and duration of the action" taken to adjust imports, 19 U.S.C. § 1862(c)(1)(A)(ii), which the CAFC has found to include "coverage of a plan implemented over time, including options for

32

contingency-dependent choices." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1321

(Fed. Cir. 2021). Even though Section 232 tariffs do not have a fixed termination date, this broad

"authority to pursue a continuing course of action, with adjustments (including additional

impositions) adopted over time," highlights the temporary nature of the tariffs, which can be

modified or suspended by the President at any time. *Transpacific Steel*, 4 F.4th at 1324; *see also*

*Borusan*, 494 F.Supp.3d at 1374-75 ("Section 232 duties may be terminated any time the

President believes their purpose has ended.").

   Here, the Section 232 tariffs were only found to be "necessary and appropriate" under the

"current circumstances." *Proclamation 9705*, 83 Fed. Reg. at 11626. The proclamation

implementing the Section 232 tariffs expressly directs the Secretary of Commerce to continue to

monitor imports of steel articles and to periodically review the status to inform the President of

any circumstances that might require modifications or circumstances that might indicate that the

tariffs would no longer be necessary. *Id.* at 11628. Indeed, since the publication of *Proclamation*

*9705*, the President has modified the Section 232 tariffs on steel articles on multiple occasions,

including by changing the number of countries covered, by raising and then lowering the

applicable duty rates, and by expanding the scope to include certain downstream derivative

products. *See Proclamation 9711 of March 22, 2018: Adjusting Imports of Steel Into the United*

*States*, 83 Fed. Reg. 13361 (Mar. 28, 2018); *Proclamation 9740 of April 30, 2018: Adjusting*

*Imports of Steel Into the United States*, 83 Fed. Reg. 20683 (May 7, 2018); *Proclamation 9759 of*

*May 31, 2018: Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857 (June 5,

2018); *Proclamation 9894 of May 19, 2019: Adjusting Imports of Steel Into the United States*, 84

Fed. Reg. 23987 (May 23, 2019); *Proclamation 9980 of January 24, 2020: Adjusting Imports of*

*Derivative Aluminum Articles and Derivative Steel Articles Into the United States*, 85 Fed. Reg.

33

5281 (Jan. 29, 2020). As with Section 201 safeguards, specific products can also be excluded

from the Section 232 tariffs for a one-year period of time. Compare *Submissions of Exclusion*

*Requests and Objections* at 46026 (exclusion request procedures for Section 232 tariffs), with

*Procedures To Consider Additional Requests for Exclusion of Particular Products From the*

*Solar Products Safeguard Measure*, 83 Fed. Reg. 6670 (USTR Feb. 14, 2018) (exclusion request

procedures for Section 201 tariffs).

Finally, as detailed below, the fact that the Section 232 tariffs are temporary is further

evidenced by their placement in Chapter 99 of the Harmonized Tariff Schedule of the United

States ("HTSUS"). *See Proclamation 9740*, at 20687 ("To Modify Certain Provisions of Chapter

99"). When Chapter 99 was created, the ITC issued a report explaining that "Chapter 99 is

designed for the incorporation of legislation, proclamations, and administrative actions, which,

because of their *temporary* or collateral nature, are not assimilated into the main body of the

tariff schedule." *Conversion of the Tariff Schedules of the United States Annotated Into the*

*Nomenclature Structure of the Harmonized System*, Inv. No. 332-131, USITC Pub. 1400, at 16

n.1, 28 (June 1983) (emphasis added). Thus, from the outset, Congress and the ITC envisioned

Chapter 99 as a location for temporary tariffs, separate and distinguishable from the ordinary

Customs duties included in Chapters 1-97 of the HTSUS.

This Court has previously found Section 232 tariffs to be "temporary in that no

Congressional action is needed to end them," which is "a clear difference from normal customs

duties, which are enacted by Congress." *Borusan*, 494 F.Supp.3d at 1374. This "lack of

permanenc{y}" aligns the Section 232 tariffs more closely with other special tariffs than with

ordinary customs duties. *Id.* at 1375. The Court should thus continue to find that Section 232

tariffs, like antidumping and Section 201 safeguards, are temporary in nature.

c.      **Section 232 Tariffs Were Implemented Under Congress's
Specific Delegation of Authority to the Executive**

The special nature of Section 232 tariffs is further emphasized by constitutional

principles, which "vests in Congress the sole authority to impose tariffs" but allows the President

to impose special tariffs such as under the Trade Expansion Act of 1962. S. Rep. No. 90-1385, pt.

2, at 13 (1968). Specifically, the U.S. Constitution provides that Congress is responsible for

levying and collecting taxes and duties. U.S. Const. art. I, § 8. The reviewing courts have

interpreted this authority such that "{t}he general power to modify the HTSUS belongs

exclusively to Congress," with the President given by Congress "limited authority to make

modifications to the HTSUS based solely within the framework of statutorily defined

objectives." *Forest Lab'ys, Inc. v. United States*, 403 F.Supp.2d 1348, 1352 (Ct. Int'l Trade

2005), *aff'd,* 476 F.3d 877 (Fed. Cir. 2007).

The ability of the Executive Branch to impose tariffs pursuant to Section 232 thus flows

directly from an express delegation of authority through legislation from Congress. U.S. Const.

art. I, § 8. This delegation of limited authority, which authorizes the President to apply special

tariffs only where certain conditions are found to exist, is consistent with antidumping and

Section 201 tariffs. *See* 19 U.S.C. § 1862. In each case, the Executive Branch may implement

special tariffs for the remedial purposes specified in the statute. This is in stark contrast to

ordinary U.S. import duties, which are determined and imposed by Congress pursuant to the

United States' World Trade Organization ("WTO") obligations. While Congress has delegated to

the Executive Branch the limited authority to apply special tariffs in certain circumstances,

Congress has never delegated to the President any general or blanket authority to modify duty

rates or to set ordinary customs duties. This power lies solely with Congress. Any authority

35

delegated by Congress to the President to impose tariffs, as it has done here, is by definition a special duty implemented to fulfill specific statutory objectives.[6]

Here, Congress delegated its exclusive authority to the Executive Branch, allowing it to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c). Congress's delegation is limited to "safeguarding national security," including the "economic welfare of individual domestic industries." 19 U.S.C. § 1862(d). This delegation is distinguishable from ordinary customs duties set by Congress, and indicates that these special tariffs imposed by the Executive Branch should not be "treated as any other duties." *Final I&D Memo* at 28, P.R. 159. Indeed, the antidumping, Section 201, and Section 232 laws each involve a delegation of legislative authority to the Executive Branch to investigate the consequences of increased imports and the resulting economic harm. *Wheatland Tube*, 495 F.3d at 1363-64.

This legal distinction is carried through to the classification of duties in the HTSUS. Though Commerce cites absence of an "express exception" in the Annex to *Proclamation 9740*, as evidence of the President's intent that the 232 tariffs be treated as U.S. import duties, *Final I&D Memo* at 28. P.R. 159, the placement of the modification in HTSUS Chapter 99 further highlights its special nature. *See Proclamation 9740*, at 20687. Chapters 1 to 97 of the HTSUS are used for ordinary customs duties, whereas Chapter 99 is specifically reserved for special

---

[6] Pursuant to 19 U.S.C. § 1862(c)(1)(A)(ii), (b)(3)(A) Congress delegated its authority to the President to "determine the nature and duration of the action that . . . must be taken to adjust the imports of the {imported} article and its derivatives" if the Secretary of Commerce finds that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."

tariffs imposed under "Temporary Legislation, Temporary Modifications Established Pursuant to Trade Legislation, {and} Additional Import Restrictions{.}" HTSUS, Ch. 99.

The HTSUS designation is not simply a matter of organization or nomenclature, but rather, reflects the critical legal distinction between regular customs duties imposed by Congress, and special duties imposed by the Executive Branch. Even Commerce has acknowledged that Chapter 99 "is reserved for special or temporary duties" and regarded the designation of Section 201 tariffs in Chapter 99 as significant to its distinction of those tariffs from ordinary customs duties. *SSWR Korea*, 69 Fed. Reg. at 19160. Having previously recognized placement in Chapter 99 as a signifier that tariffs are special, it is unreasonable for Commerce to take a different position with respect to the Section 232 tariffs in this case without further explanation.

Consistent with both Congress's delegated authority and the history of Chapter 99 of the HTSUS, the Court should find the Section 232 tariffs to be special tariffs.

3.     **There Is A Clear Interplay Between Section 232 Tariffs and Antidumping Duties Such That Deducting Section 232 Tariffs Imposes A Double Remedy**

The reviewing courts have found that the deduction of special tariffs from U.S. price in the calculation of dumping margins results in double-counting. *See, e.g.*, *AK Steel Corp. v. United States*, 988 F.Supp.584, 607 (Ct. of Int'l Trade 1997) (treating remedial tariffs as costs "would create the same double-counting issue Commerce is seeking to avoid in its refusal to consider countervailing and antidumping duties to be U.S. import duties." *Id.* at 608 n.12). As the CAFC confirmed, because safeguards "may reduce or eliminate the injury that is required for an antidumping duty to continue and because deducting . . . safeguard duties from the EP may create an artificial dumping margin," their deduction from the calculation of dumping margins would result in the punitive collection of additional duties in contravention of the statute.

37

*Wheatland Tube*, 495 F.3d at 1365. Indeed, "{t}o assess both a safeguard duty and an antidumping duty on the same imports without regard to the safeguard duty, would be to remedy substantially overlapping injuries twice." *Id*.

In its prior review of the Section 232 tariffs, the Court's decision turned on the extent of the "statutory interplay" between Section 232 and antidumping duties, *i.e.* whether Section 232 tariffs are "related to and complimentary to antidumping duties." *Borusan*, 494 F.Supp.3d at 1375. In its *Final AD Results*, Commerce claimed that there was no such "overlap" because the Section 232 and antidumping duties "do not provide multiple remedies for the same situation." *Final I&D Memo* at 28, P.R. 159. Contrary to Commerce's claims, the President and Commerce have frequently indicated that the Section 232 tariffs were contemplated as an alternative to other special trade remedies, most notably antidumping duties. For example, in its Report to the President, Commerce noted that "{d}espite efforts to level the playing field through AD/CVD orders, there are numerous examples of U.S. steel producers being unable to fairly compete with foreign suppliers." *Section 232 Report* at 40216. Commerce clearly viewed the Section 232 tariffs as commensurate with other special provisions, stating that "{s}maller steel manufacturers are financially unable to afford {AD/CVD} cases, or are hesitant to file cases in light of possible market entry retaliation in foreign markets for finished steel products." *Id.* at 40211.

The CAFC's finding in *Wheatland Tube* that "deducting the 201 duties from U.S. prices effectively would collect the 201 duties twice-first as 201 duties, and a second time as an increase in that dumping margin," *Wheatland Tube*, 495 F.3d at 1363 (citation omitted), thus applies with equal force to Commerce's deduction of Section 232 tariffs in this proceeding. To the extent that there is any preexisting dumping margin, Commerce's methodology results in a dollar-for-dollar increase in that margin equal to the amount of the Section 232 duty; if there is

38

no preexisting dumping margin, Commerce's methodology would create one. This result is contrary both to the remedial purpose of the antidumping statue, as well as Commerce's obligation to calculate dumping margins "as accurately as possible." *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Commerce's attempts to mask the double remedy inherent in its methodology by citing to a statement in the Annex to *Proclamation 9740* that "{a}ll anti-dumping or countervailing duties, or other duties and charges applicable to such goods shall continue to be imposed, except as may be expressly provided herein" is unavailing. *Final I&D Memo* at 28, P.R. 159. The issue is not whether antidumping duties should continue to apply to steel imports like rebar, but rather whether Commerce should be permitted to collect Section 232 tariffs a second time in the form of an increased antidumping margin based on their collection. Commerce's rationale does not confirm that Section 232 tariffs are to be treated as regular customs duties, nor resolve the direct conflict between its methodology and the CAFC's determination in *Wheatland Tube*. Contrary to the Court's finding in *Borusan*, there are no "crucial differences" between Section 201 and Section 232 justifying disparate treatment by Commerce. *Borusan*, 494 F.Supp.3d at 1376. Both Section 201 and Section 232 tariffs are special tariffs, more akin to antidumping duties than to ordinary customs duties. *See Wheatland Tube*, 495 F.3d at 1362 (finding Section 201 duties to be special duties because "they are more like AD {antidumping duties} in purpose and function than they are like ordinary customs duties" (citation omitted)).

Because the purpose and function of both Section 232 tariffs and antidumping duties is to remedy injury to a domestic industry, deduction of the Section 232 tariffs in the dumping calculation presents the same "unique circularity issue," *Borusan*, 494 F.Supp.3d at 1373, identified by the CAFC in *Wheatland Tube*.

AFDOCS/24821064.1

**C.    Any Deduction Should Be Limited to the 25 Percent Tariffs Assessed Pursuant to Presidential *Proclamation 9705***

During the POR, the President increased the Section 232 tariffs on steel imports from Turkey, including rebar, to 50 percent in August 2018, then decreased the tariffs back to 25 percent nine months later in May 2019. *See Proclamation 9772*, 83 Fed. Reg. 40429; *Proclamation 9886 of May 16, 2019: Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23421 (May 21, 2019) ("*Proclamation 9886*"). During this period, Turkish Respondents were forced to pay tariffs of 50 percent on imports of rebar to the United States. Icdas Sec. C Resp. at Exh. C-16; C.R. 55, P.R. 56, Kaptan Sec. C Resp. at Exh. C-22, C.R. 96, P.R. 58. Though Turkish Respondents maintain that *no* Section 232 tariffs should be deducted from Commerce's antidumping calculations, any contemplated deduction should not exceed the standard 25 percent rate of the Section 232 tariffs applicable to all countries.

This Court previously found that the "decision to increase the tariffs on imported steel products from Turkey, and Turkey alone, without any justification, is arbitrary and irrational" and declared *Proclamation 9772* to be unlawful. *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1258 (Ct. Int'l Trade 2020), *rev'd and remanded*, 4 F.4th 1306 (Fed. Cir. 2021). While the legality of *Proclamation 9772* is still being considered on appeal,[7] it is clear that the additional 25 percent tariffs applicable only to Turkish imports, which were uniquely temporary and remedial, are more akin to special tariffs than to ordinary customs duties.

Because the lawfulness of the tariffs imposed on Turkish imports pursuant to *Proclamation 9772* remains an unsettled legal question, the difference between any tariffs

---

[7] *See Transpacific Steel LLC v. United States*, Plaintiffs' Response to the Court's October 6, 2021 letter (Court No. 19-00009), ECF 86 (informing the Court that Plaintiffs intend to file a writ of *certiorari* with the Supreme Court and requesting that the Court not dismiss the case until final resolution).

collected pursuant to *Proclamation 9772* and the 232 tariff that would otherwise apply should be excluded from Commerce's calculations. Alternatively, the Court should stay this proceeding pending a final decision regarding the legality of the additional tariffs on imports from Turkey in *Transpacific Steel.*

### D. There Was High Inflation In Turkey During The POR Necessitating Use Of Commerce's Special Methodology

The statute requires that Commerce's calculations "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Consistent with this mandate, in cases where an economy experiences "high inflation", Commerce uses a special methodology comparing U.S. sales prices to normal values based on either home market sale prices or the inflation adjusted cost of production for the same month. *See, e.g.*, *Light-Walled Rectangular Pipe and Tube from Turkey: Preliminary Results; 2018-2019,* 85 Fed. Reg. 44861 (Dep't Commerce Jul. 24, 2020) ("*LWRPT from Turkey*"), and accompanying Issues & Decision Memorandum at 7 (Jul. 20, 2020). Historically, Commerce has applied its high inflation methodology where "the annualized rate of inflation exceeds the 25 percent threshold" based on the "annualized rate of inflation over the relevant reporting period." Enforcement and Compliance Antidumping Manual at Chap. 8 pg. 74 ("Dumping Manual"). However, in the *Final Results*, Commerce improperly determined that "high inflation in Turkey during the POR did not reach {its} 25 percent threshold," *Final I&D Memo* at 21, P.R. 159, despite producer price index ("PPI") data establishing that the inflation rate in Turkey exceeded 25 percent in every month of the POR.

Specifically, Turkish Respondents provided PPI data from the Turkish Statistical Institute ("Turkstat") showing that the annual inflation rate for Turkey exceeded 25 percent during the 12-month period covering the POR. Icdas Sec. D Resp. at Exh. D-11, C.R. 121, P.R. 60-61; Kaptan

41

Sec. D Resp. at Exh. D-8, C.R. 103, P.R. 59; *see also* Turkish respondents' Rebuttal Factual

Information at Exhs. 2-3 (Nov. 25, 2020) ("*RFI Submission*"), P.R. 128. This data is corroborated

by the PPI figure released by the Central Bank of the Republic of Turkey ("TCMB"), which is

likewise 25.04 percent for the POR. *RFI Submission* at Exh. 4, P.R. 128. The data provided

measures the inflation for the period of July 2018 to June 2019 – the exact POR in this

administrative review. *Id.* at 3, P.R. 128. Commerce nevertheless found that inflation in Turkey

during the POR "falls below the 25 percent threshold" based on the change in Turkey's PPI

"from the first month of the POR to the last month of the POR," *i.e.* based on the division of the

June 2019 PPI figure by the PPI figure for July 2018. *Final I&D Memo* at 22, P.R. 159. Though

Commerce contends that this comparison "captures the full price level change" for the "full

twelve-month POR," *id.*, it in fact only measures inflation for only an 11-month period and

improperly excludes July 2018 from the analysis. *RFI Submission* at 3, P.R. 128.

    If it is Commerce's intention to base its calculations on the "*annualized* rate of inflation

over the relevant reporting period," *Dumping Manual* at Chap. 8 pg. 74, it should have divided

the June 2019 index figure by the index figure of June 2018, consistent with the annual

measurements of Turkstat and the TCMB. *RFI Submission* at 3 and Exhs. 2-4, P.R. 128. The 11-

month period analyzed by Commerce cannot properly be considered a  measurement of the

"annualized rate" in Turkey and fails to account for the fact that monthly price information is

"published on the third work day of the month *following the reference month*." Memorandum

from Robert Copyak to The File, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey:*

New Factual Information and Deadline for Rebuttal Factual Information (Nov. 18, 2020)

(emphasis added), P.R. 116.  A review of the full 12-month period – June 2018 to June 2019 –

clearly shows that the inflation rate was greater than 25 percent during the POR. *See RFI Submission* at Exhs. 1-2, P.R. 128.

As such, in accordance with its own threshold test and consistent with its determinations in other recent cases involving Turkey and covering the same timespan (2018-2019), Commerce should have found that Turkey's economy experienced high inflation above 25 percent. *See, e.g.*, *See, e.g., LWRPT from Turkey* at 7. In failing to acknowledge the high inflation in Turkey during the POR, Commerce also unlawfully failed to account for the impact of that inflation on Turkish Respondents' POR costs. Specifically, inflation from month to month may hide patterns of pricing that differ significantly as a result of the pricing volatility produced by rapid inflation. *See, e.g.*, *Certain Corrosion Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Preliminary Results of the Antidumping Duty Administrative Review*, 74 Fed. Reg. 46110 (Dep't Commerce Sept. 8, 2009), and accompanying Issues and Decision memorandum at Comment 3.

To remedy this distortion and ensure that its calculations "reasonably reflect" costs pursuant to the statute, 19 U.S.C. § 1677b(f)(1)(A), Commerce should have applied its high inflation methodology in this case. At minimum, Commerce must "explain its reasons for ignoring the devaluation and to explore methods for calculating the most accurate dumping margin possible." *Viraj Grp., Ltd. v. United States*, 162 F.Supp.2d 656, 663 (Ct. Int'l Trade 2001). It has not done so here.

**V.     PRAYER FOR RELIEF**

WHEREFORE, Turkish Respondents respectfully requests that this Court:

(a)      Hold that Commerce's determination in the *Final AD Results* is not in accordance with law and is unsupported by substantial record evidence with respect to the

claims advanced by Turkish Respondents in this appeal and in a manner consistent with the opinion of this Court;

(b)   Remand the *Final AD Results* to Commerce with instructions to recalculate Icdas's U.S. prices to include a duty drawback adjustment as required by 19 U.S.C. § 1677a(c)(1)(B);

(c)   Remand the *Final AD Results* to Commerce with instructions to recalculate Turkish Respondents' U.S. prices to eliminate the deduction of the Section 232 tariffs on steel imports during the POR consistent with 19 U.S.C. § 1677a(c)(2)(A), which only permits the deduction of United States import duties;

(d)   Alternatively, remand the *Final AD Results* to Commerce with instructions to recalculate Turkish Respondents' U.S. prices to eliminate the deduction of the additional Section 232 tariffs pursuant to *Proclamation 9772*, which applied only to steel imports from Turkey;

(e)   Alternatively, stay this proceeding pending a final holding regarding the legality of the additional Section 232 tariffs pursuant to *Proclamation 9772*;

(f)   Remand the *Final AD Results* to Commerce with instructions to base its analysis of annualized inflation in Turkey on the 12-month period from June 2018 to June 2019 and apply its special methodology for inflation exceeding 25 percent;

(g)   Grant such additional relief as the Court may deem just and proper.

44

Respectfully submitted,

**/s/ Matthew M. Nolan**
Matthew M. Nolan
Leah N. Scarpelli

Arent Fox LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6013

*Counsel for Icdas Celik Enerji Tersane ve*
*Ulasim Sanayi A.Ş. and Kaptan Demir Celik*
*Endüstrisi ve Ticaret A.Ş.*

October 15, 2021

45

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiff's 56.2 Motion for Judgment on the Agency Record filed on October 15, 2021 complies with the word limitation requirement. The word count for Plaintiffs' 56.2 Brief, as computed by Arent Fox LLP's word processing system is 13,745.


  **/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel for Icdas Celik Enerji Tersane ve*
*Ulasim Sanayi A.Ş. and Kaptan Demir Celik*
*Endüstrisi ve Ticaret A.Ş.*