# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| ————————————————— ) | |
| ICDAS CELIK ENERJI TERSANE VE ) | |
| ULASIM SANAYI, A.S. and KAPTAN ) | |
| DEMIR CELIK ENDUSTRISI VE ) | |
| TICARET A.S., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Court No. 21-00306 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| REBAR TRADE ACTION COALITION, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ————————————————— ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL

DAVID RICHARDSON
Senior Counsel
Office of the Chief Counsel for Trade
Enforcement and Compliance
U.S. Department of Commerce

ANN C. MOTTO
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 353-7968
Fax: (202) 305-2062
Email: Ann.C.Motto@usdoj.gov

December 30, 2021

*Attorneys for Defendant*

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ........................................................ iv

RULE 56.2 STATEMENT ........................................................ 2

    I.    The Administrative Determination Under Review ................................. 2

    II.   Issues Presented For Review ..................................................... 2

SUMMARY OF ARGUMENT ........................................................ 2

STATEMENT OF FACTS ........................................................ 4

ARGUMENT ........................................................ 12

    I.    Standard Of Review ........................................................ 12

    II.   Icdas Is Not Entitled To A Duty Drawback Adjustment ..................... 13

        A.   Legal Framework ........................................................ 13

        B.   Commerce Properly Denied Icdas's Request For A Duty Drawback Adjustment Because Icdas Provided No Record Evidence That Its IPCs Were Closed ........................................................ 15

    III.   Commerce's Determination That Section 232 Duties Are United States Import Duties For Purposes Of 19 U.S.C. § 1677a (c)(2)(A) Is Supported By Substantial Evidence And In Accordance With Law ........................................................ 25

        A.   Commerce Reasonably Determined That Section 232 Duties Are "United States Import Duties" That Must Be Deducted From Export Price ......... 26

        B.   Commerce's Interpretation Is Consistent With *Wheatland Tube* ............. 28

    IV.   Commerce's Determination To Deduct Section 232 Duties From Export Price In Excess Of 25 Percent Is Supported By Substantial Evidence And In Accordance With Law ........................................................ 38

    V.   Commerce Properly Limited Its High-Inflation Analysis To Data Within The Period Of Review ........................................................ 39

        A.   Legal Framework For Determining Whether High Inflation Exists ..........39

B.      Commerce Properly Used The Producer Price Index Figures For The First
And Last Months Of The Period Of Review To Determine That Turkey
Had Not Experienced High Inflation During The Period Of Review .......41

CONCLUSION ...........................................................................................................44

## **TABLE OF AUTHORITIES**

**CASES**                                                                                        **PAGES**

*AK Steel Corp. v. United States*,
    988 F. Supp. 594 (Ct. Int'l Trade 1997) ...........................................................................28

*Allied Tube & Conduit Corp. v. United States*,
    374 F. Supp. 2d 1257 (Ct. Int'l Trade 2005) ............................................................ 14-15

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    977 F.3d 1379 (Fed. Cir. 2020)...........................................................................................39

*Am. Inst. for Int'l Steel, Inc. v. United States*,
    806 F. App'x. 982 (Fed. Cir. 2020) ....................................................................................36

*Apex Exports v. United States*,
    777 F.3d 1373 (Fed. Cir. 2015)...........................................................................................26

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)...........................................................................................11

*Bethlehem Steel Corp. v. United States*,
    27 F. Supp. 2d 201 (Ct. Int'l Trade 1998) ........................................................................28

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borsuan Mannesmann Pipe U.S. Inc. v.*
    *United States*,
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ........................................................... *passim*

*Chevron U.S.A. Inc. v. Nat'l Res. Def. Council Inc.*,
    467 U.S. 837 (1984)................................................................................................3, 11, 12

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)..............................................................................................................11

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)..............................................................................................................11

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007)...........................................................................................19

*Deacero S.A.P.I DE C.V. et al. v. United States*,
    No. 20-3924, 2021 WL 6067010, slip op. 21.171
    (Ct. Int'l Trade Dec. 20, 2021) ...............................................................................3, 25, 28

*Dongtai Peak Honey Indus. Co. v. United States*,
    777 F.3d 1343 (Fed. Cir. 2015)...........................................................................................24

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)......................................................................................16, 17, 21

*Fla. Citrus Mut. v. United States*,
    515 F. Supp. 2d 1324 (Ct. Int'l Trade 2007) .......................................................3

*Fujitsu General, Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)...................................................................12, 24

*Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*,
    361 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) .................................................40, 41

*HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*,
    439 F. Supp. 3d 1342 (Ct. Int'l Trade 2020) ..........................................15, 16, 21

*Hoogovens Staal BV v. United States*,
    4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998) .........................................................28

*Huvis Corp. v. United States*,
    570 F.3d 1347 (Fed. Cir. 2009).................................................................17, 21

*JBF RAK LLC v. United States*,
    790 F.3d 1358 (Fed. Cir. 2015)...........................................................................12

*Mittal Steel Point Lisas Ltd. v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008)...........................................................................19

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006)...........................................................................11

*Pastificio Lucio Garofalo, S.p.A. v. United States*,
    783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011) ...................................................40

*Power Steel Co. v. United States*,
    No. 20-03771, 2021 WL 6098309, slip op. 21-173 (Ct. Int'l Trade Dec. 23, 2021).....3, 25

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014)...........................................................................43

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)...........................................................................43

*Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*,
    635 F.3d 1335 (Fed. Cir. 2011).................................................................13, 14

*SeAH Steel Corp. v. United States*,
    704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) ....................................................................41

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004)..........................................................................12, 27

*Toscelik Profil ve Sac Endustrisi, A.S. v United States s*,
    348 F. Supp. 3d 1321 (Ct. Int'l Trade 2018) ....................................................................21

*Transpacific Steel LLC v. United States*,
    466 F. Supp. 3d 1246 (Ct Int'l Trade 2020) ....................................................................10

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ...........................................................................10, 35, 38

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996)..........................................................................12

*U.S. Steel Grp., a Unit of USX Corp. v. United States*,
    15 F. Supp. 2d 892 (Ct. Int'l Trade 1998) ....................................................................3, 28

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009)..........................................................................11, 12

*Wheatland Tube Co. v. United States*,
    495 F.3d 1355 (Fed. Cir. 2007)................................................................. *passim*

*Yantai Timken Co. v. United States*,
    521 F.Supp.2d 1356 (Ct. Int'l Trade 2007) ....................................................................24

*Zenith Electronics Corp. v. United States*,
    77 F.3d 426 (Fed. Cir. 1996)..........................................................................27

## **STATUTES**

19 U.S.C. 1516a..........................................................................11, 19

19 U.S.C. § 1673..........................................................................13

19 U.S.C. § 1677..................................................................... *passim*

19 U.S.C. § 1862..................................................................... *passim*

19 U.S.C. § 2251..........................................................................28, 33

19 U.S.C § 2132..........................................................................35

28 U.S.C. § 2637(d) ........................................................................................19

## **REGULATIONS**

19 C.F.R § 351.102 ...................................................................................22, 23

19 C.F.R. § 351.301 ...................................................................................22, 23

19 C.F.R. § 351.309(c)(2) ...............................................................................19

## **PRESIDENTIAL PROCLAMATIONS**

*Presidential Proclamation 4907 of March 10, 1982: Imports of Petroleum*,
48 Fed. Reg. 10,507 (Mar. 10, 1982) ...........................................................31

*Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United States*,
83 Fed. Reg. 11,625 (Mar. 15, 2018) ..................................................... *passim*

*Proclamation 9772 of August 10, 2018 Adjusting Imports of Steel Into the United States*,
83 Fed. Reg. 40,429 (Aug. 15, 2018)....................................................... *passim*

*Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel Into the United States*,
84 Fed. Reg. 23,421 (May 21, 2019) ...............................................................6

## **OTHER AUTHORITIES**

*Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*,
63 Fed. Reg. 8,909 (Dep't of Commerce Feb. 23, 1998) ..................................40

*Final Results of Antidumping Duty Administrative Review: Certain Pasta from Italy*,
65 Fed. Reg. 77,852 (Dep't of Commerce Dec. 13, 2000)................................40

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Steel Concrete Reinforcing Bars from Turkey*,
66 Fed. Reg. 6,274 (Dep't of Commerce Nov. 7, 2001)...................................40

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*,
69 Fed. Reg. 19,153 (Dep't of Commerce Apr. 12, 2004) ........................ *passim*

*Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*,
69 Fed. Reg. 61,649 (Dep't of Commerce Oct. 20, 2004)................................ 29

*Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*,
   71 Fed. Reg. 61,716 (Dep't of Commerce Oct. 19, 2006)................................................15

*Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Canada*,
   71 Fed. Reg. 3822 (Dep't of Commerce Jan. 24, 2006) ...................................................40

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Welded Stainless Steel Pipe from the Republic of Korea*,
   74 Fed. Reg. 31,242 (Dep't of Commerce June 30, 2009). ...............................................41

*Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty Administrative Review*,
   75 Fed. Reg. 6627 (February 10, 2010) ............................................................................41

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*,
   81 Fed. Reg. 47355 (Dep't of Commerce July 21, 2016).....................................15, 16, 18

*Light-Walled Rectangular Pipe and Tube: Final Results of Antidumping Administrative Review and Final Determination of No Shipments: 2015-2016*,
   82 Fed. Reg. 47477 (October 12, 2017).......................................................................16, 18

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   84 Fed. Reg. 47242 (Dep't of Commerce Sept. 9, 2019) ...................................................6

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*,
   85 Fed. Reg. 40,202 (Dep't of Commerce July 6, 2020) ............................................32, 33

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No-Shipments; 2018–2019*,
   85 Fed. Reg. 74,983 (Dep't of Commerce Nov. 24, 2020)..................................................8

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review; 2018-2019*,
   86 Fed. Reg. 28,574 (Dep't of Commerce May 27, 2021) .................................................2

1994 U.S.C.C.A.N. 3773 ......................................................................................................36

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE JANE A. RESTANI, JUDGE

———————————————————————— )
ICDAS CELIK ENERJI TERSANE VE          )
ULASIM SANAYI, A.S. and KAPTAN         )
DEMIR CELIK ENDUSTRISI VE              )
TICARET A.S.,                          )
                                       )
            Plaintiffs,                )
                                       )
     v.                                )      Court No. 21-00306
                                       )
UNITED STATES,                         )
                                       )
            Defendant,                 )
                                       )
REBAR TRADE ACTION COALITION,          )
                                       )
            Defendant-Intervenor.      )
———————————————————————— )

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the

United States, respectfully responds to the motion for judgment on the administrative record filed

by plaintiffs, Icdas Celik Enerji Tersane Ve Ulasim Sanayi, A.S. (Icdas), and Kaptan Demir

Celik Endustrisi Ve Ticaret A.S. (Kaptan) (collectively plaintiffs or respondents).  Plaintiffs

challenge the final determination of the United States Department of Commerce (Commerce) in

the second administrative review of the antidumping duty order covering steel concrete

reinforcing bar from the Republic of Turkey.  As explained below, the motion should be denied

because Commerce's determination is supported by substantial evidence and is otherwise in

accordance with law.

## RULE 56.2 STATEMENT

### I.     The Administrative Determination Under Review

The administrative determination under review is Commerce's determination in *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 28,574 (Dep't of Commerce May 27, 2021) (Final Results) and the accompanying Issues and Decision Memorandum (IDM) (P.R. 159).[1]  The period of review is July 1, 2018, through June 30, 2019.

### II.    Issues Presented For Review

1.   Whether Commerce properly denied Icdas's request for a duty drawback adjustment because Icdas provided no record evidence that the government of Turkey had forgiven Icdas's duty liability.

2.   Whether Commerce's decision to deduct Section 232 duties from Icdas's and Kaptan's export prices is supported by substantial evidence and in accordance with law.

3.   Whether Commerce's decision to deduct the additional Section 232 duties implemented pursuant to Presidential Proclamation 9772 is supported by substantial evidence and in accordance with law.

4.   Whether Commerce properly limited its high inflation analysis to data from the period of review.

### SUMMARY OF ARGUMENT

Plaintiffs' motion for judgment on the agency record challenging Commerce's Final Results should be denied.  Icdas is not entitled to a duty drawback adjustment because it failed to

---

[1] Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

2

place evidence on the record that the government of Turkey had closed its Inward Processing

Certificates (IPCs), thereby forgiving Icdas's duty liability.

Additionally, this Court has consistently rejected claims that Section 232 duties should

not be deducted from export price, and it should do so again here.  *See Borusan Mannesmann*

*Boru Sanayi ve Ticaret A.S. and Borsuan Mannesmann Pipe U.S. Inc. v. United States*, 494 F.

Supp. 3d 1365 (Ct. Int'l Trade 2021); *Deacero S.A.P.I DE C.V. et al. v. United States*, No. 20-

3924, 2021 WL 6067010, slip op. 21-171 (Ct. Int'l Trade Dec. 20, 2021); *Power Steel Co. v.*

*United States*, No. 20-03771, 2021 WL 6098309, slip op. 21-173 (Ct. Int'l Trade Dec. 23, 2021).

The antidumping duty statute provides that the price used to establish constructed export

price (*i.e.*, United States price) shall be reduced by the amount included in such price attributable

to "United States import duties."  19 U.S.C. § 1677a(c)(2)(A).  The phrase "United States import

duties" is ambiguous, *see, e.g.*, *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359 (Fed.

Cir. 2007); *Fla. Citrus Mut. v. United States*, 515 F. Supp. 2d 1324, 1331 (Ct. Int'l Trade 2007),

*aff'd*, 550 F.3d 1105 (Fed. Cir. 2008), and, therefore, Commerce's interpretation of the phrase to

encompass Section 232 duties is entitled to deference under *Chevron U.S.A. Inc. v. Nat'l Res.*

*Def. Council Inc.*, 467 U.S. 837 (1984).

In its Final Results, Commerce determined that Section 232 duties were not similar to

antidumping or safeguard duties, and, therefore, Section 232 duties constituted "United States

import duties" that must be deducted from plaintiffs' export price.[2]  Not only is Commerce's

---

[2] The legislative history of the Antidumping Act of 1921 referred to antidumping duties as "special dumping duties," signifying that "special dumping duties" were distinguished and treated differently from ordinary "United States import duties" under the antidumping duty statute.  *See* S. Rep. No. 67-16 (1921).  Commerce's practice of distinguishing antidumping duties from "United States import duties" has been sustained by this Court and the Federal Circuit.  *See, e.g., U.S. Steel Grp., a Unit of USX Corp. v. United States,* 15 F. Supp. 2d 892, 898 (Ct. Int'l Trade 1998) (collecting cases); *Wheatland Tube*, 495 F.3d at 1361 (sustaining

analysis consistent with the antidumping statute, but it is harmonious with the President's

proclamations, which explicitly treat Section 232 duties as any other duties, referring to them as

"ordinary" customs duties and instructing that the duties be imposed in addition to all other

duties, including antidumping duties.  IDM at 27-28.  Thus, Commerce's interpretation of the

statute is reasonable and should be sustained.

Finally, Commerce properly relied on data only from the period of review to determine if

the period of review experienced high inflation.  Icdas's arguments to the contrary are based on a

misunderstanding of the facts and should be rejected.

## STATEMENT OF FACTS

On March 8, 2018, pursuant to his authority under Section 232 of the Trade Expansion

Act of 1962 (Section 232), 19 U.S.C. § 1862, the President imposed a 25 percent *ad valorem*

tariff on imports of steel articles from all countries, except Canada and Mexico, effective March

23, 2018.  *See Proclamation 9705 of March 8, 2018 Adjusting Imports of Steel Into the United

States*, 83 Fed. Reg. 11,625 (Mar. 15, 2018).

The President concurred with the Secretary of Commerce's finding that steel articles

were being imported into the United States in such quantities and under such circumstances as

to threaten to impair the country's national security.  *Id.* ¶ 5; *see* 19 U.S.C. § 1862(b)(3)(A).

The Secretary found that excessive steel imports were weakening our internal economy and

shrinking our ability to meet national security steel production requirements in a national

emergency.  Proclamation 9705, ¶ 2.  The goal of the 25 percent tariff was to reduce imports to

a level that would "ensure that domestic producers can continue to supply all the steel necessary

Commerce's determination that safeguard duties, like antidumping duties, do not fall within the
meaning of "United States import duties.").

4

for critical industries and national defense." *Id.* ¶¶ 4-5, 8.  The President stated that the new 25

percent tariff applied "in addition to any other duties, fees, exactions, and charges applicable to

such imported steel articles." *Id.* clause 2.

To establish the tariff, the President modified subchapter III, chapter 99, of the

Harmonized Tariff Schedule of the United States (HTSUS) to add a new heading, 9903.80.01,

which provided for an additional 25 percent tariff for "products of iron or steel provided for in

the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of

Canada [or] of Mexico…or any exclusions that may be determined and announced by the

Department of Commerce."  HTSUS, Revision 2, Chapter 99, heading 9903.80.01 (Posted Mar.

29, 2018).  The President also added a new Note 16, subsection (a) of which provided:

> Heading 9903.80.01 sets forth the *ordinary customs duty* treatment
> applicable to all entries of iron or steel products from all countries,
> except products of Canada and of Mexico, classifiable in the
> headings or subheadings enumerated in this note.  Such goods shall
> be subject to duty as provided herein.  No special rates of duty
> shall be accorded to goods covered by heading 9903.80.01 under
> any tariff program enumerated in general note 3(c)(i) to the tariff
> schedule.  *All anti-dumping, countervailing, or other duties and
> charges applicable to such goods shall continue to be imposed*.

Proclamation 9705, Annex (U.S. Note 16(a) (emphasis added)).  Consistent with the President's

instructions, the following row was added to the HTSUS:

| Heading/ Subheading | Stat Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | 1 | | 2 |
| | | | | General | Special | |
| 9903.80.01 | 1/ | Products of iron or steel provided for in the tariff headings or subheadings enumerated in note 16 to this subchapter, except products of Canada, of Mexico, of Australia, of Argentina, of South Korea, of Brazil, or of the member countries of the European Union or any exclusions that may be determined and announced by the Department of Commerce.................... | 1/ | 25% | | The duty provided in the applicable subheading + 25% |

HTSUS, Revision 2, Chapter 99, heading 9903.80.01 (Posted Mar. 29, 2018).  Imports of steel

rebar produced by Kaptan and Icdas were thus subject to the 25 percent tariff after March 23,

2018.  *See* Proclamation 9705, clause 2.

On August 10, 2018, the President increased the tariff on Turkish steel imports from 25

percent to 50 percent, effective August 13, 2018.  *See Proclamation 9772 of August 10, 2018*

*Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 40,429 (Aug. 15, 2018).  Imports

of steel rebar produced by Kaptan and Icdas were thus subject to the 50 percent tariff after

August 13, 2018.  *See* Proclamation 9772, ¶ 6.

On May 16, 2019, the President reduced the tariff on Turkish steel imports from 50

percent back to 25 percent.  *See Proclamation 9886 of May 16, 2019 Adjusting Imports of Steel*

*Into the United States*, 84 Fed. Reg. 23,421 (May 21, 2019).

On September 10, 2019, Commerce published the initiation notice for the second

administrative review of the antidumping duty order covering steel concrete reinforcing bar from

the Republic of Turkey.  *Initiation of Antidumping and Countervailing Duty Administrative*

*Reviews*, 84 Fed. Reg. 47,242, 47,250 (Dep't of Commerce Sept. 9, 2019) (P.R. 10).  The review

concerned two producers/exporters of the subject merchandise, with Icdas and Kaptan selected

as the mandatory respondents.  Respondent Selection Memo (P.R. 27) at 1.

Commerce issued questionnaires to Icdas and Kaptan on February 24, 2020.  (P.R. 29 and

31).  On April 15, 2020, Icdas submitted its Section C questionnaire response in which it

requested a duty drawback adjustment.  Icdas Section C Questionnaire Response (P.R. 56) at C-

38.  Icdas explained that under the government of Turkey's duty drawback scheme, identified as

the Inward Processing Regime (IPR), producers were eligible to have liability forgiven for

Turkish import duties on certain inputs that are used for production of products destined for

export.  *Id*. at C-38-39.  Icdas reported that it had participated in Turkey's duty drawback scheme during the period of review.  *Id*. at C-39.  Icdas explained in detail that the user of the IPR is required to obtain an IPC (Inward Processing Certificate) which keeps track of all of the eligible imported inputs and the exports which are made from them.  *Id*.  Icdas reported that "{a}fter confirming that all inputs imported with IPR exemptions are used in the production of the exported goods, the Ministry of Trade of the Turkish Government closes out the certificates."  *Id*. However, Icdas provided no evidence that the Ministry of Trade of the Turkish Government had closed out any of Icdas's IPCs relevant to the review at issue.

Further, Appendix V of Commerce's initial questionnaire requested that Icdas and Kaptan report any Section 232 duties paid during the period of review.  Commerce Initial Questionnaire, Appendix V (P.R. 29 and 31).  Both Icdas and Kaptan reported that they had paid Section 232 duties on subject merchandise during the period of review.  Icdas Section C Questionnaire Response (P.R. 56) at C-33; Kaptan Section C Questionnaire Response (P.R. 58) at C-34.

In Section D of the questionnaire, Commerce also requested that plaintiffs report their cost of production (COP) for the period of review.  Section D Questionnaire (P.R. 29 and 31) at D-2.  Specifically, Commerce asked plaintiffs to "{c}alculate reported COP and CV {(constructed value)} figures based on the actual costs incurred by your company during the period of review (POR), as recorded under your company's normal accounting system."  *Id*. (footnote omitted).  The questionnaire further stated that "{i}f in any month during the period of review the annual inflation rate in the foreign market was in excess of 25 percent," the respondents should contact the official in charge by no later than two weeks after issuance of the questionnaire.  *Id*. at A-10 to A11.

Both Icdas and Kaptan reported to Commerce that, based on Turkish Statistical Institute data and the producer price index, the annual rate of inflation in Turkey exceeded 25 percent during the period of review.  *See* Icdas and Kaptan Notice of Inflation Rate Above 25 Percent (P.R. 37) at 1-2 and Attachment; Icdas Section D Questionnaire Response (P.R. 60) at D-22-D-23 and Exhibit D-11; Kaptan Section D Questionnaire Response (P.R. 59) at D-14 and Exhibit D-8.

Defendant-Intervenor, Rebar Trade Action Coalition (RTAC), submitted a response to Idcas's and Kaptan's assertions that inflation exceeded 25 percent during the period of review. RTAC Comments on High Inflation (P.R. 63) at 3-5.  RTAC explained that plaintiffs' inflation calculations included an extra month of data prior to the 12-month period of review, and that removing the non-period of review data from the calculation resulted in an inflation calculation that was less than the 25 percent threshold.  *Id.* at 3.

On November 24, 2020, Commerce published its preliminary results.  *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 74,983 (Dep't of Commerce Nov. 24, 2020) (P.R. 127) (Preliminary Results).  Commerce denied Icdas's request for a duty drawback adjustment because "Icdas did not provide evidence demonstrating that any of the IPCs pertaining to the amounts of duty drawback claimed were closed by the Government of Turkey."  Preliminary Issues and Decision Memorandum (PDM) (P.R. 114) at 15.

Commerce also determined that Section 232 duties are "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A), and, thus, must be deducted from Icdas's and Kaptan's United States price.  PDM at 11-13.  Relying on Section 232's statutory text, the Court of Appeals for the Federal Circuit's decision in *Wheatland Tube*, and language from the President's proclamations implementing Section 232 duties, Commerce determined that Section 232 duties

were not akin to antidumping duties or Section 201 duties—which are not considered "United States import duties" under the antidumping statute—because Section 232 duties are imposed to address imports that threaten to impair national security, while antidumping and Section 201 duties remedy injuries to the domestic industry. *Id*. at 12.

Additionally, based on 12 months of data covering the period of review, Commerce determined that Icdas and Kaptan did not experience high inflation over 25 percent. *Id*. at 19. Commerce declined to rely on data from June 2018 because such data was outside the period of review. *Id.*

On May 27, 2021, Commerce published its Final Results. Consistent with its Preliminary Results, Commerce did not grant Icdas a duty drawback adjustment. IDM at 16-19. In rejecting Icdas's argument that official letters from the Turkish government closing the IPCs were not necessary, Commerce cited to recent administrative determinations demonstrating that it was Commerce's practice to only permit a duty drawback adjustment if the Turkish government had closed the IPC. *Id*. at 16. Although Icdas had submitted documentation to the Turkish government for IPC closure, Icdas provided no evidence that the Turkish government had actually closed the IPCs. *Id*. at 16-17.

Moreover, Commerce noted that Icdas had indicated in its initial questionnaire response that imports and exports associated with some IPCs had not yet been completed, and that Icdas had submitted an estimated export calculation for uncompleted IPCs. *Id.*; *see* Icdas Section C Questionnaire Response (P.R. 56) at C-40.

Commerce rejected additional factual information that Icdas had submitted on September 17, 2020—well after the April 15, 2020, deadline—because Icdas's submission did not comply with Commerce's regulations and deadlines. IDM at 17. Icdas failed to follow Commerce's

questionnaire instructions requiring respondents to contact the official in charge of the case and request an extension if they are unable to provide all of the documentation by the deadline.  *Id*. at 17-18.  Further, Commerce explained that in cases in which parties are requesting an adjustment to the dumping calculations, the respondent carries the initial burden to demonstrate (in a timely fashion) that it is entitled to the adjustment and Commerce is not required to issue supplemental questionnaires in such circumstances if the party has failed to provide evidence that it is entitled to the adjustment.  *Id*. at 18.

Commerce also continued to deduct Section 232 duties from plaintiffs' United States prices.  *Id*. at 26.  Commerce rejected respondents' argument that deducting Section 232 duties would result in double-counting, reasoning that "the function of section 232 duties and section 201 duties are separate and distinct" such that there is no overlap between them.  *Id.* at 28.  Commerce also declined to cap the Section 232 deduction at 25 percent.[3]  *Id.*

Finally, Commerce continued to use the inflation index data from the 12 months that comprised the period of review—July 1, 2018 to June 30, 2019—to determine if Icdas and Kaptan experienced high inflation of their costs.  *Id*. at 21.  Based on that data, Commerce determined that during the period of review, Turkish inflation did not reach the 25 percent threshold to trigger Commerce's practice of resorting to quarterly costs instead of annual average costs in determining cost of production and constructed value.  *Id*. at 22.  Commerce declined respondents' invitation to add an extra month of data not included within the period of review because measuring potential high inflation during the same period in which the cost of

---

[3] *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1249 (Ct Int'l Trade 2020), which invalidated the 25 percent tariff increase on Turkish steel imports (increasing the tariff to 50 percent), was subsequently overturned on appeal, *Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021).

production and constructed value are reported is predictable and consistent with Commerce's long-established practice. *Id*. at 22-23.

## ARGUMENT

## I.     Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court reviews Commerce's statutory interpretations, it employs the two-pronged test established in *Chevron*, 467 U.S. at 842-43. The Court first examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency must comply with Congress's clear intent. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's

answer is based on a permissible construction of the statute." *Id*. at 843.  In such cases, "{a}ny

reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*,

354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's

"interpretation governs in the absence of unambiguous statutory language to the contrary or

unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citation

omitted).  The Court "need not conclude that the agency construction was the only one it

permissibly could have adopted to uphold the construction, or even the reading the court would

have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at

843 n.11.  Indeed, "the whole point of *Chevron* is to leave the discretion provided by the

ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316 (citation

omitted).

Finally, this Court affords Commerce an especially great deal of deference "when a

statute fails to make clear 'any Congressionally mandated procedure or methodology for

assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363

(Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)).

In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'"

*Id.* (quoting *U.S. Steel Grp.*, 96 F.3d at 1362).  Consequently, Commerce receives "tremendous

deference" that is "both greater than and distinct from that accorded the agency in interpreting

the statutes it administers" when it exercises its technical expertise to select and apply

methodologies to implement the dictates of the trade statute.  *Fujitsu Gen., Ltd. v. United States*,

88 F.3d 1034, 1039 (Fed. Cir. 1996).

## II.    <u>Icdas Is Not Entitled To A Duty Drawback Adjustment</u>

In the Final Results, Commerce correctly determined that Icdas was not entitled to a duty

drawback adjustment because Icdas had failed to provide any evidence that the Turkish

government had forgiven Icdas's duty liability.  IDM at 16-19.  Icdas's primary argument is that

an IPC is "closed" when imports and exports under that IPC are completed.  Pl. Br. (Dkt. No. 25)

at 11.  Icdas argues that Commerce's use of only closed IPCs—that is, IPCs that have been

officially closed by the government of Turkey—is inconsistent with Commerce's past practice

and case law.  *Id.*  As we demonstrate below, Icdas is wrong.

### A.    <u>Legal Framework</u>

Goods that are imported into the United States will be subject to an antidumping margin

if Commerce determines that the foreign like product is being sold in the United States at "less

than its fair value."  19 U.S.C. § 1673.  The amount of the antidumping duty reflects the amount

by which the home market price of the foreign like product (or normal value) exceeds the price

charged in the United States (or export price or constructed export price).  19 U.S.C.

§ 1677b(a)(1)(A)-(B).  This difference is referred to as the "dumping margin."  19 U.S.C.

§ 1677(35)(A).

In calculating the United States price of the product sold in the United States, the statute

requires Commerce to increase export price or constructed export price by "the amount of any

import duties imposed by the country of exportation which have been rebated, or which have not

been collected, by reason of the exportation of the subject merchandise to the United States."  19

U.S.C. § 1677a(c)(1)(B).  This provision is referred to as the duty drawback provision.  As the

Federal Circuit recognized in *Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*, 635 F.3d

1335, 1340 (Fed. Cir. 2011), the purpose of the duty drawback adjustment is to ensure duty

neutrality, *i.e.*, "to account for the fact that the producers remain subject to the import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases {normal value}."  In other words, "when a duty drawback is granted only for exported inputs, the cost of the duty is reflected in {normal value} but not in {export price}," and the duty drawback adjustment corrects this imbalance.  *Id.*; PDM at 14.

The duty drawback provision recognizes two types of duty drawback schemes:  rebate schemes and exemption schemes.  *Saha Thai*, 635 F.3d at 1340-44.  Rebate schemes are those in which the respondent pays import duties on inputs that can be used to make subject merchandise and the government rebates the paid duties upon exportation of the finished good which is "booked" or entered in the company records.  Exemption schemes are those in which an "off the books" liability is created when import duties are owed on inputs but not actually paid at the time of importation.  Under an exemption scheme, when the finished product is exported, the government extinguishes the liability for the duty payable or "off the books" liability.  If the product is not exported, the government then collects the import duties. Once the government makes the decision to rebate the duty or extinguish the duty liability (*i.e.*, to ultimately not collect the duty), the amount rebated or extinguished becomes a drawn back duty.  The Turkish IPR scheme at issue in this case is an exemption scheme.  *See* PDM at 15.

To determine whether a respondent qualifies for a duty drawback adjustment, Commerce traditionally uses a two-pronged test:  (1) the import duty paid and rebate payment are directly linked to, or dependent upon, one another, or the exemption from import duties is linked to the exportation of subject merchandise, and (2) there are sufficient imports of the imported raw materials to account for the drawback received upon the exports of the subject merchandise. PDM at 14; *Saha Thai*, 635 F.3d at 1340-41; *accord Allied Tube & Conduit Corp. v. United*

*States*, 374 F. Supp. 2d 1257, 1261 (Ct. Int'l Trade 2005); *see also Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61,716, 61,723 (Dep't of Commerce Oct. 19, 2006).  With regard to the Turkish IPR, it is Commerce's practice to allow adjustments only for IPCs that have been closed by the Turkish government.  IDM at 16; PDM at 15; *HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 439 F. Supp. 3d 1342, 1349 (Ct. Int'l Trade 2020).

### B.  Commerce Properly Denied Icdas's Request For A Duty Drawback Adjustment Because Icdas Provided No Record Evidence That Its IPCs Were Closed

In the Final Results, Commerce found that Icdas was not entitled to a duty drawback adjustment because Icdas provided no evidence that its IPCs were closed by the Turkish government.  IDM at 16-19.  Icdas argues that the Turkish duty drawback program meets Commerce's traditional two-pronged test which should be sufficient to qualify for the duty drawback adjustment, Pl. Br. at 8-11; an IPC is closed when imports and exports under the IPC are completed, Pl. Br. at 11-15; Icdas completed all of its imports and export under the IPCs, Pl. Br. at 15-20; and Commerce should have accepted its untimely submission of new factual information, Pl. Br. at 20-22.  We address each of Icdas's arguments in turn, all of which lack merit.

*First*, satisfaction of the traditional two-pronged test is insufficient for purposes of granting a duty drawback adjustment with regard to the Turkish inward processing regime. PDM at 15; IDM at 16.  Commerce's more-recent practice with regard to the Turkish IPR is to rely on the traditional two-pronged test *and* use only IPCs closed by the Turkish Government for purposes of calculating a duty drawback adjustment.  PDM at 15; *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 81 Fed. Reg. 47,355 (Dep't of Commerce July 21, 2016) (*HWRPT*), accompanying IDM at Comment 4, page 37 (basing the

duty drawback adjustment "on only closed DIIBs" "consistent with our past practice" because Turkish companies are liable for the duties until satisfying the export requirements under a DIIB); *Light-Walled Rectangular Pipe and Tube*, 82 Fed. Reg. 47,477 (Dep't of Commerce Oct. 12, 2017) (*LWRPT*), accompanying Issues and Decision Memorandum at Comment 5, page 10 (denying adjustment where respondent "ha[d] not provided any evidence that two of the three DIIBs related to POR sales have been closed.").

This Court recently sustained Commerce's decision, in another segment of the proceeding at issue, to base eligibility for inclusion in the adjustment on the existence of record evidence establishing that the IPC has been closed by the Turkish government. *Habas*, 439 F. Supp. 3d at 1349. In *Habas*, the respondent argued that Commerce was required to include IPC #1598 that had not been closed in its duty drawback adjustment. *Id*. at 1348. The Court held that "Commerce reasonably predicates its inclusion of IPC's on evidence of closure as demonstrating final duty exemption; . . . {a}ccordingly, this aspect of Commerce's determination is sustained." *Id*. at 1349. Icdas is simply wrong that Commerce has added a "new requirement in this review[.]" Pl. Br. at 22; IDM at 16 (explaining Commerce's practice of requiring IPC closure for duty drawback adjustments under the Turkish IPR). Since 2016, Commerce has consistently applied the duty drawback adjustment to only those IPCs that have been officially closed by the government of Turkey. *HWRPT* (2016); *LWRPT* (2017).

But even if Commerce had changed its methodology in this proceeding, this Court should sustain it because Commerce's methodology is permissible under the statute and Commerce provided good reasons for requiring actual closure of the IPCs. *See F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) ("it suffices that the new [agency] policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better,

which the conscious change of course adequately indicates."); *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009) (applying *Fox Television* and reasoning that "Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology.").  The statute requires Commerce to increase export price or constructed export price by "the amount of any import duties imposed by the country of exportation which have been rebated, *or which have not been collected*, by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. § 1677a(c)(1)(B) (emphasis added).  Icdas conceded in its questionnaire response that "{a}fter confirming that all inputs imported with IPR exemptions are used in the production of the exported goods, the Ministry of Trade of the Turkish Government closes out the certificates."  Icdas Section C Questionnaire Response (P.R. 56) at C-39.  Therefore, based on Icdas's own description of the IPR and IPC system, the Turkish government has to "confirm that all inputs imported with IPR exceptions are used in the production of the exported goods" *before* the Turkish government "closes out the" IPCs.  *Id.*  If the Turkish government has not made its "confirmations" in the duty drawback system and closed the IPC, there is no drawn back duty for which to make an adjustment.  *See* IDM at 16.  In other words, the duty can still be collected if Icdas fails the confirmation process.  *See id.* (explaining that unless the duty liability has been extinguished, the duty has not been drawn back, the liability remains, and it does not qualify for the adjustment).  Commerce's methodology is not new, but even if it were, it should be sustained.

   ***Second***, IPCs are not closed when imports and exports under that IPC are completed, as Icdas urges.  Pl. Br. at 11.  Icdas's own questionnaire responses contradict this argument.  *See* Icdas Section C Questionnaire Response (P.R. 56) at C-39 (stating that "{a}fter confirming that

all inputs imported with IPR exemptions are used in the production of the exported goods, the Ministry of Trade of the Turkish Government closes out the certificates.").

As Commerce explained in *LWRPT*, merely applying for closure of an IPC is insufficient because "a company's application to close a DIIB may be modified or suspended," meaning submission of the application does not automatically result in extinguishment of the duty liability. *LWRPT* IDM at 15. Icdas acknowledges on page 17 of its brief that the government of Turkey could exclude a portion of Icdas's exports during the liquidation process. Pl. Br. at 17. Thus, although Commerce stated in *HWRPT* that it considers IPCs closed when the exporting company applied to the Turkish government for closure, Pl. Br. at 12; *HWRPT* IDM at 37, Commerce clarified in *LWRPT* that a company's application to close, without more, is insufficient. *LWRPT* IDM at 15. Importantly, in *HWRPT*, Commerce actually "disallowed two of the three DIIBs under which the respondent requested a duty drawback adjustment because one DIIB remained open and the other DIIB was suspended *after* the respondent had applied for closure." *Id.*; IDM at 16. Accordingly, notwithstanding Commerce's statements suggesting otherwise, the facts in *HWRPT* are consistent with Commerce's practice of only applying a duty drawback to IPCs that have been officially closed by the government of Turkey. *See id.*

Additionally, Icdas improperly relies on three documents that are not part of the administrative record.[4] Pl. Br. at 12-21. These documents are three verification reports from

---

[4] (1) Memorandum from A. Maldonado to The File, re: Verification of the Sales Response to Toscelik Profil ve Sac Endustrisi A.S.(Toscelik Profil) and Tosyali Dis Ticaret A.S. (Tosyali) in the Antidumping Duty Investigation of Welded Line Pipe from Turkey (A-489-822) (July 16, 2015) (*Welded Line Pipe Verification Report*), ACCESS Barcode: 3291956-01; (2) Memorandum from J. Lawska and G. McMahon to the File, re: Verification of the Sales Responses of Icdas in the 2012-13 Investigation of Steel Concrete Reinforcing Bar From Turkey (A-489-818) (June 27, 2014) (*2012-2013 Investigation Verification Report*), ACCESS Barcode 3212338-01; (3) Memorandum from B. Hansen to The File, re: Verification of the Sales Response of Cayirova Boru Sana ve Ticaret A.S. and Yucel Borun Ithalat-Ihracat Ve Pazarlama

antidumping cases on Turkish welded lined pipe, Turkish oil country tubular goods, and an

earlier investigation of Turkish rebar from 2012-2013.  *Id.*; *see id.* at 12, 19 (citing an ACCESS

Barcode Number rather than the administrative record).  The Court should not consider these

extra-record documents.[5]

 Moreover, the arguments Icdas now raises to the Court based on these documents were

not presented to Commerce in the underlying administrative proceeding.  It is axiomatic that a

party must raise all arguments during administrative proceedings before Commerce so that

Commerce has an opportunity to fully develop the record and respond to the argument before it

is presented to this Court for consideration.  *See Corus Staal BV v. United States*, 502 F.3d 1370,

1379 (Fed. Cir. 2007); *see also* 19 C.F.R. § 351.309(c)(2); 28 U.S.C. § 2637(d); *Mittal Steel

Point Lisas Ltd. v. United States,* 548 F.3d 1375, 1384 (Fed. Cir. 2008).

 Even if these verification reports were part of the administrative record and Icdas had not

failed to exhaust its administrative remedies, they are simply verification reports and do not

represent Commerce's ultimate decisions because, by their explicit terms, such reports are

---

A.S.,Ltd. in the Less Than Fair Value Investigation of Certain Oil Country Tubular Goods From
the Republic of Turkey (A-489-816) (March 31, 2014) (*OCTG Verification Report*), ACCESS
Barcode 3193110-01.

 [5] The statute, in relevant part, defines the "Record for Review" as:

 . . . a copy of all information presented to or obtained by the Secretary, the
administering authority . . . during the course of the administrative proceeding,
including all governmental memoranda pertaining to the case and the record of ex
parte meetings . . . and . . . a copy of the determination, all transcripts or records
of conferences or hearings, and all notices published in the Federal Register.

19 U.S.C. § 1516a(b)(2).  These documents were not placed on the record of the administrative
review by any interested party and are therefore not part of the record of the 2018-2019
administrative review at issue.

limited to providing "parties with a factual report of the methods, procedures, and results collected and obtained during the Department's verification exercise."[6]   The front page of each verification report states explicitly:  "This report does not draw conclusions as to whether the reported information was successfully verified, and further does *not* make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in the Department's determinations."[7]   Drawing conclusions about Commerce's determination from the extra-record verification reports is exactly what Idcas is inappropriately asking the Court to do.

*Third*, in light of the above explanation, it is irrelevant that Icdas claims to have completed all of its imports and exports under the IPCs.  *See* Pl. Br. at 15-20.  As an initial matter, while Icdas submitted closure applications to the Turkish government, Icdas stated in its initial questionnaire response that imports and exports had *not* yet been completed.  Icdas Section C Questionnaire Response (P.R. 56) at C-40; IDM at 16-17.  Indeed, Icdas submitted just an *estimated* export calculation for uncompleted IPCs based on a ratio of exports to imports of its completed IPCs.  Icdas Section C Questionnaire Response (P.R. 56) at C-40; IDM at 17.  But in any event, "completion of imports and exports" is not the standard that Commerce utilizes.  The critical piece of information missing from the record is the notice from the Turkish government that—as Icdas described in its questionnaire responses—the government has confirmed compliance with the terms of the Turkish duty drawback scheme and officially closed the IPC thereby actually extinguishing the duty liability.  Citations to older administrative proceedings— before Commerce changed its practice—are inapposite.  *See* Pl. Br. at 13 (citing a 2014 proceeding).

---

[6] *Welded Line Pipe Verification Report*, at 1; *2012-2013 Investigation Verification Report*, at 1; *OCTG Verification Report*, at 1.

[7] *Id.* n. 6.

Icdas cites *Toscelik Profil ve Sac Endustrisi, A.S. v United States*, 348 F. Supp. 3d 1321, 1325-26 (Ct. Int'l Trade 2018), for the general proposition that Commerce may not change its policy for IPCs and must accept IPCs that have not been officially closed.  Pl. Br. at 14.  This Court has already held that *Toscelik* does not stand for such a proposition.  *Habas*, 439 F. Supp. 3d. at 1348.  Nor could it, as agencies are indisputably allowed to change their methodology. *See Fox Television*, 556 U.S. at 515; *Huvis*, 570 F.3d at 1354-56.

Moreover, *Toscelik* addressed the narrow issue of whether Commerce may refuse to accept official closure information received after the period of investigation, not whether submission of closure application is sufficient to constitute closure.  *Habas*, 439 F. Supp. 3d. at 1325.  Indeed, in *Toscelik*, Commerce verified that IPCs which were open at the end of the period of investigation had been closed prior to verification—a critical distinction from the facts in this case and in *Habas*.  *See Habas*, 439 F. Supp. 3d at 1347.  *Habas*, which sustained Commerce's most-recent practice requiring official closure of the IPCs, should govern here.

Icdas also picks apart Commerce's IDM, placing great emphasis on a portion of one of Commerce's statements.  *See* Pl. Br. at 14 (quoting IDM at 16, and arguing that Commerce considers IPCs closed when "import certificates to which the company was no longer permitted by the GOT to add import or export information[.]").  Citing a verification report that is not included in the administrative record, Icdas suggests that after an IPC expires or is fulfilled, Turkish companies can no longer apply additional imports or exports to the IPC.  Pl. Br. at 14-15.  But Commerce clearly stated that its "practice is to use only IPCs *closed by the government*" because "[u]ntil the government closes the IPC, the duty liability remains."  IDM at 16 (emphasis added).  And as stated above, the extra-record statements that Icdas pulls from verification reports may not be considered and are not helpful in any event because those

statements are not final determinations by Commerce.  Regardless, since 2016, Commerce has consistently required evidence that the certificate is officially closed and the duty liability is extinguished.  IDM at 16.  Mere disagreement with Commerce's well-reasoned practice does not carry Icdas's heavy burden.

**_Finally_**, Commerce correctly rejected Icdas's submission of untimely new factual information.  Section 351.301(c) of Commerce's regulations provides deadlines for the submission of factual information (1) in response to questionnaires and rebuttals, (2) in support of allegations, (3) submitted to value factors of production or to measure adequacy of remuneration, (4) that Commerce places on the record and rebuttals, and (5) which is not covered by sections (c)(1)-(4).  19 C.F.R. § 351.301(c)(1)-(5).  Subsection (c)(5) applies to "factual information other than that described in § 351.102(b)(21)(i)-(iv)."  *Id.* § 351.301(c)(5); § 351.102(b)(21)(i)-(iv)  (defining "factual information").

Commerce "will reject information" filed under section 351.301(c)(5) "that satisfies the definition of information described in § 351.102(b)(21)(i)-(iv) and that was not filed within the deadlines specified . . . ."  *Id.*  All submissions of factual information under subsection (c)(5) "are required to *clearly explain* why the information contained therein does not meet the definition of factual information described in § 351.102(b)(21)(i)-(iv), and must provide a detailed narrative of exactly what information is contained in the submission and why it should be considered."  *Id.* (emphasis added); *see* 19 C.F.R. § 351.301(b) ("Every submission of factual information must be accompanied by a written explanation identifying" what type of factual information is being submitted, in accordance with the definitions provided in section 351.102(b)(21)).

Additionally, for any submission identified under section 351.102(b)(21)(v)—which covers "[e]vidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence"—"the party must explain why the information does not satisfy the definitions described in 19 C.F.R. § 351.102(b)(21)(i)-(iv)."  19 C.F.R. § 351.301(b)(1).[8]  Icdas failed to follow these regulations and its submission of factual information was therefore properly rejected.

On September 17, 2020, Icdas filed a submission ostensibly under 19 C.F.R § 351.301(c)(3) (factual information submitted to value factors of production or to measure adequacy of remuneration).  Commerce Letter Rejecting Icdas' Submission of New Factual Information (P.R. 91) at 2 (Rejection Letter).  Because duty drawback information is not related to factors of production or the adequacy of remuneration, Commerce determined that Icdas had not identified the appropriate regulatory section as required by the regulations.  *Id*. at 1-2; *see* 19 C.F.R. § 351.301(b).  Commerce determined that the information should have been submitted in Icdas's Section C questionnaire response, but the deadline for doing so had lapsed in April 2020. IDM at 17-18.  Icdas also failed to explain in its submission "why the information does not satisfy the definitions described in 19 C.F.R. § 351.102(b)(21)(i)-(iv)"—a prerequisite to submitting information under 19 C.F.R. § 351.301.102(b)(21)(v).  *See* Rejection Letter at 1-2; s*ee also* IDM at 18.  Because Icdas failed to follow Commerce's regulations for the submission of new factual information, Commerce properly rejected its submission.

---

[8] Both 19 C.F.R. § 351.102(b)(21)(v) and 19 C.F.R § 351.301(c)(5) refer to the same information—information other than that described in 19 C.F.R. § 351.102(b)(21)(i)-(iv) or 19 C.F.R. § 351.301(c)(1)-(4).

Icdas incorrectly asserts that Commerce's interpretation of its regulations requires respondents to file all duty drawback information by the due date of the Section C questionnaire response.  Pl. Br. at 21.  As Commerce noted in its IDM, Commerce's questionnaire specifically instructs parties who cannot get all the necessary information by the date specified in the questionnaire to contact the official in charge immediately and request a formal extension in writing.  IDM at 20-21.  Icdas did neither.  *Id*. at 18.  Moreover, although Commerce rejected Icdas's submission, Icdas still had time to refile its submission of new information with the correct regulation and necessary detailed explanation.  *Id.* at 18-19.  Icdas did not do so, depriving Commerce of the opportunity to review a corrected submission.

As the questionnaire instructions demonstrate, Commerce explicitly contemplates that parties like Icdas may not have all necessary information in time for Section C questionnaire responses, but it is the respondents' responsibility to notify Commerce and file submissions in accordance with the regulatory requirements.  Icdas cannot blame Commerce for its failure to ask for an extension.  *See* 19 C.F.R. § 351.302(c) (A party may request an extension "*[b]efore the applicable time limit ... expires*," and such a "request must be in writing, ... and state the reasons for the request.") (emphasis added).  "In order for Commerce to fulfill its mandate to administer the antidumping duty law, including its obligation to calculate accurate dumping margins, it must be permitted to enforce the time frame provided in its regulations." *Yantai Timken Co. v. United States,* 521 F.Supp.2d 1356, 1371 (Ct. Int'l Trade 2007); *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1351 (Fed. Cir. 2015).

Icdas argues that Commerce should have issued a supplemental questionnaire.  Pl. Br. at 21-22.  But duty drawback is an adjustment for which the respondent bears the burden of making a prima facie case that it is entitled to receive.  *Fujitsu*, 88 F.3d at 1040 (the party seeking

adjustment bears burden of proof).  Icdas has asked for an adjustment to the dumping

calculations and failed to provide the information necessary to qualify for the adjustment.  As

Commerce stated in its IDM, if Icdas knew it could not get the documents by the deadline, the

questionnaires specifically instruct the submitter to contact the official in charge of the case and

request an extension, but Icdas did not do so.  IDM at 17-18.

Commerce's practice of requiring proof that the government of Turkey has officially

closed the IPC to qualify for a duty drawback adjustment is reasonable and supported by

substantial evidence.  Consequently, because Icdas failed to provide evidence of official closure

of its IPCs by the Turkish government, this Court, consistent with its prior opinion in *Habas*,

should affirm Commerce's denial of a duty drawback adjustment to Icdas.

## III.  Commerce's Determination That Section 232 Duties Are United States Import Duties For Purposes Of 19 U.S.C. § 1677a (c)(2)(A) Is Supported By Substantial Evidence And In Accordance With Law

Commerce determined that Section 232 duties constitute "United States import duties"

under the antidumping statute and deducted them from Kaptan's and Icdas's United States price.

IDM at 26-29.  This Court has on three occasions sustained Commerce's determination that

Section 232 duties must be deducted from United States price.  *Borusan*, 494 F. Supp. 3d 1365;

*Deacero*, slip op. 21.171 (Ct. Int'l Trade Dec. 20, 2021); *Power Steel*, slip op. 21-173 (Ct. Int'l

Trade Dec. 23, 2021).  Icdas and Kaptan have not raised any new or persuasive arguments that

warrant departing from those decisions.

Section 232 duties are import duties, and the phrase "United States import duties" is

broad, as this Court noted in *Borusan*, 494 F. Supp. 3d at 1375.  As Commerce explained,

reducing export price by Section 232 duties is consistent with the plain language of the

antidumping statute because it instructs Commerce to adjust export price for "the amount, if any,

included in such price, attributable to any . . . United States import duties."  IDM at 28 (quoting section 772(c)(2)(A)).

Moreover, in establishing the Section 232 duties, the President explicitly said that the new tariff heading "sets forth the *ordinary* customs duty treatment" applicable to steel imports, and that all antidumping duties shall continue to be imposed *in addition to* Section 232 duties. Proclamation 9705, clause 2 and Annex (emphasis added).  Thus, not only is Commerce's interpretation consistent with the language of the antidumping statute, but it is consistent with the President's proclamations.

Further, Commerce's determination is consistent with *Wheatland Tube.*  "{S}ection 232 duties are not akin to {special} antidumping or section 201 duties" because Section 232 duties serve a different purpose, do not have a statutorily-imposed duration, and there is no risk of double counting antidumping and Section 232 duties.  IDM at 27-28.  Thus, the Court should sustain Commerce's decision to deduct Section 232 duties from plaintiffs' export prices.

### A. Commerce Reasonably Determined That Section 232 Duties Are "United States Import Duties" That Must Be Deducted From Export Price

The goal of Commerce's statutorily prescribed antidumping calculation is to allow Commerce to compare the fair value of the merchandise to the price charged in the United States.  19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6); *see also, e.g., Apex Exports v. United States*, 777 F.3d 1373, 1374-75 (Fed. Cir. 2015) (holding that "{t}he overall goal {of the antidumping calculation methodology} is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise.").  Accordingly, both constructed export price and normal value are subject to adjustments "so that they closely reflect the price of subject merchandise at a common point in the chain of commerce."  *Id.* at 1374 (citing 19 U.S.C. § 1677b(a)(1)(B); 19 U.S.C. § 1677a(c)(2); 19 U.S.C. § 1677b(a)(6)).

Pertinent here, the antidumping statute directs Commerce to reduce Kaptan's and Icdas's constructed export price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and *United States import duties . . . .*"  19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  The term "United States import duties" is not defined in the statute, and Commerce's interpretation need only be reasonable to be sustained.  *See* 19 U.S.C. § 1677a(c)(2)(A); *Timken Co.*, 354 F.3d at 1342; *Wheatland Tube*, 495 F.3d at 1359-60.

Commerce explained that its decision is consistent with the statute's language because the statute directs Commerce to adjust constructed export price for United States import duties, and Section 232 duties are indisputably import duties.  *See* IDM at 28.  Commerce also explained that the Presidential proclamations contained no exception or indication that Section 232 duties should not be treated as "United States import duties" under the statute.  *See id*.  To the contrary, the proclamation states that Section 232 duties are to be imposed "in addition to other duties unless expressly provided for in the proclamation."  Proclamation 9705, clause 2 and Annex. Indeed, the President explicitly referred to the Section 232 duties as "ordinary" customs duties, *id.*, supporting Commerce's determination that "section 232 duties are treated as any other duties."  IDM at 28; *see* HTSUS, Revision 2, Chapter 99, heading 9903.80.01 (Posted Mar. 29, 2018) (table indicating that the rate of duty for steel imports is the duty provided in the regular, applicable subheading plus 25 percent).  Commerce's interpretation of the phrase "United States import duties" is reasonable and is entitled to deference because it is consistent with the broad language of the statute and with the President's proclamations.  *See, e.g.*, *Zenith Electronics Corp. v. United States*, 77 F.3d 426, 430 (Fed. Cir. 1996) (the Court must interpret an ambiguous statute "with deference to Commerce's interpretation. . . .").  Plaintiffs fail to articulate how Commerce's interpretation is inconsistent with the terms of the antidumping statute.

### B.  Commerce's Interpretation Is Consistent With *Wheatland Tube*

Icdas's and Kaptan's primary argument is that Commerce's interpretation is inconsistent with the analysis in *Wheatland Tube*.  *See* Pl. Br. at 27-34.  But this Court already sustained Commerce's analysis distinguishing Section 232 duties from the duties at issue in *Wheatland Tube*, and plaintiffs' arguments are, therefore, unavailing.  *See Borusan*, 494 F. Supp. 3d at 1374-76; *Deacero*, slip op. 21-171, pp. 6-9.  Nonetheless, we address plaintiffs' arguments.

As an initial matter, Commerce's interpretation of the phrase "United States import duties" as not including antidumping duties has been consistently sustained.  *See AK Steel Corp. v. United States*, 988 F. Supp. 594, 607 (Ct. Int'l Trade 1997); *Hoogovens Staal BV v. United States*, 4 F. Supp. 2d 1213, 1220 (Ct. Int'l Trade 1998); *U.S. Steel Group*, 15 F. Supp. 2d at 898-900; *Bethlehem Steel Corp. v. United States*, 27 F. Supp. 2d 201, 208 (Ct. Int'l Trade 1998); *see also Wheatland Tube*, 495 F.3d 1355.

In *Wheatland Tube*, the Federal Circuit sustained Commerce's interpretation of the same phrase as also not including Section 201 safeguard[9] duties.  495 F.3d at 1355-60.  In comparing Section 201 duties with antidumping duties, the Federal Circuit made the following observations:

> (1) "{l}ike antidumping duties, {Section} 201 safeguard duties are remedial duties that provide relief from the adverse effects of imports;"
>
> (2) "{n}ormal customs duties, in contrast, have no remedial purpose;"
>
> (3) "antidumping duties and {section} 201 safeguard duties, unlike normal customs duties, are imposed based on almost identical findings that domestic industry is being injured or threatened with injury due to the imported merchandise;" and

---

[9] Section 201, 19 U.S.C. § 2251, "permits the President of the United States to impose safeguard duties on imported merchandise if the merchandise 'is being imported into the United States in such increased quantities as to be a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article.'"  *Wheatland Tube*, 495 F.3d at 1357 (quoting § 2251).

> (4) "{Section} 201 safeguard duties are like antidumping duties . . .
> because they provide only temporary relief from the injurious effects of
> imports," whereas normal customs duties "have no termination provision,
> and are permanent unless modified by Congress."

495 F.3d at 1362-63.  The Federal Circuit also held that "{t}o assess both a safeguard duty and

an antidumping duty on the same imports without regard to the safeguard duty, would be to

remedy substantially overlapping injuries twice."  *Id.* at 1365.

After a thorough analysis based on the factors considered in *Wheatland Tube*, Commerce

determined that Section 232 duties are not akin to Section 201 or antidumping duties and,

therefore, must be deducted from United States price.  IDM at 26-29; *see Stainless Steel Wire

Rod from the Republic of Korea*, 69 Fed. Reg. 19,153, 19,159 (Dep't of Commerce Apr. 12,

2004) (*Stainless Steel Wire Rod from Korea*) ("Although the {antidumping duty} law does not

define the term 'United States import duties,' the Senate Report that accompanied the

Antidumping Act of 1921 (the '1921 Act') contrasts antidumping duties (which it refers to as

'special dumping duties') with normal customs duties (which it refers to as 'United States import

duties'). . . .  Thus, Congress has long recognized that at least some duties implementing trade

remedies—including at least antidumping duties—are special duties that should be distinguished

from ordinary customs duties.")) (citing S. Rep. No. 67-16 at 4 (1921)); *see also Certain Welded

Carbon Steel Pipes and Tubes from Thailand*, 69 Fed. Reg. 61,649 (Dep't of Commerce Oct. 20,

2004).

In *Wheatland Tube*, "Commerce found that antidumping duties and § 201 safeguard

duties, unlike normal customs duties, are imposed based on almost identical findings that

domestic industry is being injured or threatened with injury due to the imported merchandise."

495 F.3d at 1362.  By comparison, Commerce found that Section 232 duties "are not focused" on

remedying a domestic injury; Section 232 "clearly concerns itself with 'the effects on the

national security of import of the article.'" IDM at 27 (quoting Section 232). Plaintiffs disagree, arguing that Section 232 tariffs are "remedial" in nature like Section 201 and antidumping duties because Section 232 duties are "related directly to the extent of the particular conditions determined to exist with regards to the domestic industry." Pl. Br. at 29. But even if Section 232 might be considered remedial in a "broad sense," *Borusan*, 494 F. Supp. 3d at 1374, Section 232 duties are not imposed *because* a domestic industry is being injured or threatened. *See* IDM at 27; *Stainless Steel Wire Rod from Korea*, 69 Fed. Reg. at 19,159 (finding that Section 201 duties were similar to antidumping duties and therefore special remedial duties because they are intended to provide "temporary relief for an industry suffering from serious injury."). Section 232 duties are imposed to address imports that threaten to impair the national security, *see* 19 U.S.C. § 1862; IDM at 12, and can be "used to promote vital nascent industries, not just already established injured industries," *Borusan*, 494 F. Supp. 3d at 1374. While an *effect* of the President's Section 232 duties may be to assist a weakened domestic injury, the *purpose* of the duties was to alleviate a national security concern—a purpose much broader than Section 201 or antidumping duties.

Proclamation 9705 states that it "is necessary and appropriate to adjust imports of steel articles so that such imports will not threaten to impair the *national security* . . . ." Proclamation 9705, ¶ 11 (emphasis added); *see also* IDM at 27 (quoting the text of Section 232). The President sought to alleviate the national security risk that our country's steel "industry will continue to decline, leaving the United States at risk of becoming reliant on foreign producers of steel to meet our national security needs—a situation that is fundamentally inconsistent with the safety and security of the American people." Proclamation 9705, ¶ 11. Antidumping duties and Section 201 safeguard measures, on the other hand, are "directed at the same overarching

30

purpose – protecting the bottom line of domestic producers." *See Wheatland Tube,* 495 F.3d at 1364.

Further, the text of Section 232 concerns itself with "the effects on the *national security* of imports of the article." *See* 19 U.S.C. § 1862(b)(1)(A) (emphasis added). The President may not act to adjust imports *unless* he concurs with the finding of the Secretary that articles are being imported in such quantities or under such circumstances as to threaten to impair the national security. *Id.* § 1862(c). By contrast, for an antidumping duty to be imposed, a domestic industry must be materially injured or threatened with material injury. *Wheatland Tube*, 495 F.3d at 1362. Likewise, Section 201 duties may only be imposed if a domestic producer is experiencing serious injury or threat. *Id.* (citing section 2251). The Federal Circuit stated that normal customs duties can be imposed "regardless of whether the U.S. industry is suffering adverse effects as a result of imports." *Wheatland Tube,* 495 F.3d at 1362. Contrary to plaintiffs' assertions otherwise, Pl. Br. at 29, Section 232 duties may be imposed regardless of whether the United States industry is suffering.[10] Thus, Commerce reasonably determined that the law and purpose behind Section 232 duties materially differ from Section 201 safeguard and antidumping duties. *See* IDM at 27.

Plaintiffs emphasize that the Section 232 duties were intended to remedy harms to the domestic industry and protect its viability. Pl. Br. at 30. This argument misses the point. The statute's fundamental concern is national security; it does not prioritize the economic welfare of domestic industries. *See* 19 U.S.C. § 1862 (b)(1)(A) ("the Secretary of Commerce . . . shall

---

[10] For example, President Reagan used his Section 232 authority to embargo oil imports from Libya due to concerns that the Libyan government supported terrorism. *See Presidential Proclamation 4907 of March 10, 1982: Imports of Petroleum*, 48 Fed. Reg. 10,507 (Mar. 10, 1982). Proclamation 4907 was issued without regard to whether United States industries were suffering.

immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion.); *id.* § 1862(b)(3)(A) ("the Secretary shall submit to the President a report on the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security"); *id.* § 1862(c)(1)(A)(ii) ("if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."). The viability of the domestic steel industry for defense capabilities *is the national security interest* that the President was seeking to address. Proclamation 9705, ¶ 2. Commerce reasonably determined that Section 232 duties are focused on national security concerns, and not on remedying injury to a domestic industry in the same way that Section 201 and antidumping duties are focused. IDM at 27.

Plaintiffs argue that the Secretary's report "repeatedly reference[s]" antidumping orders, implying that Section 323 duties are similar to antidumping duties. Pl. Br. at 31. But the Secretary's report—like the President's proclamations—states that a global Section 232 tariff should be imposed "in addition to any antidumping or countervailing duty collections applicable to any imported steel products," showing that the duties are, in fact, independent from one another. *Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40,202, 40,205 (Dep't of Commerce July 6, 2020). In fact, the Secretary's report notes why remedial antidumping and countervailing duty actions are *insufficient* to treat the broader national security threat at issue because "it could take years to identify and investigate every instance of unfairly traded steel, or attempts to transship or evade remedial duties." *Id.* at

40,212.  The goal of both the Secretary's report and the President's Section 232 tariffs was to "enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production."  Proclamation 9705, ¶ 4; Secretary's Report at 40,221.  Plaintiffs' references to the underlying Section 232 investigation are without merit because the economic impact on the United States steel industry is just a precursor to the President's ultimate finding that there is a threat to national security.

While the Court in *Borusan* disagreed with some of Commerce's analysis, it ultimately concluded that Commerce's reasoning was logical because there are material differences between Section 232 and Section 201 duties.  *See* 494 F. Supp. 3d at 1374.  Thus, plaintiffs' attempts to equate special remedial duties with 232 duties are unpersuasive.

Additionally, in *Wheatland Tube*, the Federal Circuit sustained Commerce's reasoning that Section 201 and antidumping duties provide "only temporary relief from the injurious effects of imports" unlike normal customs duties.  495 F.3d at 1362.  Section 201 duties are generally limited to four years, and antidumping duty orders provide for a termination after five years, with some exceptions.  *Id.* (citing 19 U.S.C. §§ 2251 and 1675).  "Normal customs duties, however, have no termination provision and are permanent unless modified by Congress."  *Id.* Section 232 does not have a termination provision.  To the contrary, Congress granted the President discretion to determine the duration of Section 232 duties.  *See* 19 U.S.C. § 1862(c) (providing that the President "shall…determine the nature and *duration of the action that*…must be taken to adjust the imports…so that such imports will not threaten to impair the national security.") (emphasis added).  In contrast, antidumping and Section 201 duties have a statutory expiration date tied to the cessation of injury.  *See* 19 U.S.C. § 2251; 19 U.S.C. § 1675(d).  Thus,

plaintiffs' argument that Section 232 duties are equally as temporary as Section 201 duties is unavailing.  *See* Pl. Br. at 32-33.

Icdas and Kaptan suggest that Section 232 duties are temporary because, unlike ordinary customs duties, Section 232 duties are adjusted and changed.  Pl. Br. at 33.  This argument is inconsistent with *Wheatland Tube.*  That the duties can be modified or changed at some point does not make them inherently temporary in the same way antidumping and Section 201 duties are temporary.  Normal customs duties "have no termination provision and are permanent *unless modified by Congress.*"  *Wheatland Tube*, 495 F.3d at 1362 (emphasis added).  Congress delegated broad authority and discretion to the President to determine the duration of Section 232 duties; Section 232 has no termination provision; and the duties are permanent unless modified by the President.  The point is: Section 232 provides no express time-limit on the imposition of duties.[11]

Plaintiffs also claim that the placement of Section 232 duties in chapter 99 of the HTSUS demonstrates that the duties are more similar to remedial duties because that chapter is reserved for temporary actions such as proclamations or legislation.  Pl. Br. at 34, 36-37.  This argument misses the mark.  Regardless of whether chapter 99 is usually reserved for temporary, remedial action, the President has statutorily-provided discretion to decide when Section 232 duties terminate, the President himself referred to the Section 232 duties as "ordinary" custom duties, and he proclaimed that the Section 232 duties must be imposed in addition to antidumping duties.  Proclamation 9705, Annex (U.S. Note 16(a)).  In fact, the President's new heading in

---

[11] We recognize that the Court found that "lack of permanence is not a viable reason to distinguish Section 201 duties from Section 232 duties."  *Borusan*, 494 F. Supp. 3d at 1374-75.  Notwithstanding the Court's reasoning, however, the Court sustained Commerce's determination to treat Section 232 duties as United States import duties, *id*. at 1375-76, and the Court should do so here as well.

chapter 99 placed the 25 percent rate under the "general" column, not the "special" column. HTSUS, Revision 2, Chapter 99, subheading 9903.80.01. The mere title of chapter 99 cannot overcome the clear language of the President's proclamations and the text of the statute. And Commerce explained in *Stainless Steel Wire Rod from Korea* that the placement of a duty in the HTSUS is not dispositive of the purpose of that tariff and that the HTSUS "is a pragmatic way of implementing. . . collection {of duties}." 69 Fed. Reg. at 19,160. Moreover, a similar argument was raised in *Borusan*, and the Court was "not persuaded that the placement of Section 232 duties within the {HTSUS} has an effect." *Borusan*, 494 F. Supp. 3d at 1376, n. 8

Plaintiffs argue that Section 232 tariffs are implemented under Congress's specific delegation of authority to the Executive Branch, highlighting the "special nature" of the duties. Pl. Br. at 35. Such an argument, if correct, would remove *all* tariffs imposed by the President from section 1677a(c)(2)(A)'s reach. The broad phrase "United States import duties" does not support such a sweeping interpretation. In enacting Section 232, Congress did not describe Section 232 duties as "temporary" duties or set a time limit on the duration of the duties, despite doing so for other duties delegated to the President to implement. *See*, *e.g.*, 19 U.S.C § 2132 (providing that "the President shall proclaim, *for a period not exceeding 150 days* (unless such period is extended by Act of Congress) – a *temporary* import surcharge" where problems with international payments arise) (emphasis added). Section 232 is a permissible delegation of authority to the President, *Transpacific Steel LLC*, 4 F.4th at 1332, and Congress's delegation of authority, without more, does not require treating Section 232 duties as special duties.

Finally, the Federal Circuit reasoned in *Wheatland Tube* that because section 201 safeguard and antidumping duties effectively treat the same injury, Commerce reasonably found that deducting Section 201 duties from United States price could improperly result in the

collection of Section 201 duties twice.  495 F.3d at 1362-63.  As explained by Commerce in
*Stainless Steel Wire Rod from Korea*, the Statement of Administrative Action accompanying the
1921 Act states that "{i}n determining whether to provide {Section 201} relief, and, if so, in
what amount, the President will continue the practice of taking into account relief provided under
other provisions of law, such as the antidumping" law.  69 Fed. Reg. at 19,160 (quoting
Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994) reprinted in
1994 U.S.C.C.A.N. 3773).  Congress explicitly intended that the President would take into
account any potential overlap between Section 201 and antidumping duties when setting the
level of Section 201 duties.  *Id.*

In contrast, there is no similar authority demonstrating Congress's intent that the
President would take into account potential overlap between Section 232 and antidumping
duties.  In this case, the President directed that Section 232 duties should be applied in addition
to "any other duties, fees, exactions, and charges applicable to such imported steel articles{.}"
Proclamation 9705, clause 2.  The Federal Circuit recently acknowledged that the President's
Section 232 tariffs are to be applied "on top of already-applicable antidumping or countervailing
duties."  *See Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x. 982, 986 (Fed. Cir.
2020).  Commerce was properly concerned about double-counting in *Wheatland Tube* because
the legislative history indicated that Congress intended the President to take antidumping duties
into account when setting Section 201 duties.  No similar concerns are present here.

Commerce correctly determined that "the function of section 232 duties and section 201
duties are separate and distinct; there is no overlap between the two distinct types of duties and,
thus, they do not provide multiple remedies for the same situation."  IDM at 28.  Section 232
duties are not limited to addressing injury, material or otherwise, to the relevant domestic

industry caused by imports.  *See* 19 U.S.C. § 1862.  The focus of Section 232 duties is much

different in that it addresses "the capacity of the United States to meet national security

requirements."  *Id.*  Unlike the similarity in purpose and function of antidumping and Section

201 duties, Section 232 actions to "adjust imports" are not limited to addressing the injury to

industries caused by import surges or unfairly traded imports.  This Court in *Borusan* agreed

with Commerce that "{t}here is a clear statutory interplay between Section 201 duties and

antidumping duties, while Section 232 does not reveal any such coordination concerns."

*Borusan*, 494 F. Supp. 3d at 1375-76.

      Icdas and Kaptan contend that Commerce is effectively collecting Section 232 duties "a

second time in the form of an increased antidumping margin[.]"  Pl. Br. at 39.  Plaintiffs are

wrong, and their reasoning would allow importers to circumvent the Section 232 duty on the

back end.  If Commerce did not deduct Section 232 duties from United States price, plaintiffs

would benefit from an inflated constructed export price, thereby reducing their antidumping

margin, and rendering the Section 232 duty effectively useless.  Again, if plaintiffs were right,

Commerce would be prevented from deducting numerous United States import duties from

constructed export price, contrary to the broad language of section 1677a(c)(2)(A).

      In sum, Commerce thoroughly explained why it concluded that Section 232 and 201

duties are different such that *Wheatland Tube* is not controlling, and as this Court determined in

*Borusan*, there is simply no overlap between Section 232 and antidumping duties such that

double counting is a reasonable concern.  Commerce's interpretation of "United States import

duties" to include Section 232 duties is reasonable and in accordance with law because it is

consistent with the text of the statute, the President's proclamations, and *Wheatland Tube.*

**IV.    Commerce's Determination To Deduct Section 232 Duties From Export Price In Excess Of 25 Percent Is Supported By Substantial Evidence And In Accordance With Law**

Plaintiffs contend that, even if Section 232 duties are lawfully deducted from their United States prices, Commerce should have limited its deduction to 25 percent and that Commerce's determination to deduct 50 percent was unlawful.  Pl. Br. at 40-41.  Plaintiffs are wrong.  The President increased the tariff on Turkish steel imports from 25 percent to 50 percent, *see* Proclamation 9772, and Commerce was not free to disregard the President's instructions.

Plaintiffs contend that the 25 percent tariff increase solely on Turkish imports is "uniquely" temporary and remedial, and, thus, "more akin to special tariffs than to ordinary customs duties."  Pl. Br. at 40.  As demonstrated above, Section 232 duties are "United States import duties" within the meaning of the antidumping statute, regardless of a duty's particular application in a given circumstance.  Whether Section 232 duties target imports from a particular country is irrelevant.  What matters is that the focus of Section 232 is upon national security interests, as discussed above.  Moreover, the tariff increase for Turkish imports was meant to address the exact same national security threat identified in the President's original proclamation. *See* Proclamation 9772, ¶¶ 4-5 (increasing the tariff from 25 percent to 50 percent because target capacity utilization levels were "still several percentage points greater than the level of imports that would allow domestic capacity utilization to reach the target level.").

Plaintiffs rely on this Court's ruling in *Transpacific* that collecting Section 232 duties in excess of 25 percent is unconstitutional.  But the Federal Circuit reversed this Court's ruling in *Transpacific*.  *See Transpacific Steel LLC*, 4 F.4th at 1319.  Plaintiffs note that the *Transpacific* appeal is not yet final because of a pending combined petition for *certiorari*.  Pl. Br. at 40.  However, although a petition for *certiorari* remains pending before the Supreme Court, the

Federal Circuit's mandate has not been stayed.  *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 977 F.3d 1379, 1380 (Fed. Cir. 2020) (providing that pending petition for *certiorari* does not warrant staying mandate).  The Federal Circuit's decision in *Transpacific* is therefore final and binding on this Court.

In sum, Commerce correctly declined to make any adjustment to limit Section 232 duties to 25 percent because Proclamation 9772 commanded a 50 percent tariff and plaintiffs have adduced no evidence that any adjustment was warranted.  IDM at 28-29.  The record evidence demonstrates that the full amount of the duties was included in plaintiffs' United States prices. *Id*. at 29.  Commerce's deduction of the Section 232 duties from the plaintiffs' United States prices is supported by substantial evidence and in accordance with law.

## V.     Commerce Properly Limited Its High-Inflation Analysis To Data Within The Period Of Review

In the Final Results, to determine whether there was high inflation during the period of review such that Commerce should use quarterly costs instead of its typical annual average of costs, Commerce relied on data *only* from the period of review (July 2018 to June 2019).  IDM at 21-23.  Plaintiffs argue that Commerce should have included an additional month of data from outside the period of review, June 2018, in it is analysis.  Pl. Br. at 41-43.  As we demonstrate below, Commerce properly limited its analysis to the data from the 12 months of the period of review.

### A.  Legal Framework For Determining Whether High Inflation Exists

In an antidumping proceeding, Commerce calculates the normal value of the subject merchandise based on home market sales that are made "in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i).  Commerce, therefore, disregards sales at prices that are less than the cost of production, *id*. § 1677b(b)(1), because those sales are not made within the ordinary

course of trade, *id*. § 1677(15)(A).  The cost of production "equal[s] of the sum of . . . the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  *Id*. § 1677b(b)(3)(A).

The antidumping statute does not define the "period" over which a respondent's various costs must be calculated or the method by which Commerce must calculate the costs of production during the period of review.  *See id.*; *Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi, A.S.*, 361 F. Supp. 3d 1314, 1324 (Ct. Int'l Trade 2019).  Commerce must therefore select an appropriate time period for averaging the costs involved.  *See Pastificio Lucio Garofalo, S.p.A. v. United States,* 783 F. Supp. 2d 1230, 1234 (Ct. Int'l Trade 2011), *aff'd sub nom, Pastificio Garofalo, S.P.A. v. United States*, 469 F. App'x 901 (Fed. Cir. 2012).

To calculate cost of production, Commerce typically employs a consistent and predictable methodology of calculating a single weighted average cost on an annual basis for the entire period of review.  *See Certain Pasta from Italy*, 65 Fed. Reg. 77,852 (Dep't of Commerce Dec. 13, 2000) (final admin. review) and accompanying Issues and Decision Memorandum at Comment 18; *Carbon and Certain Alloy Steel Wire Rod from Canada*, 71 Fed. Reg. 3822 (Dep't of Commerce Jan. 24, 2006) (final admin. review) and accompanying Issues and Decision Memorandum at Comment 5.

Under certain circumstances, Commerce departs from its usual methodology and relies on alternative quarterly or monthly cost-averages when there are significant fluctuations in cost of materials, there have been rapid advancements in technology, or there is high inflation.  *See Certain Steel Concrete Reinforcing Bars from Turkey*, 66 Fed. Reg. 6,274 (Dep't of Commerce Nov. 7, 2001) (final admin. review); *Static Random Access Memory Semiconductors From*

*Taiwan*, 63 Fed. Reg. 8,909 (Dep't of Commerce Feb. 23, 1998) (final admin. review); *Certain Welded Stainless Steel Pipe from the Republic of Korea*, 74 Fed. Reg. 31,242 (Dep't of Commerce June 30, 2009) (final admin. review) and accompanying Issues and Decision Memorandum; *Habas*, 361 F. Supp. 3d at 1324. A significant cost change is defined as a greater than 25 percent change in cost of manufacturing between the high and low quarters during a twelve-month period of review. *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1359 n. 10 (Ct. Int'l Trade 2010); *Habas*, 361 F. Supp. 2d at 1324.

Commerce's preference is to calculate costs on an annual weighted average basis rather than to calculate costs over shorter periods because as costs are calculated over shorter periods, it directly limits the period of time over which sale prices can reasonably be matched, thus limiting price-to-price comparisons. *Stainless Steel Sheet and Strip in Coils from Mexico*, 75 Fed. Reg. 6,627 (Dep't of Commerce Feb. 10, 2010), and accompanying Issues and Decision Memorandum, at 29. Commerce has recognized that during periods of high inflation, it may be necessary to use a monthly indexation methodology to account for the effect of high inflation when computing an annual weighted average cost. IDM at 22. Commerce uses the producer price index in a country from the first month of the period of review and the last month of the period of review to determine whether the country experienced inflation greater than 25 percent during the period of review. *Id.*

### B. Commerce Properly Used The Producer Price Index Figures For The First And Last Months Of The Period Of Review To Determine That Turkey Had Not Experienced High Inflation During The Period Of Review

In the Final Results, after comparing the Turkish producer price index figure for the first month of the period of review (July 2018) with the last month of the period of review (June 2019), Commerce found that the change in inflation was only 22.87 percent and thus did not

meet the 25 percent threshold for high inflation.  IDM at 22.  Plaintiffs do not directly challenge

Commerce's standard methodology or the 25 percent threshold for high inflation.  Rather,

plaintiffs claim that to get the annualized rate of inflation over the period of review, Commerce

should have used June 2018, not July 2018, as the first month of the period of review because

June data is published in July.  Pl. Br. at 42-43.  Plaintiffs are simply incorrect and as Commerce

found in the Final Results, the data for June, though published in July, were reported in the

Turkish statistics as June data.  IDM at 22.

First, assuming, for argument's sake, that the monthly data reported in the Turkish

producer price index for a given month actually represented the prior month's data (that is, June

data were reported in the July column), then that means the June 2018 data that plaintiffs want

Commerce to use represent May data.  In other words, plaintiffs should be arguing for the

inclusion of data from July 2019 which would, according to plaintiffs' theory, represent the data

from the last month of the period of review (June 2019).  Yet plaintiffs do not make that

argument.  Data from May are two months prior to the period of review and are not relevant to

the costs during the period of review.  Plaintiffs' argument is nothing but an attempt to generate

an the inflation figure high enough to qualify for the use of the high inflation methodology.

Second, plaintiffs' argument that there is a one-month data reporting lag is incorrect.

Upon examining the Turkish producer price index data, Commerce determined that even though

data for June are published in July, they are still identified as June data in the Turkish producer

price index statistics.  IDM at 22.  The International Monetary Fund (IMF) examined Turkish

statistical data and explained that it collected data monthly on the 5th, 15th, and 25th of each

month and then published on the third business day of the following month.  Memorandum

November 17, 2020, "Excerpts of the International Monetary Fund Report (P.R. 116) at 60; *see*

*also* Turkish July 2019 Announcement of June 2019 Data, RTAC Comments on New Factual Information (P.R. 128) Exhibit 1.  Thus, it is clear from Turkstat data that, even though June data are *published* in July, they clearly represent data from June, not July.

Moreover, the June 2019 data reported in the July 2019 announcement appear in the June 2019 column of the Turkish official domestic producer price index.  Turkish Producer Price Index Statistics, attached as Exhibit 1 to RTAC Comments on High Inflation and Questionnaire Responses June 12, 2020 (P.R. 63).  There is no shift of data from one month to the next.  Therefore, by comparing July 2018 to June 2019 index data, Commerce used the producer price index data directly relevant to the costs for the period of review being examined, consistent with its past practice and standard methodology.  IDM at 22.

Finally, plaintiffs improperly imply that Commerce's finding of high inflation in a prior administrative review supports a high inflation finding in the instant review.  Pl. Br. at 43.  But the periods of review are different.  "[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).  Relying on information from previous administrative reviews does not make sense where, as here, new record information affirmatively shows that there was no high inflation during *this* period of review.  *Cf. QVD Food Co. v. United States*, 658 F.3d 1318, 1326 (Fed. Cir. 2011) (sustaining Commerce's decision to reject financial data used in a previous administrative review for surrogate valuation because new record information suggested that the data previously used was unreliable).

Because Commerce properly limited its high-inflation analysis to data representing the 12 months of the period of review, Commerce's decision, that high inflation did not exist in the instant case, is supported by substantial evidence and is in accordance with law.

## CONCLUSION

For these reasons, we respectfully request that this Court deny plaintiffs' motion for judgment upon the agency record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim *by Patricia M. McCarthy*

L. MISHA PREHEIM
Assistant Director

/s/ Ann C. Motto

OF COUNSEL:
DAVID RICHARDSON
Senior Counsel
Office of the Chief Counsel for Trade
Enforcement and Compliance
U.S. Department of Commerce

ANN C. MOTTO
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 353-7968

December 30, 2021

*Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 13,433 words, including text, footnotes, and headings.


/s/ Ann C. Motto

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                                              )
ICDAS CELIK ENERJI TERSANE VE          )
ULASIM SANAYI, A.S. and KAPTAN          )
DEMIR CELIK ENDUSTRISI VE                  )
TICARET A.S.,                                              )
                                                              )
                        Plaintiffs,                           )
                                                              )
            v.                                                 )          Court No. 21-00306
                                                              )
UNITED STATES,                                        )
                                                              )
                        Defendant,                         )
                                                              )
REBAR TRADE ACTION COALITION,       )
                                                              )
                        Defendant-Intervenor.          )
_____ )


**<u>ORDER</u>**

Upon consideration of plaintiffs' motion for judgment on the agency record, defendant's

and defendant-intervenor's responses thereto, plaintiffs' reply, the administrative

record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is

further

ORDERED that judgment is entered in favor of the United States.


Dated: _____                    _____

New York, New York                                                          Judge