Slip Op. 23-124

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.S., and KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., <br><br>      Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>      Defendant, <br><br> and <br><br> REBAR TRADE ACTION COALITION, ET AL, <br><br>      Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Court No. 21-00306 |

**<u>OPINION</u>**

[Antidumping Duty Determination in Review of Order on Steel Concrete Reinforcing Bar from Turkey Sustained.]

Dated: August 23, 2023

Leah N. Scarpelli and Jessica R. DiPietro, ArentFox Schiff LLP, of Washington, D.C., argued for Plaintiffs Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. and Kaptan Demir Celik Endustrisi ve Ticaret A.S. With them on brief was Matthew M. Nolan.

Daniel Francis Roland, Trial Attorney, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for the Defendant. With him on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was David W. Richardson, Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Maureen Elizabeth Thorson, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenors Rebar Trade Action Coalition, et al.  With her on the brief were Alan Hayden Price and John R. Shane.

Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging a final determination of the United States Department of Commerce ("Commerce"). The final determination at issue resulted from Commerce's findings during an administrative review of the antidumping ("AD") order covering steel concrete reinforcing bar ("rebar") products from Turkey. Plaintiffs Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") and Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") (collectively, "Respondents") challenge the calculation.

## BACKGROUND

### a.      Antidumping Administrative Review and Determination

On September 9, 2019, Commerce initiated an antidumping duty administrative review of rebar products from Turkey for the period of July 1, 2018, through June 30, 2019.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 47,242, 47,250–51 (Dep't Commerce Sept. 9, 2019).  On February 20, 2020, Commerce selected Icdas and Kaptan as mandatory respondents.  Commerce Respondent Selection Memorandum, P.R. 27 (Feb. 20, 2020).

On November 24, 2020, Commerce issued its preliminary results and accompanying Preliminary Decision Memorandum, and published the results in the Federal Register.  Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019, 85 Fed. Reg. 74,983 (Dep't Commerce Nov. 14, 2020); Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bar from the Republic of Turkey; 2018-2019, POR 7/1/2018-

6/30/2019 (Dep't Commerce Nov. 17, 2020) ("PDM").  Commerce issued the final results on May 27, 2021.  Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results on Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 28,574 (Dep't Commerce May 27, 2021), and accompanying Issues and Decision Memorandum for the Final Results of the 2018–2019 Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Turkey, A-489-829, POR 7/1/2018–6/30/2019 (Dep't Commerce May 21, 2021) ("IDM").

**b.        Background of Section 232 Duties**

On March 8, 2018, the President exercised his authority under Section 232 of the Trade Expansion Act of 1962, as amended, and mandated the imposition of a global tariff of 25 percent on imports of steel articles from all countries, except Canada and Mexico.  Proclamation No. 9705 of March 8, 2018, 83 Fed. Reg. 11,625, 11,626 (Mar. 15, 2018) ("Proclamation 9705").  The Section 232 duties went into effect on March 23, 2018, and applied "in addition to any other dut[y]."  Id. at 11,627–28.   By its terms, Proclamation 9705 was issued in order to "enable domestic steel producers to use approximately 80 percent of existing domestic production capacity and thereby achieve long-term economic viability through increased production" and to "ensure that domestic producers can continue to supply all the steel necessary for critical industries and national defense."  Id. at 11,625–26; see also 19 U.S.C. § 1862(d).

On August 10, 2018, the President issued another proclamation, increasing the tariff on Turkish steel imports from 25 percent to 50 percent, effective August 13, 2018.  Proclamation No.

9772 of August 10, 2018, 158 Fed. Reg. 40,429 (Aug. 15, 2018) ("Proclamation 9772").[1]  In the

proclamation, the President stated that he increased the tariffs because Turkey was a major exporter

of steel, and the increased tariff would "be a significant step toward ensuring the viability of the

domestic steel industry."  Id. at 40,429.  On May 16, 2019, the President issued a proclamation

ending the increased Section 232 tariff on Turkish steel imports.  Proclamation No. 9886 of May

16, 2019, 84 Fed. Reg. 23,421 (May 16, 2019).

    In the final results, Commerce treated the Section 232 duties paid by Respondents as

"United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) and therefore deducted the Section

232 duties on the United States price side of the dumping comparison from export ("EP") and

constructed export price ("CEP").  IDM at 26–27.  Commerce determined that Section 232 duties

were more akin to normal customs duties than to antidumping or countervailing duties or Section

201 duties, codified as 19 U.S.C. § 2251, which are not deducted.  Id.  Commerce reasoned that

the President indicated national security was the concern when issuing Proclamation 9705 and

stated that the duties were to be imposed in addition to other duties.  Id. at 27–28.  Commerce also

concluded that the temporarily increased Section 232 duties under Proclamation 9772 did not

warrant any adjustment and therefore deducted the additional duties as well.  Id. at 28.

### c.     Challenge to AD Review Determination

    On June 28, 2021, Respondents commenced the instant action against the United States

pursuant to 19 U.S.C. § 1516a(a)(1).  Compl., ECF No. 5 (June 28, 2021).  Respondents claim that

---

[1] The lawfulness of the Proclamation 9772 increased tariffs on Turkey has been affirmed by the
U.S. Court of Appeals for the Federal Circuit.  See Transpacific Steel LLC v. United States, 4
F.4th 1306 (Fed. Cir. 2021), cert. denied, 142 S. Ct. 1414 (2022).

the AD determination is unsupported by substantial evidence or is otherwise contrary to law

because Commerce incorrectly treated Section 232 duties as normal U.S. customs duties, denied

an adjustment based on inflation, and denied a duty-drawback adjustment.  Compl. ¶¶ 19–26; Pl.

R. 56.2 Mot. For J. on the Agency R., ECF Nos. 25–26 (Oct. 15, 2021) ("Pl. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).

The court sustains Commerce's results of an administrative review of an AD duty order unless it

is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"

19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.      Section 232 Duties May Be Deducted From United States Price

Respondents raise two issues related to whether Section 232 duties may be deducted from

United States price.  First, they argue that Commerce erred by treating the Proclamation 9705

Section 232 duties as a United States import duty under § 1677a(c)(2)(A) and deducting it from

the United States price side of the less-than-fair-value comparison.  Pl. Br. at 23–39.  This

argument is foreclosed, however, by binding precedent from the U.S. Court of Appeals for the

Federal Circuit.  Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 63 F.4th 25,

37 (Fed. Cir. 2023) ("Borusan Mannesmann II") ("[W]e conclude that the specific duty imposed

by the President in Proclamation 9705 was properly treated by the President's subordinate, the

Secretary of Commerce, as a 'United States import dut[y]' under § 1677a(c)(2)(A).").

Respondents' remaining argument is that Proclamation 9772's temporary increase of Section 232

duties on Turkey is sufficiently distinct, and thus, that those increased duties cannot be treated as

a United States import duty under § 1677a(c)(2)(A) because the increase was temporary and remedial.  Pl. Br. at 40–41.

Antidumping duties depend on the "dumping margin," 19 U.S.C. § 1677(35)(A), which is the difference between "the normal value," (or home country value) and the EP or CEP[2] for the merchandise, id. § 1673.  The adjustments of EP and CEP are set forth in section 772(c) of the Tariff Act of 1930, codified at 19 U.S.C. § 1677a(c).  EP and CEP are to be reduced by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . ." 19 U.S.C. § 1677a(c)(2)(A) (emphasis added).  These adjustments are made "in an attempt to get back to an ex-factory price that is comparable to the price of goods in the home market." Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 46 CIT __, __, 494 F. Supp. 3d 1365, 1373 (2021) ("Borusan Mannesmann I"), aff'd on other grounds, Borusan Mannesmann II, 63 F.4th at 33; see also S. Rep. No. 67-16, at 12 (1921); H.R. Rep. No. 67-1, at 23–24 (1921); H.R. Rep. No. 67-79, at 2–3 (1921).[3]

Regarding Section 201 safeguard duties, Commerce has previously concluded that they should not be deducted as import duties under § 1677a(c)(2)(A).  Stainless Steel Wire Rod from

---

[2] EP and CEP can be referred to as the "U.S. price" in the dumping margin comparison.  See United States Steel Corp. v. United States, 621 F.3d 1351, 1353 & n.1 (Fed. Cir. 2010).

[3] "Antidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity."  Borusan Mannesmann II, 64 F.4th at 35; see also Borusan Mannesmann I, 494 F. Supp. 3d at 1372–73 (citing S. Rep. No. 67-16, at 4 (1921)) ("[S]uch duties were 'special duties,' not the import duties that were to be deducted from price in the United States market.").

the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg.

19,153, 19,157–61 (Dep't Commerce Apr. 12, 2004) ("SSWR from Korea").  Commerce reached

this because Section 201 duties were remedial and temporary in nature, and deducting from EP

and CEP would result in an inappropriate double remedy.  Id. at 19,160–61.  In Wheatland Tube

Co. v. United States, the Federal Circuit held that Commerce's construction of "United States

import duty" statute was reasonable in the light of the specific Section 201 duties.  495 F.3d 1355,

1359–66 (Fed. Cir. 2007); but see Borusan Mannesmann II, 63 F.4th at 36–37 (declining to decide

whether intervening developments in Chevron, U.S.A., Inc. v. Natural Resources Defense Council,

Inc.[4] affect Wheatland Tube).

　　More recently, in Borusan Mannesmann II, the Federal Circuit stated that "[n]othing in §

1677a(c)(2)(A) requires the uniform treatment of all duties prescribed under a particular statutory

authorization," and more specifically, there is nothing "in the § 232 framework that requires the

uniform treatment of all duties imposed by the President under § 232."  63 F.4th at 33.  The Federal

Circuit, accordingly, declined to "make a statute-wide categorical determination regarding all

duties imposed on imports by presidential action under § 232."  Id. at 34.  Instead, Borusan

Mannesmann II requires courts to use a "proclamation-specific approach" that focuses "on the

character" of the proclamation to determine if the President intended a specific duty to qualify as

a United States import duty.  Id.

　　The Federal Circuit proceeded to analyze the text of Proclamation 9705, emphasizing that

the text made "clear that the duty newly being imposed was to add to, not partly or wholly offset,

---

[4] 467 U.S. 837 (1984).

the antidumping duties[.]"  Id. (referring to Proclamation 9705, 83 Fed. Reg. at 11,627 ("This rate

of duty, which is in addition to any other duties . . . .")); see also Proclamation 9705, 83 Fed. Reg.

at 11,629, Annex ("All anti-dumping, countervailing, or other duties and charges applicable to

such goods shall continue to be imposed.").  Based on this, the Federal Circuit concluded that the

specific Proclamation 9705 duty was properly treated as a United States import duty under §

1677a(c)(2)(A).  Borusan Mannesmann II, 63 F.4th at 37.

Now, the court is tasked with following this "proclamation-specific approach" and

analyzing the character of Proclamation 9772.  See id. at 34.  Similar to Proclamation 9705,

Proclamation 9772 provides:

> Further, except as otherwise provided in notices published pursuant to clause 3 of
> this proclamation, all steel articles imports from Turkey specified in the Annex shall
> be subject to a 50 percent ad valorem rate of duty with respect to goods entered for
> consumption, or withdrawn from warehouse for consumption, on or after 12:01
> a.m. eastern daylight time on August 13, 2018.  These rates of duty, which are in
> addition to any other duties, fees, exactions, and charges applicable to such
> imported steel articles, shall apply to imports of steel articles from each country as
> specified in the preceding two sentences."

Proclamation 9772, 158 Fed. Reg. at 40,430 (emphasis added).  And the President tied these

increased tariffs to the same indicated national security concern present in Proclamation 9705.

Compare id. at 40,429 ("[I]t is necessary and appropriate in light of our national security interests

to adjust the tariff imposed by previous proclamations.") with Proclamation 9705, 83 Fed. Reg. at

11,626 ("[T]his tariff is necessary and appropriate to address the threat that imports of steel articles

pose to the national security.").  Thus, the President stated in essence that these increased tariffs

had the same purpose, function, and character as the original § 232 steel tariffs, and were to be

imposed in addition to the antidumping duties that had been in place for decades prior to the

proclamations.[5]  Accordingly, under the <u>Borusan Manessman II</u> proclamation-specific test, the

Proclamation 9772 tariffs must be considered the same as the Proclamation 9705 tariffs: as United

States import duties.[6]  Accordingly, Commerce's treatment of the Section 232 duties is sustained.

## II.     Duty Drawback Adjustment

Another adjustment Commerce must make to calculate the dumping margin, known as the

duty drawback adjustment, calls for U.S. price to be increased by the amount of any "import duties

imposed by the country of exportation which have been rebated, or which have not been collected,

by reason of the exportation of the subject merchandise to the United States."  19 U.S.C. §

1677a(c)(1)(B).  In determining whether a duty drawback adjustment is warranted, Commerce

applies a two-pronged test in which respondent must demonstrate 1) that the rebate and import

duties, or exemption from import duties, are directly linked to, and dependent upon, the exportation

of the subject merchandise; and 2) that there are sufficient imports of the raw material to account

for the drawback upon exportation of subject goods.  <u>Antidumping Methodologies: Market</u>

<u>Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback</u>, 71 Fed. Reg. 61,716,

---

[5] <u>See</u>, <u>e.g.</u>, <u>Antidumping Duty Order; Welded Carbon Steel Standard Pipe and Tube Products From</u>
<u>Turkey</u>, 51 Fed. Reg. 17,784 (May 15, 1986).

[6] The court also notes that Section 232 lacks the clear statutory interplay that the courts have
concluded exists between Section 201 duties and antidumping duties.  <u>See</u> <u>Borusan Mannesmann</u>
<u>I</u>, 494 F. Supp. 3d. at 1375 ("There is a clear statutory interplay between Section 201 duties and
antidumping duties, while Section 232 does not reveal any such coordination concerns.").  This
statutory distinction between Section 232 and Section 201 exists regardless of presidential
proclamations, and potentially warrants distinct treatment by Commerce, because Section 232
duties are quite unrelated to antidumping duties.  <u>Compare</u> 19 U.S.C. § 2252(b), (c)(5) (requiring
injury determinations attributable to dumping or subsidization, similar to antidumping and
countervailing duty law) <u>with</u> 19 U.S.C. § 1862 (requiring a presidential determination of a threat
to national security); <u>see also</u> <u>Borusan Mannesmann I</u>, 494 F. Supp. 3d. at 1375.  The court does
not perceive the more temporary existence of the additional 25 percent duty on Turkish goods to
alter the analysis under either a purely statutory approach or a proclamation-based approach.

61,723 (Dep't Commerce Oct. 19, 2006); see also Saha Thai Steel Pipe (Pub.) Co. v. United States,

635 F.3d 1335, 1340 (Fed. Cir. 2011).

The government of Turkey's ("GOT") duty drawback program, the Inward Processing

Regime ("IPR") involves exemptions from duties, rather than rebates.  Response of Icdas Celik

Enerji Tersane Ve Ulasim Sanayi A.S. and its Affiliates to Section C of the U.S. Department of

Commerce Antidumping Duty Questionnaire at C-38, P.R. 56, C.R. 45–46 (Apr. 15, 2020) ("Icdas

CQR").  Under the program, a company that imports raw materials and exports finished goods

made from such raw materials may obtain an inward processing certificate ("IPC") (also known

by its Turkish acronym, "DIIB"), which sets forth the quantity of raw material allowed to be

imported duty-free and the quantity of export required to close the IPC.  Response of Kaptan Demir

Celik Endustrive Ticaret A.S. to Section C of the U.S. Department of Commerce Antidumping

Questionnaire at C-35–C-36, P.R. 58, C.R. 78 (Apr. 15, 2020) ("Kaptan CQR").  "After confirming

that all inputs imported with IPR exceptions are used in the production of the exported goods, the

Ministry of Trade of the Turkish Government closes out the certificates."  Icdas CQR at C-39.

"When an IPC has been closed, and the closure is approved by Turkish Ministry of Trade, the IPC

holder is released of any liability for import duties otherwise payable on the entries under the IPC."

Kaptan CQR at C-36.

On April 15, 2020, during the administrative review, Icdas timely provided Commerce its

IPCs and applications for closure of the IPCs, but it did not provide documentation from the GOT

that indicated that the IPCs were closed or approved.  Icdas CQR at C-39, Ex. C-19.  On September

17, 2020, Icdas submitted additional factual information to update its Section C questionnaire,

which Commerce rejected as an untimely addition.  Letter from Commerce to Icdas Rejecting New

Factual Information, P.R. 91 (Sept. 25, 2020) ("Commerce Rejection of New Information").[7]

Commerce stated that the deadline for information regarding duty drawbacks was April 15, 2020,

which was the date for responses to questionnaires.  Commerce Rejection of New Information at

1.  Although Icdas claimed that the submission should be accepted as timely under 19 C.F.R. §

351.301(c)(3)(ii), Commerce explained that provision only applied to information for "value

factors under 19 C.F.R. § 351.408(c) or to measure the adequacy of remuneration under 19 C.F.R.

§ 351.511(a)(2)," neither of which were applicable.  Commerce Rejection of New Information at

2.  But in a memorandum to the case file, Commerce stated that it rejected Icdas's factual

submission "because it was untimely filed under 19 CFR 351.301(c)(5)."    Commerce

Memorandum Removing Rejected Submission, P.R. 92 (Sept. 28, 2020).  This indicated that

Commerce understood Icdas was not attempting to submit irrelevant information normally

required in non-market economy questionnaires because 19 C.F.R. § 351.301(c)(5) does not seem

to apply to deficient responses to questionnaires.

Subsequently, in the preliminary results Commerce found that the GOT's duty drawback

program satisfied the traditional two-prong test for a duty drawback adjustment.  PDM at 14.

Commerce proceeded to explain that its current practice for the IPR was to use only closed IPCs[8]

to calculate the adjustment.  PDM at 15.  Following that practice, Commerce provided Kaptan

Demir an adjustment for the IPCs that the GOT had determined were closed, but Commerce

---

[7] At oral argument, Icdas proffered that the rejected factual information was a certificate from
GOT stating that one of Icdas's IPCs had been approved.
[8] Commerce stated that requiring closed IPCs meant that "the company was no longer permitted
by the [GOT] to add import or export information."  PDM at 15.

declined to provide Icdas any adjustment because Icdas did not provide evidence that demonstrated that any of the IPCs were closed.  PDM at 15; see also Icdas CQR at Ex. C-19.

In the final results, Commerce continued to deny Icdas's request for the adjustment.  IDM at 19.  Further, Commerce explained that Icdas did not follow instructions to request an extension to file the additional factual information, which requires a party to "notify the official in charge and submit a request for an extension" when filing factual information in response to a questionnaire.  IDM at 17.  Commerce also cited 19 C.F.R. § 351.301(c)(1)(iii), which requires that parties provide Commerce a notification within 14 days of the questionnaire for submitting further responsive information.  IDM at 18.  Commerce stated that it cannot know what information a party has, so it cannot issue supplemental questionnaires to obtain additional information for a voluntary claim such as duty drawbacks and that providing such information is a respondent's burden.  IDM at 18.  Commerce stated that it would have considered the factual submission had Icdas refiled it under 19 C.F.R. § 351.301(c)(5) with the necessary written explanation under the regulation.  IDM at 18–19.  Why this regulation might apply has not been explained by either party.

Putting aside the procedural ambiguities, Icdas argues that Commerce has unlawfully modified its long-standing practice for Turkish duty drawback adjustments by requiring proof that the GOT officially closed an IPC, which Icdas suggests adds a third prong to the established two-prong test.[9]  Pl. Br. at 8–11.  Icdas asserts that it provided sufficient record evidence of a letter

---

[9] In support of its argument, Icdas relies on a verification report from a previous administrative review to illustrate Commerce's past practice of accepting that the closed date is the date the IPC expires.  Pl. Br. at 12.  The government contends that the verification report is not part of the

guaranteeing duties owed to the GOT, a report linking the exported finished goods with the imported inputs, and the IPCs closing applications along with the IPCs and a report certifying the imports and exports.  Pl. Br. at 16–17.  Icdas contends that it has completed all steps within its control, but official liquidation of the IPCs by the GOT may take several years.  Pl. Br. at 18. Alternatively, Icdas argues that, even if final closure is required, Commerce erred in rejecting the new factual submission regarding the IPCs as untimely.  Pl. Br. at 20–22.  Icdas asserts that it never would have known it could have refiled the information under 19 C.F.R. § 351.301(c)(5) because the file memorandum stated it was untimely under that specific regulation.  Pl. Br. at 22.

        The court has long relied on the duty drawback adjustment's two-prong test, and has rejected attempts to "add a new hurdle to the drawback test that is not required by the statute." Chang Tieh Industry Co. v. United States, 17 CIT 1314, 1320, 840 F. Supp. 141, 147 (1993); see also Arcelormittal USA Inc. v. United States, 32 CIT 440, 463 n.23 (2008) (declining plaintiff's "invitation to alter Commerce's reasonable interpretation of 19 U.S.C. § 1667a(c)(1)(B)"). Commerce's requirement of IPC closure is not new, but Commerce's evaluation of when an IPC is closed has evolved.  Toscelik Profil ve Sac Endustrisi A.S. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1321, 1328 n.1 (2018); Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, 44 CIT __, __, 439 F. Supp. 3d 1342, 1349 (2020).

        In Toscelik, for a period of investigation ("POI") of October 1, 2013, through September 30, 2014, Commerce considered an IPC closed after it "expired" because then the company "could

---

administrative record, and thus the court should not consider it.  The verification report is being cited only as an illustration of Commerce's past practice, not as a fact or evidence of a fact.  Thus, the court will consider the verification report along with Commerce's other previous administrative statements.

no longer apply any additional imports or exports to the DIIB," regardless of whether the GOT may have officially closed the IPC.  Toscelik, 348 F. Supp. 3d at 1328 n.1.[10]  At some point after the Toscelik investigation, Commerce defined closure as when "the DIIB holder applies for closure of the DIIB with the Turkish Government."  Id.  Subsequently, during a POI of July 1, 2015, through June 30, 2016,[11] Commerce stated its practice was to provide a duty drawback adjustment only "upon evidence that the subject country's government has forgiven those duties."  Habas, 429 F. Supp. 3d at 1347.[12]  The court sustained Commerce's rationale as reasonable because duty drawback eligibility required record evidence that showed the GOT had "forgiven the duty liability."  Id. at 1349.

As indicated, Commerce has not been consistent in how it defines closure of IPCs.  In one proceeding, Commerce considered an IPC closed "[f]or practical purposes . . . when the exporting company has applied to the Turkish government for closure."  Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 47355 (Dep't Commerce July 21, 2016) ("HWRP from Turkey"),

---

[10] In Toscelik, the Turkish plaintiffs argued that Commerce's requirement that IPCs must be closed during the POI was unreasonable.  348 F. Supp. 3d at 1325.  The court agreed, holding that limiting the acceptance of IPCs to those closed during the POI ignored "verified record information" when plaintiffs had IPCs that Commerce considered closed but only after the conclusion of the POI.  Id. at 1327–28.

[11] The investigation at issue was for steel concrete reinforcing bar from Turkey.  Steel Concrete Reinforcing Bar From the Republic of Turkey, 82 Fed. Reg. 23,192 (Dep't Commerce May 22, 2017).

[12] As Commerce explained in its remand results in the Habas case, Commerce needed more record evidence than that "Habas had exports under these IPCs during POI."  Redetermination Pursuant to Court Remand Order, Habas Sinai Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, Consol. Ct. No. 17-00204, ECF No. 83 (Jan. 15, 2020).  Instead, Commerce required record evidence that the GOT "actually refund[ed] any paid duties or ha[d] forgiven the imputed duties."  Id. at 8–9.

and accompanying <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey</u> at Comment 4, A-489-824, POI 7/1/2014–6/30/2015 (Dep't Commerce July 14, 2016).  But in a later proceeding, Commerce explained that applying for IPC closure is insufficient because "a company's application to close a DIIB may be modified or suspended."  <u>Light-Walled Rectangular Pipe and Tube from the Republic of Turkey</u>, 82 Fed. Reg. 47,477 (Dep't Commerce Oct. 12, 2017) ("<u>LWRPT from Turkey</u>"), and accompanying <u>2015– 2016 Antidumping Duty Administrative Review of Light-Walled Rectangular Pipe and Tube from Turkey: Issues and Decision Memorandum for the Final Results</u> at Comment 9, A-489-815, POR 5/1/2015–4/30/2016 (Dep't Commerce Oct. 12, 2017) ("<u>LWRPT from Turkey IDM</u>").  Further, Commerce noted in <u>LWRPT from Turkey</u> that, in <u>HWRPT from Turkey</u>, Commerce actually "disallowed two of the three DIIBs under which the respondent requested a duty drawback adjustment because one DIIB remained open and the other DIIB was suspended after the respondent had applied for closure."  <u>LWRPT from Turkey IDM</u> at Comment 9.  In this proceeding, Commerce acknowledged its conflicting statements, and clarified that "an IPC may be modified or suspended even after it has been submitted," and thus an IPC cannot be closed without sufficient documentation establishing that GOT had forgiven the liability.  <u>IDM</u> at 16.

Here, the court recognizes that Commerce has not always been clear as to when it will consider an IPC closed.  In two recent instances, however, <u>LWRPT from Turkey</u> and <u>Habas</u>, Commerce clearly stated that it required more than closure application and instead required "evidence that the subject country's government has forgiven those duties."  <u>See Habas</u>, 439 F. Supp. 3d at 1347; <u>LWRPT from Turkey IDM</u> at Comment 9 ("Thus the Department is not satisfied

that a DIIB has been closed until a respondent can provide sufficient documentation establishing its closure by the GOT.").  Thus, it appears to the court that in recent years Commerce's practice has been to require some indication from the GOT that the IPC was approved, and Icdas should have been on notice that this was likely the requirement.[13]

In this review, Commerce addressed its past practice and reasoned that it needed more definite information to grant the § 1677a(c)(1)(B) adjustment under the statute.  IDM at 16.  There are factual differences and inconsistencies in Commerce's past practice, but the most recent cases make Commerce's current practice clear.  Because Commerce has long required some evidence of finality for the drawback adjustment, this is not adding a third prong to the § 1677a(c)(1)(B) test.  Rather it is clarification of the level of proof required.  Commerce can seek better proof than it has in the past cases.  See Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed. Cir. 2009) ("Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology").  This is not unreasonable.  The questions remaining are whether Icdas did all it reasonably could under Commerce's procedures given the lack of clarity of such procedures, whether it was harmed by this lack of clarity and thus should be given an opportunity to comply, and whether Commerce's substantive requirements for a drawback adjustment are fair.

---

[13] Icdas relies on Toscelik to suggest that the court has scrutinized Commerce's attempts to change the definition of a closed IPC.  Pl. Br. at 14.  Toscelik is one example of Commerce's lack of clarity regarding the definition of closure because it is an earlier administrative review where Commerce considered IPCs closed when the applications "expired."  348 F. Supp. 3d at 1325–26 n.1.  Its holding, however, is limited to the rejection of Commerce's then-requirement that an IPC must be closed during the POI in order to be accepted.  Id. at 1327.  Thus, it is inapposite to this case.

The court sees two scenarios under which Icdas's and Commerce's actions in the administrative proceedings can be explained. In the first scenario, Icdas's original duty drawback submissions were a questionnaire response. If so, Commerce should have found Icdas's response unsatisfactory, and Commerce would have needed to send a deficiency notice under 19 U.S.C. § 1677m(d) and provide Icdas an opportunity to correct its filing within 30 days. See 19 U.S.C. § 1677m(d); 19 C.F.R. § 351.301(c)(1). Icdas likely could not have complied because, here, it did not attempt to submit its new factual information until five months after its Section C questionnaire response. See Icdas CQR at C-39; Commerce Rejection of New Information at 1. In the second scenario, Icdas's submission was not a questionnaire response. Thus, Icdas likely could have filed its supplemental information later under 19 C.F.R. § 351.301(c)(5). Here, though, Icdas's new factual information submission, allegedly applicable to one drawback request, failed to comply with the requirements for such late filed information of "clearly explain[ing] why the information [] does not meet the definition of factual information described in § 351.102(b)(21)(i)–(iv)" as well as providing a detailed narrative of the information. 19 C.F.R. § 351.301(c)(5); IDM at 18–19. Likely such a narrative would describe the proper purpose and not refer to irrelevant non-market economy provisions.[14] Regardless, Icdas did not fully describe the rejected factual information to the court and make a clear case for finding Commerce's decision erroneous. Further, when a party asks the court to rule on information Commerce rejected from the record, the party should proffer

---

[14] Icdas appears to believe that its proposed information is not governed by rules regarding questionnaire responses because Icdas argues that the new factual submission was timely under 19 C.F.R. § 351.301(c)(5) and does not argue before the court that it was owed a deficiency notice under 19 U.S.C. § 1677m(d).

the rejected information to the court for examination so that the court can properly determine if the record should be corrected on remand.

Finally, the record in this case does not show that the GOT fails to process IPCs and grant duty drawbacks in a timely fashion, so as to make Commerce's requirements unfair. Kaptan was able to provide a certificate from the GOT approving an IPC, which Commerce accepted as sufficient proof under this closure standard. See Kaptan CQR at Ex. C-15; PDM at 15. Thus, there is nothing in this record that shows that the evidence that Commerce seeks ordinarily cannot be obtained in a timely manner. Nonetheless, the court is concerned that Commerce is not being clear about what procedures apply for drawback information. Commerce refers to both strict questionnaire response time limits but seems to believe there is a category of adjustments that are "voluntary," to which other more lenient rules may apply. The court does not find a clear path in the regulations themselves. The court, however, cannot conclude that Icdas was harmed by this lack of clarity. Icdas neither applied for an extension of time to file nor followed the requirements for the regulations that might have allowed it to otherwise submit information late in the proceeding. Accordingly, Commerce reasonably rejected Icdas's request for a duty drawback adjustment.

## III.    Inflation Adjustment

At issue here is Commerce's denial of Icdas's request for a monthly indexation methodology to account for the effects of high inflation in Turkey during the POR. See Pl. Br. at 41–43; IDM at 21–23. Commerce calculates the normal value of the subject merchandise based on home market sales that are made "in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). Commerce, therefore, disregards sales at prices that are less than the cost of

production, id. § 1677b(b)(1)(B), because those sales are not made within the ordinary course of trade, id. § 1677(15)(A).  The cost of production "equal[s] of the sum of . . . the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  Id. § 1677b(b)(3)(A).

Section 1677b(b)(3)(A) does not define the "period" to be used or the method Commerce must use to calculate the costs of production.  See id.; see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, 43 CIT __, __, 361 F. Supp. 3d 1314, 1324 (2019).  Commerce's normal methodology requires respondents to report costs using "a POR annual average basis." IDM at 22.  Commerce may depart from its usual methodology and rely on quarterly cost-averages when "significant cost changes are evident [and] . . . sales can be accurately linked with the concurrent quarterly costs."  Pastificio Lucio Garofalo, S.p.A. v. United States, 35 CIT __, __, 783 F. Supp. 2d 1230, 1235–36 (2011), aff'd 469 F. App'x 901 (Fed. Cir. 2012).  These significant situations include periods of high inflation.  See IDM at 22; Certain Steel Concrete Reinforcing Bars from Turkey, 66 Fed. Reg. 56,274 (Dep't Commerce Nov. 7, 2001).  One significant change is inflation greater than 25 percent during the POR.  IDM at 21–22; Habas, 361 F. Supp. 3d at 1324.

During the administrative proceeding, Respondents reported that, based on Turkish Statistical Institute data and the producer price index ("PPI"), inflation exceeded 25 percent during the POR, which was July 1, 2018, to June 30, 2019.  See Icdas and Kaptan Notice of Inflation Rate Above 25 Percent at 1–2 P.R. 37 (Mar. 6, 2020); Icdas Section D Questionnaire Response at D-22–D-23 and Ex. D-11, C.R. 112, P.R. 60 (Apr. 20, 2020); Kaptan Section D Questionnaire

Response at D-14 and Ex. D-8, C.R. 97, P.R. 59 (Apr. 20, 2020).  The PPI data depicts the index

price for each month on an annual basis.  Kaptan Section D Questionnaire Response at Ex. D-8.

Notably, the June 2018 PPI was 365.60, July 2018 was 372.06, June 2019 was 457.16, and July

2019 was 452.63.  Kaptan Section D Questionnaire Response at Ex. D-8.  Respondents calculated

inflation to be 25.04 percent by subtracting June 2018 data from June 2019 data and dividing the

difference by June 2018 data.  Kaptan Section D Questionnaire Response at Ex. D-8.  Defendant-

Intervenor Rebar Trade Action Coalition ("RTAC") submitted information explaining that

Respondents' inflation calculations included data from June 2018, the month before the POR, and

that the POR-only data of July 2018 to June 2019 resulted in an inflation calculation of 22.87

percent, less than 25 percent.  RTAC Comments on High Inflation, C.R. 156, P.R. 63 at 3–5.

  In the final results, Commerce determined that there was not sufficiently high inflation

during the POR.  IDM at 21.  Commerce explained that it relied on the PPI numbers from July

2018 and June 2019, representing the POR, and found that inflation was 22.87 percent.  IDM at

22.  Although Commerce acknowledged that Respondents' data from June 2018 to June 2019

showed inflation of 25.04 percent, Commerce stated that using the full 12-month POR was its

long-established practice, and it saw no need to use the June 2018 data for a 13-month review.

IDM at 22.  Commerce found that the monthly indexes in the PPI data reflected data for the entire

month, based on collected prices on the 5th, 15th, and 25th of each month.  IDM at 22.  Thus,

Commerce concluded that the June 2018 data was from outside the POR and accordingly should

not be considered.  IDM at 22–23.

  Now, Respondents argue that Commerce should have included the June 2018 data in its

analysis.  Pl. Br. at 41.  Respondents assert that, by not considering the June 2018 data, Commerce

has only measured inflation for an 11-month period and "improperly exclude[d] July 2018 from the analysis." Pl. Br. at 42.[15]  Respondents contend that June 2018 to June 2019 is a review of the full 12-month period and shows that inflation was greater than 25 percent during the POR.  Pl. Br. at 43.

Here, Commerce's decision that high inflation did not exist in the Turkey during the POR is supported by substantial evidence.  Commerce's methodology, comparing the July 2018 data to June 2019 data, is a reasonable choice to measure inflation over the POR and on an annual basis. IDM at 22.  That comparison, showing inflation to be 22.87 percent, fails to rise to the 25 percent change that Commerce has required for quarterly-cost averages.   See Kaptan Section D Questionnaire Response at Ex. D-8; see also Habas, 361 F. Supp. 3d at 1324.  The court sees no reason for Commerce to include June 2018 data for comparing the change in price from the beginning of the POR when the June 2018 data predates the POR.[16]  Accordingly, Commerce's decision is sustained.

---

[15] Respondents also appear to argue that, because PPI data is published on the third business day of the following month, there is a one-month lag in the data.  Pl. Br. at 42.  There is no evidence that, because June 2018 data would be published in July 2018, that data would be reported as the July 2018 data.  Commerce already considered this argument and determined that the data is correctly identified based on the month from which it is collected, not the month in which it is published.  IDM at 22.  Further, the International Monetary Fund record evidence explained that the inflation data was collected on the 5th, 15th, and 25th of each month and then only published on the third day of the next month.  See Commerce Memorandum: New Factual Information at 17, P.R. 116 (Nov. 18, 2020).  Thus, this argument fails.

[16] If there is any potential problem with Commerce's methodology, it may be in not using July 2019 as part of the calculation in order to fully capture one year after the July 1, 2018, beginning of the POR.  Nevertheless, the July 2018 to July 2019 rate of inflation is only 21.66 percent, also below Commerce's required amount.  Thus, the court need not weigh in on the methodology further.

Court No. 21-00306                                                                                    Page 22

## CONCLUSION

The court sustains Commerce's determination regarding the AD order for rebar products

from Turkey.

/s/    Jane A. Restani    
Jane A. Restani. Judge

Dated: August 23, 2023
      New York, New York